UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


AUGUST PEZZENTI, JR.          :     NO: 3:03CV00419 (MRK)
INDIVIDUALLY, ET AL
                             :
vs.                          :

JOSEPH CAPALDO, ET AL        :     DECEMBER 11, 2003


DEPOSITION OF:  ELIZABETH PEZZENTI



APPEARANCES:


        WILLIAMS & PATTIS, LLC
            Attorneys for the Plaintiffs
            51 Elm Street
            New Haven, CT 06510
            (203) 562-9931
        BY:  CHRISTY DOYLE, ESQ.


        HOWD & LUDORF
            Attorneys for the Defendants
            65 Wethersfield Avenue
            Hartford, CT 06114
            (860) 249-1361
        BY:  THOMAS R. GERARDE, ESQ.


                Christine E. Borrelli
              Connecticut License No. 117
            Registered Professional Reporter


        NIZIANKIEWICZ & MILLER REPORTING SERVICES


# Exhibit C

1          . . . . . . Deposition of ELIZABETH PEZZENTI, a

2     Plaintiff, taken on behalf of the Defendants, in the herein

3     before entitled action, pursuant to the Connecticut Practice

4     Book, before Christine E. Borrelli, duly qualified Notary

5     Public in and for the State of Connecticut, held at the Law

6     Offices of Howd & Ludorf, 65 Wethersfield Avenue, Hartford,

7     Connecticut, commencing at 12:30 p.m. on Thursday, December

8     11, 2003.

9

10                    S T I P U L A T I O N S

11

12       It is hereby stipulated and agreed by and among counsel

13    for the respective parties that all formalities in

14    connection with the taking of this deposition, including

15    time, place, sufficiency of notice, and the authority of

16    the officer before whom it is being taken may be and are

17    hereby waived.

18       It is further stipulated and agreed that objections

19    other than as to form are reserved to the time of trial.

20       It is further stipulated and agreed that the reading and

21    signing of the deposition transcript by the deponent is

22    hereby waived.

23       It is further stipulated and agreed that the proof of

24    the qualifications of the Notary Public before whom the

25    deposition is being taken is hereby waived.

NIZIANKIEWICZ & MILLER REPORTING SERVICES

4

1        ELIZABETH PEZZENTI, called as a witness by the

2    Defendants, having been first duly sworn by the Notary, was

3    examined and testified on her oath as follows:

4

5        DIRECT EXAMINATION BY MR. GERARDE:

6

7        Q.   Mrs. Pezzenti, good afternoon.  My name is Tom

8    Gerarde.  I'm the lawyer for the Canton police officers that

9    you and your husband and Attorney Maben have sued.  And the

10   purpose of today's deposition is to ask you some questions in

11   connection with the lawsuit.  My first question for you is,

12   have you ever been through this process of a deposition?

13       A.   No.

14       Q.   Well, as you can see, it's a question and answer

15   session and we have a reporter who writes everything down that

16   both of us say.  And I would like to give you a couple of

17   helpful hints.  The first is that in responding to my

18   questions, you have to answer in words.  Don't say uh-huh or

19   shake your head because it can't be written.

20       A.   Yes.

21       Q.   The second is that this will not be a long

22   deposition.  I know that your husband's was much longer, but

23   he had different kinds of information and he was the first of

24   the three to go.  So, yours will be shorter.  I do want you to

25   know that breaks are permitted at any time for any reason.

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1          MR. GERARDE:  We are back on the record now.

2      Q.   (By Mr. Gerarde)  And what I would like to do, Mrs.

3  Pezzenti, is read through some of the these statements and ask

4  you some questions.  And if you look on the first page of

5  Exhibit 1, about two thirds of the way down, you see the

6  narrative begins under the heading of "Action taken."  Do you

7  see that?

8      A.   Uh-huh.  Yes.  Sorry.

9      Q.   All right.  And Officer Capaldo writes, "On the

10  above date and time, the above-named juvenile," and you see up

11  above there that Anthony Pezzenti is next to the letter "J".

12      A.   Yes.

13      Q.   And then it continues, "The above-named juvenile

14  contacted police to report that he was just hit by his

15  mother."  My question for you is, were you present when

16  Anthony made a telephone call to the Canton Police Department?

17      A.   Yes, I was.

18      Q.   And did you hear his end of the conversation so you

19  could hear what he was saying?

20      A.   Not all of it.

21      Q.   Did you hear when he told the police that he was hit

22  by you?

23      A.   Yes.

24      Q.   He did say that?

25      A.   Yes.

1          Q.    And Officer Capaldo continues, "He stated that he

2     was slapped in the face and had the telephone thrown at him."

3     Now, I want to break that into two just so we're clear about

4     this.  Did you hear Anthony say that he was slapped in the

5     face to the police?

6          A.    I don't recall.

7          Q.    Okay.  Did you, in fact, slap Anthony in the face

8     that day?

9          A.    Yes.

10          Q.    With an open hand?

11          A.    Yes.

12          Q.    How many times did you slap Anthony in the face that

13     day?

14          A.    Twice.

15          Q.    And let's move on to the next part of that.  And it

16     says, "He had the telephone thrown at him."  The first

17     question is, did you hear Anthony tell the police that from

18     his end of the conversation?

19          A.    Yes.

20          Q.    He did say that the telephone was thrown at him?

21          A.    Yes.

22          Q.    Now, did you, in fact, throw the telephone at

23     Anthony?

24          A.    No.

25          Q.    Would you tell me what happened?

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1      A.   I through the phone to Anthony.

2      Q.   And was this a cordless phone?

3      A.   Yes.

4      Q.   So, it was the part that you need to hold in order

5  to dial?

6      A.   Yes.

7      Q.   And give me some more information about that.  What

8  room did it happen in?

9      A.   Between the doorway -- the doorway of his room and

10  his room.  I was standing in the doorway and he was sitting on

11  his bed.

12     Q.   Okay.  And are you able to tell me about how far

13  away from him you were when you were in those positions?

14     A.   Probably this far away.

15     Q.   So, you're pointing from, the distance between your

16  lawyer and the Reporter, that is five or six feet or so.  Is

17  that fair?  Maybe seven feet.  Whatever.  In that range.  Is a

18  fair statement?

19     A.   Yes.

20     Q.   Okay.  Now, did you at one point have the cordless

21  phone in your hand?

22     A.   Yes.

23     Q.   And you were in the doorway when you had your phone,

24  that phone, in your hand?

25     A.   Yes.

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1     Q.   And did you throw it towards Anthony?

2     A.   Yes, I -- yes.

3     Q.   And did the phone strike Anthony?

4     A.   No.

5     Q.   It never struck him?

6     A.   Not when I threw it to him.

7     Q.   Okay.  Why don't you tell me what happened?

8     A.   When I threw the phone to Anthony, Anthony caught it

9     with his hands.  And when he caught it with his hands, the

10    phone went like this.  He caught it with his hands and he

11    didn't get a grip on it and the phone went like this and it

12    caught him in the face.

13    Q.   Now, since the record can't see what you're doing

14    with your hands, I am just going to try to describe it.

15    Listen to what I say and tell me if that's a fair statement.

16    What you told me is that you threw the phone to Anthony?

17    A.   Tossed the phone to Anthony.

18    Q.   Okay.  I'll use word toss.  Is that a word that

19    you're comfortable with?

20    A.   Yes.

21    Q.   You tossed the phone to Anthony.  Then Anthony put

22    his hands out to catch the phone in a position where it was

23    essentially in front of his face, but when he didn't catch the

24    phone, the phone hit his hand and then hit up into his face?

25    A.   I would say like a rebound to his face, yes.

1        Q.    Okay.

2        A.    If that's how you would describe it.

3        Q.    And are you aware of in what part of the face the

4   phone struck Anthony?

5        A.    It hit his lip, upper lip.

6        Q.    Did you see whether or not there was any blood?

7        A.    No, not at that time.

8        Q.    I want to be clear at that.  Are you saying there

9   was no blood or you just didn't see either way?

10       A.    I didn't see any blood.

11       Q.    Okay.  Did there come a time later when you saw some

12   blood on Anthony's lip?

13       A.    I never saw blood, no.

14       Q.    Did you ever see like the remains of a cut, like a

15   slit in the lip where --

16       A.    Much later, yes.

17       Q.    How much later?

18       A.    After the police were there.

19       Q.    Did you mean after Anthony came home from the police

20   department?

21       A.    No, after the police had come to the house.

22       Q.    Oh, I see.  And what did you see at that time?

23       A.    I saw a small little cut under his top lip.

24       Q.    Okay.  All right.  So, the statement continues that

25   when the police arrived they saw you and Anthony and that

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1  Officer Capaldo spoke with you while Sergeant Krupa spoke with

2  Anthony.  Is that how you remember it?

3      A.   I was actually upstairs.  Anthony was downstairs.

4  They spoke with Anthony way before they spoke with me.

5      Q.   Okay.  So, you're saying that both of them spoke to

6  Anthony first?

7      A.   Yes.

8      Q.   And then one of them spoke to you later or did both

9  speak to you later?

10      A.   I don't recall how it happened.

11      Q.   Okay.  When you were spoken to, do you remember

12  which of the officers it was that spoke to you?

13      A.   No.

14      Q.   Okay.  Well, what Capaldo is writing here is that he

15  was the one who spoke to you.  So, if you look at the third

16  paragraph, he writes, "She stated to me that the incident

17  began when she asked Anthony to go to the backyard and clear

18  the leaves."  Is that what happened in the sense that you

19  asked Anthony to go in the backyard and clear the leaves?

20      A.   As best as I remember, yes.

21      Q.   Okay.  The statement reads -- I'm sorry.  The police

22  report reads, "She stated that she wanted Anthony to start at

23  one side of the yard while he wanted to start at another

24  location."  Do you remember that conflict existing?

25      A.   Yes.

NIZIANKIEWICZ & MILLER REPORTING SERVICES

18

1      Q.   Tell me about that, because it sounds like from the

2    next sentence it ended where he was sent to his room.

3      A.   It started -- he started at -- he started the stairs

4    and then he didn't finish the stairs, so he then decided to do

5    the deck.  So he was starting on the opposite side of the deck

6    where he should have been started, so I tried to explain to

7    him to do the deck on the side, that would be the smart -- the

8    smartest way to do it, however you explain it like that.  And

9    he wanted to do it his way, so I told him never mind.  Leave

10   it.  Just go to your room.  And he got mouthy, so I sent him

11   to his room.

12     Q.   Okay.  Just so I understand, the reason why Anthony

13   went to his room is because you ordered him to his room as his

14   mother?

15     A.   Yes.

16     Q.   And it wasn't like I am now going to go hang out in

17   my room?

18     A.   Right.

19     Q.   Okay.

20     A.   Not ordered.  Well --

21     Q.   Well --

22     A.   Whatever.

23     Q.   I understand.  All I am trying to do is just draw a

24   distinction between a kid deciding I think I'll go play in my

25   room and the mother telling him get to your room.  It was the

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    latter?

2        A.   He was told to go to his room.

3        Q.   Okay.  Now, at the top of the second page, Officer

4    Capaldo writes, "Elizabeth stated that while in his room,

5    Anthony was being mouthy and said that he hated her."  Did

6    that happen?

7        A.   Yes.

8        Q.   So, what does mouthy mean, since that was your word?

9    I mean --

10       A.   Mouthy.  How do you explain it?  Just kept mumbling

11   and complaining and being rude.

12       Q.   I have kids.  I think I know what you're talking

13   about; did the back talk, the chatter, the complaining?

14       A.   Exactly.

15       Q.   So you then -- I'm sorry.  Officer Capaldo then

16   writes, "Elizabeth also stated to me that Anthony told her, 'I

17   am glad you had me so that I can make your life miserable.'"

18   Is that what you told Officer Capaldo?

19       A.   Yes.

20       Q.   And is that what Anthony said?

21       A.   Yes.

22       Q.   "I then asked Elizabeth if she struck Anthony.  She

23   stated that she slapped Anthony in the face twice with an open

24   hand after he said this."  Is that what happened?

25       A.   Yes.  That's what happened, but when -- well, when

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1  that happened, I -- before that happened, I jokingly said to

2  him, Well, I'm glad that I had you, too, because -- that's

3  what happened.

4       Q.   And you said what to him back?

5       A.   That's what happened.

6       Q.   No.  But I am wondering what did you say in response

7  to that?  "I'm glad that I had you then, too, because then

8  I'll" what?

9       A.   That's what happened.

10      Q.   Are you saying that you don't remember what you said

11 back to him?

12      A.   No.  I am not saying that I don't remember.

13      Q.   Okay.  Well, you do have -- you are under oath and

14 you do have to tell me what you said back to him if you

15 remember.

16      A.   That because as a mother I can -- as a mother,

17 that's my responsibility.  I am responsible for disciplining

18 you, too.  So, if that's what has to be done, that's what has

19 to be done.

20      Q.   Okay.  And is this what you said when you slapped

21 him?

22      A.   I don't recall the exact words I said.

23      Q.   Okay.  I mean, whatever that was that got said, is

24 the time that it got said right after he had told you, "I am

25 glad you had me, now I can make your life miserable," and then

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1   you were responding to that and slapping him.

2       A.   I said, I'm glad I had you so you can make my life

3   miserable also.

4       Q.   Okay.  The next paragraph says, "I then asked

5   Elizabeth if she struck Anthony.  She stated that she slapped

6   Anthony in the face twice with an open hand after he said

7   this."  Is that what occurred?

8       A.   I slapped him in the face, but it was -- it wasn't

9   -- it wasn't anything -- I struck him in the face, yes.

10      Q.   Two times with an open hand?

11      A.   Yes.

12      Q.   Okay.  Officer Capaldo writes, "I then asked her if

13  she threw the telephone at Anthony.  She stated that she

14  tossed the phone to Anthony when he said he wanted to call the

15  police after she struck him."  Let me just -- you have told me

16  something about that already.  But in the sequence of things,

17  after you slapped him in the face, Anthony then said I want to

18  call the police.

19      A.   He had been stating right along he wanted to call

20  the police.

21      Q.   Starting when?  Like when did he first say that?

22      A.   When I first went to his room.

23      Q.   He said, I want to call the police.  Right?  He went

24  up to his room?

25      A.   Well, shortly after the whole mouthy thing, how he

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    hated me and all of that -- that's it.

2         Q.   Okay.  Now, there is this part of the statement that

3    talks about the officer speaking to you about, Did you throw

4    the phone or did you toss the phone.  Do you see that?  And

5    then the officer writes, "She then picked up an item off the

6    counter and threw it across the kitchen smashing it against

7    the wall and stated, 'I didn't do this.'"

8         A.   I saw that.

9         Q.   Is that what happened?

10        A.   That's not exactly what happened, no.

11        Q.   What did happen?

12        A.   I threw something.  I didn't smash anything.

13        Q.   So, what you did is you picked up something in the

14   kitchen, threw it against the wall and said, I didn't do it

15   that way?

16        A.   I threw something.  It wasn't against the wall.  It

17   was at the basement -- or the baseboard of the counter or of

18   the cabinet.

19        Q.   The baseboard of the cabinet?

20        A.   Yes.

21        Q.   Is that where it meets the floor, you mean?

22        A.   Yeah.

23        Q.   Okay.  And what was it that you threw?

24        A.   I have no idea.  It wasn't anything big.

25        Q.   Was it something that broke?

1       A.   No.

2       Q.   It wasn't glass?

3       A.   No.

4       Q.   Okay.  Was Mallorie home at the time that you and

5   Anthony had the words and the issue with respect to the

6   slapping and the phone?

7       A.   Yes, she was.

8       Q.   Was she present to see any of that?

9       A.   No, she wasn't.

10       Q.   Do you know what she was doing during this time?

11       A.   No, I don't recall.

12       Q.   Okay.  And then Capaldo writes that he then spoke to

13   Anthony and got his version of the events.  And what I want to

14   ask you is, were you present when Officer Capaldo was speaking

15   with Anthony?

16       A.   Not through the whole thing, no.

17       Q.   Okay.  One of the things Officer Capaldo writes is

18   that when he first asked Anthony what was happening, Anthony's

19   first response was -- and he quotes him -- "I don't want to

20   get hit anymore."  Did you hear Anthony say that to the

21   officers?

22       A.   I heard him say it outside.  I didn't hear it when

23   he made a statement to the police.

24       Q.   Okay.  So, what you're saying is you remember that

25   when Anthony and the police and you were all outside later on,

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    you remember hearing Anthony say to the police officers, "I

2    don't want to get hit anymore."  Is that right?

3         A.    I believe so.

4         Q.    Okay.  But if it was said while they were all in the

5    house, that's not something that you were present for?

6         A.    Not that I remember.

7         Q.    All right.  Approximately -- if you skip a couple of

8    paragraphs, because I can talk to Anthony about those issues,

9    there is one paragraph that begins, "Anthony stated that he --

10   his struck" -- I think there is a word missing there, but do

11   you see that?  -- "by one of his parents."  Do you see that in

12   the paragraph?

13        A.    Anthony stated that he -- yes.

14        Q.    What Capaldo wrote is, "Anthony stated that he" --

15   and the word "his" and I think he meant to write "is", but we

16   will ask him about that -- "struck by one of his parents at

17   least one time per week.  He stated that he is also struck

18   with a belt on occasion by his father, August Pezzenti."  And

19   it says, "When I asked Anthony if he was afraid to be home, he

20   said, No.  I just don't want to get hit anymore."  I just want

21   to walk through that with you now.  Would you say that Anthony

22   was struck by either you or August Pezzenti one time per week

23   as of September 12, 2002?

24        A.    No.  I wouldn't say that was an accurate statement.

25        Q.    Did you hear Anthony say that to the police officer?

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1     A.   No.

2     Q.   What would be accurate in terms of frequency?   Would

3  Anthony be struck one time every two weeks, one time a month?

4     A.   That would depend on Anthony's behavior.

5     Q.   Okay.  The statement also reads, "He stated he is

6  also struck with a belt on occasion by his father, August

7  Pezzenti."  My question is, have you ever seen August strike

8  Anthony with a belt prior to September of 2002?

9     A.   I did once.

10    Q.   Did that have to do with Anthony getting a demerit

11 from school?

12    A.   Yes, it did.  Actually, it was many demerits, long

13 time in coming.

14    Q.   Okay.  When Anthony says towards the end of this

15 paragraph we are in now -- well, let me ask you.  Did you hear

16 the police officer ask Anthony if he was afraid to be home and

17 Anthony responded, "No.  I just don't want to get hit

18 anymore"?

19    A.   I don't recall.

20    Q.   Okay.  Now, the next paragraph describes the fact

21 that August was not home at the time and that the police

22 officers made a decision that they would remove Anthony from

23 the home and contact the State Department of Children &

24 Families for an interview.  And it says, "After I explained

25 this to Elizabeth, she asked if she could say goodbye to

1    Anthony."  And I want to break that in half.  Did the police

2    officers explain to you that they would be taking Anthony to

3    be interviewed by the Department of Children & Families?

4         A.    Where are you reading that?

5         Q.    The next -- I'll show you on mine.  The next

6    paragraph that begins, "Anthony's father, August Pezzenti."

7    If you go to the third line down, the sentence starts, "After

8    I explained this to Elizabeth, she asked if she could say

9    goodbye to Anthony.  She then went outside, kneeled in front

10   of and hugged Anthony."  Do you remember that happening?

11        A.    I remember going outside, yes, yes.

12        Q.    And you were aware at that time that the police were

13   taking Anthony to be interviewed by the State Department of

14   Children & Families?

15        A.    No.  They told me that they were taking him to the

16   police department.

17        Q.    But they didn't tell you why they were taking him?

18        A.    No.  They said they were going to take him to the

19   police department and they would be in contact with me is what

20   they told me.

21        Q.    All right.

22        A.    And they also gave me the impression that I could

23   not go see my son.

24        Q.    Okay.  The police officer then writes, "She then

25   asked Anthony if he knew why she hit him."  While you were

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1  down in front hugging him, did you have that conversation with

2  Anthony, Do you know --

3      A.   Yes, I did.

4      Q.   -- why I hit you?  And the police officer writes

5  that, "Anthony then immediately began to cry stating that, 'I

6  always get hit.  None of my friends get hit.  I always get

7  hit.'"  Did he say that?

8      A.   Similar to that, yes.

9      Q.   And then you responded to Anthony.  And it says in

10  quotes here that the Bible says that I have the right to hit

11  you.  Is that what you said in words or substance?

12      A.   Substance to that, but not close.

13      Q.   Okay.  But the point of the communication was that

14  you communicated to him that the Bible allows parents to do

15  this?

16      A.   That the Bible says that -- yeah, yes.

17      Q.   Are you a student of the Bible?

18      A.   Am I a student of the Bible?

19      Q.   In other words, do you go to Bible study?

20      A.   I believe in the Bible, yes, I do.

21      Q.   And I am just wondering, some people go to Bible

22  study.  Some people just go to church on Sunday.  Some people

23  go to Bible study and then they go to church services or

24  whatever.  And I was just wondering if you had separate Bible

25  study or do you just go to church?

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    A.  I go to church on Wednesday night which offers

2    approaching Bible Study, if you will, and then we pray on

3    Wednesday night.  I go to church on Sunday morning.  I go to

4    church on Sunday night, so you describe to me what that is.

5    Q.  Okay.

6    A.  My children go to Sunday school.

7    Q.  I understand.  I was just wondering if you have the

8    ability to tell me where in the Bible you rely on when you say

9    that the parents have the right to hit their children?

10    A.  I can't give you that quote right now, but I could

11    go get my Bible.  I can give you that quote.

12    Q.  So, in other words, you're saying if you had a Bible

13    in front of you, you could thumb through it and find that?

14    A.  I can go and get my Bible in the truck and give you

15    that verse, yes, sir, I could.

16    Q.  And approximately what would it say, do you know?

17    A.  Yes.

18    Q.  What?

19    A.  It tells you spare not the rod for you spoil the

20    child.

21    Q.  Spare not the rod for you spoil the child?

22    A.  Yes.

23    Q.  And "the rod" meaning something that you can strike

24    a child with?

25    A.  Yes.

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1      A.   Yes, I did.

2      Q.   Is this the first time that you have seen this, Mrs.

3   Pezzenti?

4      A.   I do believe this is the first time I have seen

5   this.

6      Q.   Okay.  The first paragraph essentially relates what

7   we have already gone through, but I want to direct your

8   attention to about halfway through that first paragraph.  The

9   conversation says, "While in his room, they argued more and

10   his mother slapped him open handed across the face."  Do you

11   see where it says that?

12      A.   Yes.

13      Q.   The next sentence says, "He cried and went to his

14   bed."  Did that happen?  Did he start crying?  Did Anthony

15   start crying after you slapped him?

16      A.   I don't understand what you're asking here.

17      Q.   What I'm asking is, after you slapped Anthony with

18   your open face --

19           MS. DOYLE:  Open hand.  You said open face.

20      Q.   (By Mr. Gerarde)  I'm sorry.  With the open hand on

21   the face, did Anthony start to cry?

22      A.   Does this relate to what you asked me before?

23      Q.   Yes.  It's the same event, but I'm just wondering

24   whether or not he started crying after you slapped him?

25      A.   I don't recall.  I don't recall whether he started

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1   crying or not.

2       Q.   Okay.  Sergeant Krupa then writes, "He pulled a

3   blanket over his head and said he was going to call the police

4   because she hit him."  We know about the statement that he

5   said he wanted to call the police.  But the beginning part of

6   that says, "He pulled a blanket over his head."  Do you

7   remember him doing that?

8       A.   No.

9       Q.   Are you saying --

10      A.   I don't recall.  If he did that, I did not see that.

11      Q.   Okay.  Do you remember Anthony crying at any time

12  the police were there?  In other words, crying like a -- not

13  crying out, but crying, you know, with tears coming out of his

14  eyes?

15      A.   Sure, yes.

16      Q.   All right.  Because at the top of the second page of

17  Exhibit 2, the second sentence says, "Several times he broke

18  out crying about what was happening to him."  And it follows,

19  "He admitted that sometimes he is a wise guy, but that he

20  doesn't deserve to be hit."  So, let me put some questions to

21  you.  You do recall that there were times when Anthony broke

22  out crying while the police were there?

23      A.   Yes.

24      Q.   Okay.  Did you hear him say words to the effect of,

25  I admit I'm a wise guy, but that doesn't mean I need to be

                NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    hit?

2          A.    I never heard him say those words.

3          Q.    Now, if you skip to the paragraph that begins, "I

4    briefly spoke with Anthony's mother" -- do you see that?

5          A.    Yes.

6          Q.    Sergeant Krupa writes, "I asked her when her husband

7    would be home, and she responded, quote, Why?  You going to

8    take me?  I don't care."  Do you remember saying that to the

9    officer?

10         A.    Not particularly those words.

11         Q.    Did you say in substance that to the officer?

12         A.    Maybe words to that extent, but not in formation of

13   that.

14         Q.    Not in the formation that I just read, you mean?

15         A.    Correct.

16         Q.    It then reads on, "She" -- I'm sorry.  The statement

17   indicates, "She explained that Anthony is a wise guy and

18   wouldn't listen."  Is that a fair characterization of what you

19   said to the officer?

20         A.    Yes.  Disrespectful.

21         Q.    He then writes, "I told her we weren't doing

22   anything until we spoke with D.C.F."  Did he tell you that?

23         A.    I don't recall.

24         Q.    Okay.  He indicates -- he writes, "She said she had

25   no idea what time, probably late, her husband would be home."

1   Did you tell that to the officers?

2       A.   Probably.

3       Q.   Let me ask you this, it's clear that your husband

4   was not home at the time?

5       A.   Yes.

6       Q.   And he was, as far as you're concerned, probably

7   coming home much later than the time when the officers were

8   there?

9       A.   Yes.

10      Q.   He then writes, "I advised her that we would most

11  likely take Anthony into protective custody as her husband

12  wasn't present and investigate this with D.C.F. and if an

13  arrest was probable, we would most likely do it by warrant."

14  Is that what the officer said to you?

15      A.   Words similar to that, probably.

16      Q.   Okay.  Do you remember which officer Anthony went

17  with?

18      A.   I don't recall, no.

19      Q.   What did you do after the officers left with

20  Anthony?

21      A.   I flipped out.

22      Q.   Tell me like what specifically did you do?

23      A.   I started calling people, finding out what I could

24  do because they took my son.

25      Q.   Understood.  Who did you call?

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1       A.   I called a friend from church who -- a friend from

2   church, another woman from church who informed me that I could

3   be at the police station.  I didn't have to stay home and wait

4   for the police to call me, which was the impression they gave

5   me.

6       Q.   Who were the friends that you called?

7       A.   I called Buddy Sadowski.

8       Q.   Say the last name again, please?

9       A.   Sadowski.  Don't ask me how to spell it.

10      Q.   Was that another name that you gave me?  Donna --

11  I'm sorry.

12          MS. DOYLE:  She said she doesn't know how to

13      spell it.

14      Q.   (By Mr. Gerarde)  Don't ask me to spell it.  Sorry.

15  Buddy Sadowski?

16      A.   Buddy.

17      Q.   Who else did you call?

18      A.   Cindy Lalya.

19      Q.   How do you spell Cindy's last name?

20      A.   L-I-L-Y-A.  L-A-L-Y-A.

21      Q.   The whole last name is L-A-L-Y-A?

22      A.   Yes.

23      Q.   L-A-L-Y-A?

24      A.   That's it.

25      Q.   Okay.  And where does Cindy live?

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1      A.    Plainville.

2      Q.    Did there come a time when -- well, let me go in

3  order.  Who else did you call?

4      A.    I called my girlfriend, who I also consider my

5  mother.

6      Q.    Who is that?

7      A.    Joan Krakowitz (phonetic).

8      Q.    Joan.  Is she a member of your church also?

9      A.    Yes.

10     Q.    Okay.  And did you call your husband at some point?

11     A.    Yes.  I don't know in between where I called him,

12  no.  I might have called him first.  I don't recall the

13  sequence in which I called anybody.  I think I might have

14  called my husband first.

15     Q.    Okay.  And did there come a time when you went to

16  the police station?

17     A.    Yes.

18     Q.    When did you go?

19     A.    After my husband -- I went with Cindy and Michael

20  Lalya after I had somebody to watch my daughter.

21     Q.    Okay.  Do you remember what time you arrived at the

22  police station that night?

23     A.    No, I don't.

24     Q.    And do you remember being interviewed by the

25  Department of Children & Families?

NIZIANKIEWICZ & MILLER REPORTING SERVICES

38

1       A.   Yes, I do.

2       Q.   Did you tell them -- did you answer all of their

3    questions truthfully?

4       A.   Yes, I did.

5       Q.   What was the upshot of your meeting with the

6    Department of Children & Families that night?  What was

7    that --

8       A.   Could you rephrase that.

9       Q.   Sure.  We don't need to -- I am going to get you to

10   the end of the night.  And at the end of the night, the

11   Department of Children & Families -- I guess they took a while

12   to get there.  They spoke to you, your husband and Anthony.

13   Correct?

14      A.   Yes.

15      Q.   And at the end of the meeting, what was the game

16   plan as far as you and the Department of Children & Families

17   was concerned?

18      A.   To bring Anthony home and talk about another form of

19   discipline, other than spanking.

20      Q.   Okay.  And did you make an appointment or did you

21   establish a plan that you would see the Department of Children

22   & Families person again in the future?

23      A.   They told me they would be in contact with me, and

24   they followed-up with that.

25      Q.   Okay.  How was it that Anthony came to live with the

1          A.   Yes and no.

2          Q.   When was the next time that you saw anyone from the

3     Department of Children & Families?

4          A.   I'm not certain.  Maybe a month later.

5          Q.   All right.  And what was the purpose of that visit?

6          A.   Follow-up.

7          Q.   Did you discuss with them a new plan of discipline

8     that did not involve spanking or physical contact at that time

9     at that visit?

10         A.   I guess.

11         Q.   Was there anything else that was critical to D.C.F.

12    in terms of what they wanted to see happen before they closed

13    their case and went away?

14         A.   No.

15         Q.   Did you see D.C.F. just one additional time?

16         A.   Best of my knowledge, I saw D.C.F. at the police

17    station and the one time.  Just the two times.

18         Q.   There is a record we have that identifies the D.C.F.

19    case worker as Scott Harvey.  Does that ring a bell to you?

20         A.   That was at the police station.

21         Q.   And then who followed-up with you?

22         A.   I don't recall what the woman's name was.

23         Q.   It was a woman, though?

24         A.   I believe so.

25         Q.   Did you have to identify to this woman what the new

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    plan of discipline was going to be from that point forward

2    when she saw you that one time?

3        A.    Not in absolute, I don't believe.

4        Q.    What was she interested in?  That's what I am trying

5    to get at.

6        A.    I think mainly just to see if there was a problem in

7    the house, a foregone problem in the house.

8        Q.    Okay.

9        A.    An ongoing problem in the house.

10        Q.    Sure.  You told me that when you left the police

11    station that the plan with respect to D.C.F. was to go home

12    and talk about a different way of disciplining besides

13    spanking?

14        A.    Yes.

15        Q.    Did you ever do that as a family?

16        A.    Yes, we did.

17        Q.    And did you come up with an alternative plan to

18    physical spanking?

19        A.    Yes.

20        Q.    Now, there came a time when you were arrested,

21    correct --

22        A.    Yes.

23        Q.    -- for breach of peace in the second degree?

24        A.    Yes.

25        Q.    Is that the first time you were ever arrested?

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1       A.    No.

2       Q.    What were you arrested for previously?

3       A.    Bad check.

4       Q.    Okay.  How long ago did that happen?

5       A.    So long ago I can't remember.

6       Q.    More than ten years ago?

7       A.    Much longer.

8       Q.    Okay.  Do you remember going to court after being

9  arrested?

10      A.    Yes.

11      Q.    How many times did you go to court?

12      A.    I appeared once.

13      Q.    I have Exhibit 4, which is a document entitled,

14  Information, and I'll represent to you that this is the

15  charging document that charges you with breach of peace in the

16  second degree in Canton on or about September 12, 2002.  And

17  it says, "In violation of a public act 01-2 Section -- what

18  appears to be (6)(9)."  When you went to court, did you have a

19  lawyer with you?

20      A.    Yes.

21      Q.    Do you remember who that was?

22      A.    No, I don't.

23      Q.    And you only went one time?

24      A.    I appeared one time.

25      Q.    Did your lawyer appear a second time on your behalf?

1      A.   Yes.

2      Q.   And what was that purpose of that?

3      A.   To get the case closed.

4      Q.   Okay.  Well, what happened?  In other words, what

5  was the outcome of this breach of peace arrest?

6      A.   It was nollied.

7      Q.   It was nollied?

8      A.   I believe so, yes.

9      Q.   But it wasn't nollied that first time that you went?

10      A.   No.

11      Q.   I'm right about that?

12      A.   No.  It wasn't nollied.

13      Q.   Okay.  What was the game plan between you and the

14  prosecutor after that first event, the first appearance?  What

15  were you going to do between then and the second appearance,

16  if anything?

17      A.   Nothing to my knowledge.  It was just to come back.

18      Q.   Okay.  Did he ask you to see anybody from the Family

19  Relations Department?

20      A.   No, sir.

21      Q.   Did anyone from the -- of a family type adjunct of

22  the court talk to you that day when you went?

23      A.   No, sir.

24      Q.   How long between the first appearance and the second

25  appearance, if you know?

44

1          A.   I have no idea.

2          Q.   I mean, was it a year or --

3          A.   No.

4          Q.   It was a few weeks?

5          A.   A month or two.

6          Q.   Okay.  I want to show you why I am asking you these

7     questions.  Here is Exhibit 5.  It's a document entitled

8     Family Violence Protective Order, and it's signed by a judge

9     or assistant clerk.  I can't tell from the signature.  And

10    it's dated October 3rd of '02.  If you would, just take a

11    minute and look at that.

12         A.   Okay.  I recall this.

13         Q.   Okay.

14         A.   Now that it's in front of me.

15         Q.   Yes.  Tell me, how did this come into being?

16         A.   I don't recall.

17         Q.   It happened -- it was associated with one of your

18    court appearances, wasn't it?

19         A.   Apparently.

20         Q.   Okay.  And it's entitled Family Violence Protective

21    Order, and it indicates that -- the box is checked halfway

22    down, "On this date, it is hereby ordered that the above named

23    defendant/respondent" -- and that's you.  Correct?

24         A.   Yes.

25         Q.   And it checks, "Refrain from imposing any restraint

1   upon the person or liberty of the victim."  And the victim is

2   named as Anthony Pezzenti.  Correct?

3       A.   Yes.

4       Q.   And there is also checked across the page, "Refrain

5   from threatening, harassing, assault, sexual assault" -- no

6   one is accusing you of any of those other things.

7       A.   Right.

8       Q.   So, I don't mean to suggest that, but it's kind of a

9   catchall box that they checked.

10      A.   Yes.

11      Q.   Threatening, harassing, assaulting.  And I can tell

12   you that physically spanking would probably trigger the

13   assaulting piece of this.

14       MS. DOYLE:  I am going to object.  First of all,

15       that's completely -- I would dispute that legally.  I

16       have a lot of familiarity with the criminal statute,

17       and moreover, I don't think it's proper for you to

18       characterize what the statute is.

19       MR. GERARDE:  I will take back the

20       characterization.  I didn't mean to cause trouble.

21      Q.   (By Mr. Gerarde)  And then it indicates, "Further

22   order," it says, "Comply with D.C.F."  So, my question is, do

23   you know what this protective order meant?  In other words, it

24   was issued on October 3rd and it was issued to you?

25      A.   Yes.  Apparently this was the first time I went to

46

1  court, and I don't recall getting this.

2      Q.  Okay.  So, this was probably something that you got

3  the first day?

4      A.  Yes.  This was probably my first one.  And I

5  probably don't recall it because Anthony wasn't in the house

6  at the time.

7      Q.  Okay.

8      A.  So, obviously, I do recall now that it is in front

9  of me.

10     Q.  All right.  And --

11         MS. DOYLE:  Can I have one second before we

12     continue?

13

14         (Off record conference)

15

16         MS. DOYLE:  We are all set.  Thanks.

17     Q.  (By Mr. Gerarde)  So, do you see the handwriting it

18  indicates, "Further order, comply with D.C.F."?

19     A.  Yes.

20     Q.  And what was the meant by that, to your

21  understanding?

22     A.  To best of my ability, I can say that "comply with

23  D.C.F." would be that -- I hadn't seen D.C.F. at that time.

24     Q.  Meaning the follow-up visit?

25     A.  Yes.

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1      Q.   Now, when you were arrested for breach of peace, you

2   were arrested pursuant to a warrant.  Is that right?

3      A.   Yes.

4      Q.   And in other words -- well, tell me.  How did that

5   happen?  Did you get a telephone call and someone alerted you?

6      A.   Yes.  I had a phone call.

7      Q.   And they said, we have a warrant and we ask you to

8   come down and submit yourself to it?

9      A.   Yes.

10      Q.   And did you do that?

11      A.   Yes.

12      Q.   And were you processed and released that same day?

13      A.   Yes.

14      Q.   So, you weren't required to post a bond?

15      A.   No.

16      Q.   Were you put in a jail cell at all?

17      A.   No.

18      Q.   The first day, this October 3rd day, which you

19   believe might be your first day in court, what was said on the

20   record when your case was called and you had to walk up before

21   the judge with your lawyer?

22      A.   I don't recall.

23      Q.   Okay.  Did you think something was said -- that the

24   prosecutor said something, and then your lawyer said something

25   and then you walked away?

56

```
 1                    C E R T I F I C A T E

 2

 3          I, Christine E. Borrelli, a Notary Public and

 4    Licensed Court Reporter for the State of Connecticut, do

 5    hereby certify that the deposition of ELIZABETH PEZZENTI, was

 6    taken before me pursuant to the Connecticut Practice Book at

 7    the Law Offices of HOWD & LUDORF, 65 Wethersfield Avenue,

 8    Hartford, Connecticut, commencing at 12:30 p.m. on Thursday,

 9    December 11, 2003.

10          I futher certify that the witness was first sworn by

11    me to tell the truth, the whole truth, and nothing but the

12    truth, and was examined by counsel, and her testimony was

13    stenographically reported by me and subsequently transcribed

14    as herein before appears.

15          I further certify that I am not related to the

16    parties hereto or their counsel, and that I am not in any way

17    interested in the events of said cause.

18          Witness my hand this 22nd day of December, 2003.

19

20

21

22                                    _____

23                                    Christine E. Borrelli
                                      Notary Public
24                                    CT License No. 117
      My Commission Expires:
25    June 30, 2006
```