UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


AUGUST PEZZENTI, JR.          :    NO: 3:03CV00419 (MRK)
INDIVIDUALLY, ET AL
                             :
vs.                          :

JOSEPH CAPALDO, ET AL        :    DECEMBER 11, 2003



DEPOSITION OF:  AUGUST PEZZENTI, JR.




APPEARANCES:


        WILLIAMS & PATTIS, LLC
            Attorneys for the Plaintiffs
            51 Elm Street
            New Haven, CT 06510
            (203) 562-9931
        BY:  CHRISTY DOYLE, ESQ.


        HOWD & LUDORF
            Attorneys for the Defendants
            65 Wethersfield Avenue
            Hartford, CT 06114
            (860) 249-1361
        BY:  THOMAS R. GERARDE, ESQ.


IN ATTENDANCE:

August Pezzenti
Elizabeth Pezzenti


            Christine E. Borrelli
          Connecticut License No. 117
         Registered Professional Reporter




NIZIANKIEWICZ & MILLER REPORTING SERVICES


# Exhibit D

2

```
 1        . . . . . . Deposition of AUGUST PEZZENTI, JR., a

 2    Plaintiff, taken on behalf of the Defendant, in the herein

 3    before entitled action, pursuant to the Connecticut Practice

 4    Book, before Christine E. Borrelli, duly qualified Notary

 5    Public in and for the State of Connecticut, held at the Law

 6    Offices of Howd & Ludorf, 65 Wethersfield Avenue, Hartford,

 7    Connecticut, commencing at 10:20 a.m. on Thursday, December

 8    11, 2003.

 9

10                 S T I P U L A T I O N S

11

12       It is hereby stipulated and agreed by and among counsel

13    for the respective parties that all formalities in

14    connection with the taking of this deposition, including

15    time, place, sufficiency of notice, and the authority of

16    the officer before whom it is being taken may be and are

17    hereby waived.

18       It is further stipulated and agreed that objections

19    other than as to form are reserved to the time of trial.

20       It is further stipulated and agreed that the reading and

21    signing of the deposition transcript by the deponent is

22    hereby waived.

23       It is further stipulated and agreed that the proof of

24    the qualifications of the Notary Public before whom the

25    deposition is being taken is hereby waived.
```

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1                           I N D E X

2

3

WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

4

5    August Pezzenti, Jr.          4

6

7

8

9

10   EXHIBIT                                        PAGE:

11
     Defendant's Exhibit 1, Police Report ...............   81
12
     Defendant's Exhibit 2, Police Report ...............   82
13
     Defendant's Exhibit 3, Police Report ...............   89
14

15

16

17

18

19

20

21

22                    * * * * * * * * * * * *

23

24

25

                NIZIANKIEWICZ & MILLER REPORTING SERVICES

4

1           AUGUST PEZZENTI, JR., called as a witness by the

2     Defendant, having been first duly sworn by the Notary, was

3     examined and testified on his oath as follows:

4

5           DIRECT EXAMINATION BY MR. GERARDE:

6

7     Q.    Would you state your name for the record, please?

8     A.    August D. Pezzenti, Jr.

9     Q.    Mr. Pezzenti, I'd like to introduce myself to you.

10    My name is Tom Gerarde, and I am the attorney for the Canton

11    Police Officers that you have sued.  The purpose of today's

12    deposition is to ask you some questions in connection with the

13    lawsuit.  The record can reflect that we are here at your

14    deposition and you have waived reading and signing the

15    deposition, but otherwise, we will operate under the usual

16    stipulations with respect to the Court Reporter's

17    qualifications and all of the rest of it.  Is that correct?

18          MS. DOYLE:  That's fine.

19    Q.    (By Mr. Gerarde)  Mr. Pezzenti, are you taking any

20    medication that would interfere with your ability to

21    understand --

22    A.    No.

23          MS. DOYLE:  I'll just interrupt.  You may want

24    to --

25          MR. GERARDE:  I'll go through that right now.

                NIZIANKIEWICZ & MILLER REPORTING SERVICES

1          (Off record conference)

2

3          MR. GERARDE:  Back on the record.

4     Q.    (By Mr. Gerarde)  All right.  So, let me just focus

5     you on what the point of my earlier question was.  We are here

6     today because of something that happened on September 12th of

7     2002 --

8     A.    Right.

9     Q.    -- when your son was taken to the police station.

10    A.    Right.

11    Q.    And I know that there are other things that have

12    happened, apparently, between you and the Canton Police

13    Department.  And I'm going to give you a chance to tell me

14    about those, but I will try to sharpen my question as we go

15    along.

16    A.    All right.  Thank you.

17    Q.    Specifically for preparation for this deposition,

18    have you looked at any of the police records associated with

19    the September 12th event?

20    A.    Yeah.  I looked at their report that they handed

21    into D.C.F..

22    Q.    Okay.  And do you recall if you had seen anything

23    else?

24    A.    I've seen -- no.  Not really, no.

25    Q.    Okay.  For instance, your wife was arrested --

NIZIANKIEWICZ & MILLER REPORTING SERVICES

9

1       A.   Right.

2       Q.   -- for breach of peace in the aftermath of that?

3       A.   Right.

4       Q.   And did you see any of those arrest records --

5       A.   Yes, I did.

6       Q.   -- the warrant application where one of the officers

7   details what happened?

8       A.   Yes, I did.

9       Q.   And when is the last time that you have seen that?

10      A.   I have seen it when I hired Pete Soulby to represent

11  my wife from Hartford.  He went over the records, and I seen

12  them then.

13      Q.   And did you keep a copy of that?

14      A.   Yes, we did.

15      Q.   Did you look at it in getting ready for today?

16      A.   Yes.

17      Q.   What we're talking about is the case now with your

18  wife and your son.  Did you have any conversations as to like

19  what happened, in other words, in order to get ready for

20  today?

21      A.   No, because it's the truth of everything that

22  happened.

23      Q.   Sure.  I am not questioning that you won't tell me

24  the truth.  I am just wondering, did you have a family meeting

25  and say this is what --

1      A.   Ran around the back of the cruiser.

2      Q.   Yes.

3      A.   And met me at the side.

4      Q.   Okay.  And that's where you had the conversation

5   about him telling you that Anthony was in protective custody?

6      A.   He took him -- took Anthony out of the front seat

7   and walked in.  They went in and they put him into the locked

8   dispatcher's room.

9      Q.   That was the room that this person was sitting in

10  that you spoke to initially?

11     A.   Yes.

12     Q.   And there were glass windows --

13     A.   Yes.

14     Q.   -- so you could see Anthony?

15     A.   And cameras, too.

16     Q.   Cameras?

17     A.   There were cameras where you see them.  And I could

18  see the monitors working.  You could see the cameras taping

19  and everything.

20     Q.   Okay.  Were the cameras showing who was in the

21  dispatcher's room?

22     A.   Yes, and the police department, the whole

23  circumference surrounding the building outside the back where

24  they bring the prisoners into the cell downstairs.  I was in

25  the hallway.  Anthony was looking.  He says, Daddy, I can see

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    you.  He settled down a little bit because -- I held his hand

2    through the window like he was kidnapped.  I had to hold his

3    hand.  He was shaking.  I said, Anthony, slow down.  Daddy is

4    here.  I'll take care of you.  And he says, Well, I can see

5    you, Daddy, up there on the camera.

6        Q.   And just so I have the picture here, Anthony is

7    brought into the dispatch area and he is seated in the

8    dispatch room somewhere?

9        A.   Yes.

10       Q.   And he was at all times in a position where you

11   could see him?

12       A.   After.  When he first went in, they put him -- there

13   is a side room off the dispatcher's room where they had him

14   for a little while.  And then I told them -- they brought him

15   out so I could hold his hand through the window.

16            MR. GERARDE:  Off the record.

17

18            (A recess was taken.)

19

20            MR. GERARDE:  Back on the record.

21       Q.   (By Mr. Gerarde) So, from what I gather, when

22   Anthony was brought into the dispatch area, one of the first

23   things that happened was he was in an area where he could

24   reach his hand out through somewhere and touch your hand?

25       A.   When they first took him into the area there, they

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    kept him back in -- there was, like, a room on the other side

2    of the dispatch room.  As you walk in the door, the dispatcher

3    is here with all of his cameras and monitors.  And then there

4    is another room around the corner.  They had him over there to

5    start with, and then when he got so upset, they brought him

6    around and I asked to speak to him.  And they says, No, you

7    cannot speak to him.  So I says, Well, can I see him.  Anthony

8    put his hand through the window and I held his hand and I got

9    him to calm down a little bit.  I said, Daddy will take care

10   of it.  I am going to call you -- I am leaving right now to go

11   outside.  I am going to call an attorney and he will be here

12   very shortly to settle this matter.

13       Q.   Okay.  And how long was it that you were talking to

14   Anthony at that time when his hand was through the window?

15       A.   Maybe four or five minutes to calm him down.

16       Q.   Okay.  And by the time that you stopped, did that

17   have a positive effect in calming him down?

18       A.   It calmed him down.  They gave him a chair to sit

19   in.  He was pretty calm after that for a while.

20       Q.   Do you know if he had anything, like music with

21   headphones, to listen to?

22       A.   He had his headphones and he had his bookbag with

23   him and his homework and stuff.

24       Q.   So, when he sat in the chair, was he in a position

25   where you could see him if you looked through the window?

NIZIANKIEWICZ & MILLER REPORTING SERVICES

62

1      A.   Yes.

2      Q.   Okay.

3      A.   Well, no, not at that first time.  They didn't set

4   him in the chair until after his lawyer got there, John --

5   Attorney John Maben because I called -- I told Capaldo and

6   Krupa and I told Anthony after holding his hand, I says,

7   Anthony, I am going to call John -- Attorney John Maben for

8   you right now.  I am going outside.  And I says, I have a town

9   meeting tonight because I was putting an addition on my house.

10  I am not going to the town meeting.  I said, just hold my

11  hand.  Calm down.  Everything will be okay.  So, he sat in the

12  chair and I went outside and I called Attorney John Maben.

13  John Maben was there within twenty minutes.  He came inside

14  and Krupa and Capaldo came out and John introduced himself.

15  He said he was representing Anthony, and here is a business

16  card.  He said he wanted to see his client, and they says, No.

17  You cannot see him.  Then they didn't believe John was our

18  lawyer.  He said, I'll do better than that.  I'll go out in my

19  car and I will get my picture I.D. and I will give it to you.

20  So, he went out to his car, got his picture I.D. and gave it

21  to Capaldo and he, kind of, smiled.  And Mr. Maben says again,

22  I'm Attorney John Maben.  I want to talk to my client.  I am

23  representing my client, and he says, No, you're not.  You're

24  not talking to your client now.  And John says, Well, you

25  know, you're violating his civil rights.  He says, I am the

1    boss here.  You see these stripes.  He got up just like this.

2    John was over here.  He got up.  He's a pretty big guy.  He

3    says -- he got right up and he says, See these stripes right

4    here, he says, I am the man.

5         Q.   Who is this who is saying that?

6         A.   Krupa.  He put his chest right to John Maben's chest

7    and he said, See these stripes here?  I am the man.  I run the

8    place and I'm in charge.  And he was telling Maben he was not

9    going to see Anthony, not before D.C.F. got there.  And John

10   says, Okay.  John says, Okay, put the kid in front of the

11   window where I can see him and he'll sit right here.  And so

12   Capaldo came out.

13        Q.   Okay.

14        A.   Now, Capaldo came out and I says, you know, What is

15   the deal here?  He says, Krupa didn't have to go this far with

16   this case.  He says, He could have resolved this inside the

17   police department.  He did not have to go as far as he did.

18   And I says, Well, can I talk to my son, Mr. Capaldo?  And he

19   says, When Krupa goes to lunch at 6:00, I'll bring him out for

20   you and you can talk to him.  So, when 6:00 came, Krupa went

21   out the back door and Mr. Capaldo did by his word and came and

22   brought Anthony outside.  So, me and Anthony stood there.  Mr.

23   Capaldo stood by the door and blocked the door so I couldn't

24   take him out the door, and me and Anthony stood there.  Now he

25   was crying.  We kneeled down and we prayed.  When we got done

1    praying Anthony got up and I says to Mr. Capaldo, I says,

2    Well, you can go back in there now.  Mr. Capaldo was, you

3    know, not too bad then.  And I says to Mr. Capaldo, I says,

4    You know, what is going on here?  And he says, I think he is

5    high tonight.  Those were his exact words.  Capaldo said that

6    about Krupa.  I think he's high tonight.  So, Attorney John --

7    I belong to the First Baptist Church in Plainville.  I called

8    up two friends of ours.  He's a colonel in the Army and he is

9    still active, Mr. -- oh, what was his name?  He is -- I can't

10   think of the name right now, but he is an active colonel in

11   the service and he works out of Bradley Field.  He is a

12   licensed foster parent house.  His wife is an Oriental.  They

13   was there and they sat there from six o'clock that night until

14   11:30 so the state could not take my son.  You know, if they

15   wouldn't let him go with us, he could go to the foster -- you

16   know, to friends of ours.  So, we told Mr. Krupa that we have

17   people here that are licensed.  They brought their license

18   with them and they says, We are going to sit here until we

19   find out what is going on.  And they seen everything; the

20   actions of these two officers and everything, and the colonel

21   couldn't believe what he was seeing.

22        Q.    What did happen in the colonel's presence that you

23   say was improper?

24        A.    Well, the colonel was there when they says about --

25   when they would not let us see Anthony.  The colonel was

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    there.

2         Q.    You're talking about when John Maben wanted to see

3    him?

4         A.    Yes.

5         Q.    And Krupa says, I am the boss here.

6         A.    No.  He didn't see him do that.  He came in right

7    after that, but he was there when John Maben asked several

8    times to see Anthony.

9         Q.    Okay.  Just so I understand the sequence, I thought

10   what happened is that the conversation happened with Krupa and

11   Maben, and Maben was told he wasn't going to see Anthony?

12        A.    Right.

13        Q.    And Maben said, Well, then put him right in the

14   window here where I can watch him?

15        A.    Right.

16        Q.    Are you saying that he then tried to see him again

17   later?

18        A.    Yes.  Right after that, I think, Mr. -- I think -- I

19   can't remember his name right now.  They are good friends of

20   ours, too, but I think the two people from our church who are

21   the licensed foster parents, they arrived there at six o'clock

22   and they sat over there in the corner.  And I told Mr. Capaldo

23   and Krupa, I have foster parents right there in case there is

24   any problem, Anthony can go with them.  So, John got up like

25   every ten minutes.  He said, Well, can I see my client?  Nope.

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    They wouldn't let him see his client.  My kid was there.  And

2    then Capaldo -- I asked Mr. Krupa at 8:30, I says, My kid has

3    been here since 4:30.  It's been four-and-a-half hours.  He

4    needs something to eat.  He says, Well, when we get a chance,

5    we will get to it.  I says, No.  You're not feeding him.  I'll

6    get him something to eat.  So, I left and went to McDonald's

7    and I got him something to eat.  Now, it's getting towards

8    9:30 and I kept saying, you know, the lawyer is still trying

9    to see his client.  The foster parents are over there.  My

10   wife is over here and --

11        Q.   Just so I'm clear about that, your wife was at the

12   station at this time?

13        A.   After.  She didn't come until about 7:00 because I

14   went and picked her up.

15        Q.   Seven.  Okay.

16        A.   And at 9:00, the lawyer was still trying to see

17   Anthony.  He kept -- Capaldo kept saying no.  They said,

18   D.C.F. is on the way.  So, D.C.F. arrives on the scene at

19   10:30 and they were called at 4:30.  They came and they

20   brought us into a room and they questioned me.  They checked

21   my background.  Then they questioned my wife and they checked

22   her background.  And the guy says, I don't know what I'm

23   really here for.  So, he went and talked to Krupa and Capaldo

24   and then he came back in and he says, There was no need for

25   this whole thing that went on here, and he says that Anthony

1    is going to be released to you, and then we walked out of the

2    door and we left.  That was about twelve o'clock at night.

3         Q.   Did D.C.F. interview Anthony?

4         A.   Yes.

5         Q.   Was that in your presence or was it separate?

6         A.   Separate.

7         Q.   And were you and your wife interviewed separately?

8         A.   Separately and then together.

9         Q.   So, during the time that Anthony was being kept by

10   the police, was it known to you that the reason he was being

11   kept was because the Department of Children & Families had

12   been called and they were waiting for someone to come and

13   interview him?

14        A.   Reword that again.

15        Q.   In other words, you knew that they had Anthony and

16   that he was in protective custody?

17        A.   Right.

18        Q.   At what point did you also know that the reason that

19   the hours were going by was that they had called the

20   Department of Children & Families and they were waiting for

21   someone to show up?

22        A.   Well, for about -- I guess they called D.C.F. at

23   about 4:30, 5:00.  But, yeah, they told me that they were

24   holding him until he was -- yeah, until I was interviewed by

25   D.C.F.

                NIZIANKIEWICZ & MILLER REPORTING SERVICES

68

1    Q.   And Anthony was brought out to see you at around
2  6:00.  Is that right?
3    A.   No.  He was, yeah.  Let's see -- I would say yes,
4  about 5:30, 6:00 right around there because -- that's right.
5  Krupa went to lunch at 6:00 because he worked 3:00 to 11:00
6  then.  Yeah, I would say 6:00 because that's when Capaldo
7  says, When Krupa goes to lunch at 6:00, I'll bring him out,
8  which he was told by his commander, Krupa, not to let me see
9  him at all.
10    Q.   Okay.
11    A.   And so he brought him out at 6:00 when Krupa went
12  out the back.  So, he brought him over to me.  He says, Here
13  is your son, Anthony.  And Capaldo stood over by the door.  I
14  think he thought I was going to run away or something.  I
15  don't know.  But me and Anthony kneeled down and we prayed.
16  And we talked about a couple of things.  I said, Don't worry
17  about it.  I said, John is on his way.
18    Q.   How long were you with Anthony during that time?
19    A.   For five minutes.  Maybe three, four, five minutes.
20  Not very long.
21    Q.   Okay.
22    A.   And then Capaldo says to me after Anthony went back
23  in behind the window -- he says to me, I don't know why he is
24  acting like this because it could have been handled
25  internally.  There was no narcotics on the kid or no nothing.

69

1   And he says, I think he is high tonight.  That's the exact

2   words that Capaldo said.

3       Q.   Did you talk to Anthony about what had happened at

4   the house?

5       A.   No.  I couldn't even talk to him that long.  All we

6   had time to do was pray, hug each other, and they whisked him

7   right away again.

8       Q.   And when he was brought back into the dispatch room,

9   was he in a place where you could see him?

10      A.   Right in front in the chair again, yes.

11      Q.   And he had his headphones?

12      A.   Yeah.

13      Q.   Is that yes?

14      A.   Yeah.  He had his headphones.

15           MS. DOYLE:  Asked and answered.

16           THE WITNESS:  He had his headphones and books

17           and stuff like a normal kid would have, you know.  He

18           was kind of interested in the cameras because he

19           could see all around, you know, the big room and see

20           the whole complex and everything.

21      Q.   (By Mr. Gerarde)  Anthony was?

22      A.   Yes.  Well, I could see him, too.  It's a pretty big

23   area.  It's a big room with this -- like, with all cameras and

24   monitors and everything.

25      Q.   All right.  And when was the first time that you had

                NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    any business dealings with John Maben?

2         A.   When was the first time I --

3         Q.   Yes.

4         A.   I have known John Maben for ten years.

5         Q.   In other words, in what capacity did he --

6         A.   Just as a personal friend.

7         Q.   Oh, is he?  Just tell me about that.

8         A.   Well, I went to work for Aiudi Concrete and I used

9    to take care of their management properties for probably six

10   years.  John used to rent the houses for them, and I did the

11   maintenance.  That's how I met John.

12        Q.   So, in other words, John was Aiudi's lawyer?

13        A.   No.  John was a real estate broker.  He rented

14   houses for them, got the leases going.

15        Q.   I see.

16        A.   That's how I met John.

17        Q.   So, in addition to being a lawyer, John Maben is

18   also a real estate broker?

19        A.   He is a broker, yes.  I own a house and he rented it

20   for me, too -- my houses.

21        Q.   Did John -- well, tell me what your recollection is

22   as to when John arrived?

23        A.   John was there within -- I would say John was there

24   about ten after five.

25        Q.   I thought that John wasn't there when Anthony was

NIZIANKIEWICZ & MILLER REPORTING SERVICES

71

1   out in the room with you.

2        A.   He wasn't, that's right.  I would say Capaldo --

3   excuse me.  I can rephrase that.  Krupa left for supper at

4   five o'clock and John got there at ten after five.

5        Q.   So, whatever the timing was --

6        A.   Because it was only -- I left Southington at quarter

7   after four.  I got to the police department, and right after

8   4:20, they came in.  At 4:35 or 4:30, I think that's right.

9   And then Krupa left for lunch at 5:00 and John came right

10  after that, 5:10 or so.  About that.  About 5:10 he arrived.

11       Q.   And I take it that John Maben then had the

12  conversation with Sergeant Krupa after Krupa got back from

13  wherever he was?

14       A.   Yep.

15       Q.   Did John stay with you until Anthony was eventually

16  released?

17       A.   John Maben was there for -- from ten after five

18  until 12:00.

19       Q.   Did you leave at the same time?

20       A.   He stayed right there.

21       Q.   And did he go with you when you spoke to D.C.F.?

22       A.   Yes, he was.

23       Q.   He was sitting with you?

24       A.   No.  He wasn't with us then, no.  He went with us

25  when D.C.F. was at the house.  That's right.  No, not at the

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    police department neither, he didn't talk to them.

2        Q.    All right.

3        A.    He talked just a quick conversation with him, that

4    John wanted stuff put on the record about what went on up

5    there.

6        Q.    Meaning -- is this talking to D.C.F., you mean?

7        A.    Yes.

8        Q.    So, I have learned so far that you, your wife and

9    Anthony each were interviewed by D.C.F.?

10       A.    Yes.

11       Q.    And are you saying that John was not with any of you

12   at the time of the interview?

13       A.    At the police department?

14       Q.    Right.

15       A.    No.  He was there, but he wasn't in the room with

16   us.

17       Q.    And was there a second time that you were

18   interviewed by D.C.F?

19       A.    When they came to the house.

20       Q.    When was that?

21       A.    Oh, well, the problem was they called my house the

22   next day and said they were coming.  And I told them they were

23   not coming until his attorney was there.  And they says,

24   Attorney?  I says, Yes.  I says, You will talk to my son when

25   his attorney is with him.  Other than that, you are not going

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    to do it.  So, what they did is they never had a case like

2    that where he had to do anything like that.  So, they came to

3    the house.  I refused them seeing him and then I got ahold of

4    John.  John set up all of the appointments with D.C.F..  So,

5    when they came and interviewed Anthony at my house, John would

6    be there.  When they interviewed Mallorie -- they talked to my

7    daughter briefly, but when they interviewed all of us, John

8    was there.  So, what I did was I gave Anthony a cooling off

9    period, and I put him over -- it's Lilly, the colonel's name.

10        Q.  Say the last name again?

11        A.  L-I-L-L-I-E or L-Y.  Something like that.  A

12   lieutenant he is.  He is a lieutenant colonel.

13        MS. DOYLE:  Can I just have a minute with my

14        client before we get to the next question?

15        MR. GERARDE:   Sure.  Off the record.

16

17        (A recess was taken.)

18

19        Q.  (By Mr. Gerarde)  We are back on the record, and you

20   were telling me about the second D.C.F. interview.  The first

21   one being that night at the police station.  The second

22   interview was one that D.C.F. wanted to set up the next day,

23   but you wanted Anthony to have a lawyer with him --

24        A.  Yes.

25        Q.  -- before any interview happened?

                NIZIANKIEWICZ & MILLER REPORTING SERVICES

1        A.    Yes.

2        Q.    When did that interview ultimately happen?

3        A.    Probably two and a half weeks afterwards.

4        Q.    Did it happen the way that you wanted it to, with

5    John Maben being present?

6        A.    Yes.  He set up all of the appointments.  He set up

7    everything.  He met them at my house and he met them at Mr.

8    Lillye's (SIC) house.  We gave Anthony a cooling of period for

9    ninety days.  He went to the Lillye's house where I didn't see

10   him for thirty days, me or my wife.  We just put him over

11   there, let him cool off a little bit, and get a little

12   accustomed to that.  And Mr. Maben went over when D.C.F.

13   investigated with the Lillyes, so -- they are personal friends

14   of ours, Mr. and Mr. Lillye.

15       Q.    You're saying this man who you described as

16   lieutenant colonel, that is Lieutenant Colonel Lillye?

17       A.    Lillye, yes.

18       Q.    And you believe the name is spelled L-I-L-L --

19       A.    L-I-L-L-Y-E I think it is.

20       Q.    Lillye?

21       A.    Lillye.

22       Q.    Do they live in Canton?

23       A.    They live in Plainville.

24       Q.    Do you know what street they live on?

25       A.    North Washington Street I think that is.

1    reports.  And I am going to mark as an exhibit -- I have a

2    copy for both of you.  I just need a minute here.  This is the

3    first one.

4

5              (Defendant's Exhibit 1, Police Report, marked

6              for identification)

7

8       Q.   (By Mr. Gerarde)  For the record, Exhibit 1 is a

9    three-page document.

10      A.   Am I supposed to read this?

11      Q.   Well, I was offering you the opportunity to read

12   along.

13      A.   Okay.  Are you going to read it?

14      Q.   But I'm going to reference some of the things

15   written here and ask you if you believe that that happened or

16   -- first of all, well, let me ask you.  Do you have reading

17   glasses with you today --

18      A.   No.  I forgot them at home.

19      Q.   -- if you hold them away?

20      A.   I can see it pretty good, yeah.

21      Q.   Okay.  Now, I'll represent to you, sir, that Exhibit

22   1 is a three-page incident report completed by Joseph Capaldo.

23   And you see in the lower left-hand corner that that is his

24   badge number and his signature.  It will be on that same spot

25   on all three-pages.  Have you read this report?  Is this one

                NIZIANKIEWICZ & MILLER REPORTING SERVICES

1      his question.

2           THE WITNESS:  Thank you.

3      Q.   (By Mr. Gerarde)  Let me just get the question out

4  and then you can give me your answer.  The report reads, "I

5  met him and brought him into the interview room."  And the

6  question is, did, in fact, you and Officer Krupa speak in an

7  interview room?

8      A.   No.

9      Q.   You say you spoke out in the lobby?

10     A.   Yes.

11     Q.   It then continues, "I advised him of the complaint,

12 and Officer Capaldo was present then on the phone with D.C.F."

13 My question is, did you have a conversation with Krupa wherein

14 he advised you of the nature of the complaint?  In other

15 words, that he had Anthony in protective custody related to

16 something that had happened between your wife and Anthony?

17     A.   Yes.

18     Q.   And did he tell you that someone or Capaldo or

19 someone else was on the phone with D.C.F.?

20     A.   He never told me he was on the phone with D.C.F.

21     Q.   But he told you that D.C.F. was going to be

22 contacted?

23     A.   Yes.

24     Q.   He says that you were -- it reads, "He was very

25 concerned about getting Anthony back."  I take it that part is

                NIZIANKIEWICZ & MILLER REPORTING SERVICES

86

1    true?

2         A.    Yes.

3         Q.    It says you asked if -- I'll read it verbatim.  "He

4    asked if his wife was going to be arrested and was acting very

5    nervous."  I'll go away from the nervous part, but do you

6    remember asking whether or not Elizabeth was going to be

7    arrested?

8         A.    Yes.

9         Q.    It reads, "I told him that we weren't doing anything

10   until D.C.F. arrived."  Do you remember that being the

11   sergeant's response?

12        A.    I don't remember him saying anything like that, no.

13   I just remember him saying he was going to call D.C.F.  We

14   never talked too much after that.

15        Q.    Okay.  The report reads, "As we spoke, I explained"

16   -- I think that's a typographical error -- I think it means

17   "our concern" not "out concern", "was that he would be safe at

18   their home.  He told me that he would ensure that Anthony was

19   safe even if it meant that he had to bring him to his

20   grandmother's house."  Do you remember telling that to Officer

21   Krupa?

22        A.    No.  I never said nothing like that.

23        Q.    Is there a grandmother that lives nearby?

24        A.    No.

25        Q.    Is there a grandmother that lives in Connecticut?

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1        A.    Manchester.

2        Q.    And would one of the options that you would have had

3    open to you have been to bring Anthony to his grandmother's if

4    it meant that he had to go somewhere other than your home?

5        A.    No.  He would have went with Mr. and Mrs. Lillye.

6    My mother is 90 years old.

7        Q.    How old?

8        A.    Ninety.

9        Q.    The report then reads, "I again said that our best

10   course of action would be to wait for D.C.F. and go from

11   there.  I advised him of the complaint against him hitting

12   Anthony with a belt for demerits at school, and he admits that

13   he did that and indicated that it was common to discipline

14   with a belt across the butt."  Now, did you hit Anthony with a

15   belt for demerits at school?

16       A.    Yes, I did.

17       Q.    And did you indicate to the sergeant that it was

18   common to discipline with a belt across the butt?

19       A.    Yes, I did.

20       Q.    Next paragraph, "A short time later, I was told that

21   an attorney was in the lobby."  That has to do with him and

22   Maben, so I'll spare you that part.  If you look at the third

23   page, please, the first full paragraph there begins with "He

24   then told me" --

25       A.    Yes.

```
 1        Q.    Okay.  Just to orient you, the report is talking
 2   about what Maben told Sergeant Krupa, and it reads, "He then
 3   told me that it was a violation of Anthony's rights to take a
 4   statement from him without his attorney present.  I already
 5   told him that no one took a statement from him."  And that's
 6   what I want to focus on.  Would you agree that no one in the
 7   police department took a statement from Anthony?
 8        A.    No.  I wouldn't agree with that.
 9        Q.    Who took a statement from Anthony at the police
10   department?
11        A.    I have never seen -- I was out in the hallway.  I
12   mean, I was out in the foyer.  I didn't see if they took a
13   statement.  You know what I mean?
14        Q.    But are you saying that you know they took a
15   statement from Anthony and they had him sign something?
16        A.    I don't know, no.  I can't say nothing about that,
17   no.
18        Q.    And then it reads, "He says that's not what he said.
19   I went over the question he just asked me.  And he then said
20   that's not what he meant.  This went back and forth.  I told
21   him the bottom line is Anthony's safety.  I told him no one
22   was interviewing Anthony until D.C.F. got there.  I showed him
23   where Anthony was and told him he could look at him from the
24   lobby."  Again, this doesn't pertain to you, but you can at
25   least confirm at the point when Sergeant Krupa was talking
```

1   with Attorney Maben that Anthony was located in a spot where

2   he could be seen through the glass in the dispatch area?

3       A.   After John told him to put him in front of that

4   window, yes.  Until then he wasn't.

5            MR. GERARDE:  Let's mark this as the next one.

6

7            (Defendant's Exhibit 3, Police Report, marked

8            for identification)

9

10      Q.   (By Mr. Gerarde)  Would you take a minute and look

11  at Exhibit 3, please.  Let me ask you some questions about

12  Exhibit 3.  First of all, is that one of the reports that you

13  had seen before today?

14      A.   Never seen this one before.

15      Q.   Okay.  This is a report that indicates that Scott

16  Harvey, a social worker with D.C.F., had come to the Canton

17  Police Department.  Do you see that?

18      A.   Yes.

19      Q.   Does Scott Harvey ring a bell?  Was that the person

20  that was there?

21      A.   Yes.

22      Q.   Did he have a woman with him?

23      A.   No.

24      Q.   I thought you said that you were referring in the --

25  to the gender of the person who spoke to you as female?

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1      A.   Male.

2      Q.   It was?

3      A.   Male.

4      Q.   Okay.  And the report indicates that, "Harvey

5   privately interviewed Anthony in the patrol room and he spoke

6   to Anthony for about twenty minutes."  Does that jive with

7   your recollection?

8      A.   Yes, it does.

9      Q.   And that, "He then spoke to both parents

10  separately."

11     A.   Yes.

12     Q.   And it indicates that, "Harvey then determined that

13  Anthony was in no danger if he were to return home on that

14  evening."

15     A.   Yes.

16     Q.   And that's how it was related to you?

17     A.   Yes.

18     Q.   And it further indicates -- and this is Mr. Capaldo

19  who is writing this, "Prior to releasing Anthony to his

20  parents' custody, I spoke with them.  I informed them that

21  despite their religious beliefs, it was illegal to discipline

22  their children the way they have in the past."  Did a

23  conversation of that nature occur?

24     A.   Yes.

25     Q.   And what to your recollection did Capaldo say to

1    you?

2        A.    Capaldo was sitting there and he says that when he

3    was a kid he used to get beat with a strap.  And like I told

4    him, I says, a kid needs to be disciplined.  And that's the

5    way we left it.

6        Q.    All right.  Well, that's not exactly what it says

7    here.  What it says here is that he advised you -- and I guess

8    this is regardless of what happened to him when he was young.

9    He says, "It was illegal to discipline their children the way

10   they have in the past.  It's not lawful to strike the children

11   with any item that can cause injury."  Do you remember him

12   saying that part?

13       A.    I don't remember him saying injury, no.  I refer --

14   no.  Let me rephrase that.  I remember him telling us that we

15   could not touch Anthony.

16       Q.    As a means of discipline?

17       A.    That's right.

18       Q.    All right.  And do you feel as you sit here today

19   that as soon as Scott Harvey's investigation of everybody was

20   complete, that Anthony was then turned back over to you?

21       A.    Anthony was never taken from us.

22       Q.    In other words, what I mean is he was allowed to

23   come out of the dispatch area, brought to you so that you

24   could take him home?

25       A.    After they interviewed me and my wife, checked our

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1   background, our police records and at 12:00 at night, yes.

2       Q.   Okay.  So, in other words, once D.C.F. had made up

3   their mind it was okay for Anthony to leave with you, it's not

4   as if the Canton Police still hung onto him for a while?

5       A.   No.  They held him until all of the backgrounds were

6   checked and everything, until they interviewed me, my wife and

7   him.  And then they put him back in the room and me and my

8   wife -- and then he went into the room and we came out and

9   about five minute later he came out.

10      Q.   Okay.  Now, it also reads at the bottom here that

11  your wife was advised by Capaldo that he would be applying for

12  a warrant for her arrest?

13      A.   Uh-huh.

14      Q.   Did he tell you that that night?

15      A.   Yes.

16      Q.   How is Anthony doing in school?

17      A.   He is doing -- his grades are not real good right

18  now, but he is working on getting them up.  He came from Ds

19  and he is up to Cs and Bs now.

20      Q.   When you say he came from Ds, when was he getting

21  Ds?

22      A.   When all of this case came down on him, school was

23  just a washout.

24      Q.   So, I am going to assume that you're talking about

25  the school year of September, '02, to June of '03?

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1      Q.   In other words, it seems that there was conflict

2  between them?

3      A.   When?

4      Q.   That they would argue shortly before the day that

5  this happened.

6      A.   No.  I disagree with that.

7      Q.   Tell me what your characterization of the

8  relationship was between your wife and Anthony prior to this

9  day?

10      A.   Perfect.

11      Q.   Perfect?

12      A.   Perfect.

13      Q.   Now, did you speak to your wife and Anthony about

14  what actually happened that day?

15      A.   Yes.

16      Q.   And what did -- let's start with your wife, what did

17  she tell you happened?

18          MS. DOYLE:  Object to the form.  Hearsay.  Go

19      ahead and answer.

20          THE WITNESS:  I can answer it?

21          MS. DOYLE:  Uh-huh.

22      Q.   (By Mr. Gerarde)  Yes.

23      A.   Betty told me that he was outside blowing the leaves

24  off of the driveway and he -- some rocks were hitting the

25  house, so she told him not to do that and she took the leave

1  blower and put it in the shed and then he went on his way up

2  to his room and he called her a fat slob.  So, my wife -- I

3  guess she slapped him, and he said he was going call the cops.

4  So she says, I'll dial them for you, and she threw him the

5  phone.  The phone hit the bed and popped up and hit him in the

6  lip.

7     Q.   Okay.  So, Betty told you that she slapped Anthony

8  and she told you that the phone hit him in the lip?

9     A.   She told me that she slapped him and then he said he

10  was going to call the police.  She said, I'll call them for

11  you.  And she picked up the cordless phone and threw it on the

12  bed and it bounced up off the bed and hit him in the face and

13  hit him in the lip.

14     Q.   So, then that's something that she told you

15  happened?

16     A.   Yes.  Anthony told me the same exact thing.

17     Q.   Okay.  So, when you talked to Anthony, he confirmed

18  that's what happened?

19     A.   Yes.

20        MS. DOYLE:  Again, I am going to object.  It's

21        all hearsay.  I'm just putting in a standing

22        objection.

23        MR. GERARDE:  She is a party opponent.  It's

24        admissions.

25     Q.   (By Mr. Gerarde)  So, let me then ask you about

                   NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    Anthony's lip.  Did you ever notice the cut on the inside of

2    his lip?

3         A.   Yes, I noticed it.

4         Q.   Okay.  When did you notice it?

5         A.   I noticed it when he was at the police department,

6    but it wasn't bleeding.  Nothing.  It was just, you know, a

7    little minor bruise and a little split maybe.

8         Q.   Okay.  Now, I know that your rock solid belief is

9    that there was no need for D.C.F. to do any kind of interview

10   with your family.  And I'm not here to challenge that at all,

11   and I don't challenge it.  What I am asking you, though, is

12   given the fact that the police officers were told and,

13   apparently accurately, that Anthony had been slapped and that

14   he did have a bruise on his lip, do you at least understand

15   why it was that D.C.F. was called?

16        A.   No.

17        Q.   You don't believe that they should have been?

18        A.   No, I don't.

19        Q.   Are you familiar with any of the requirements of the

20   statutes about when D.C.F. has to be called by other people?

21        A.   Yes.

22        Q.   They are called mandated reporters?

23        A.   Yes, but I think he went a little too far.

24        Q.   Okay.  How has your relationship with your wife been

25   since this incident?

1  Q. (By Mr. Gerarde) I'm going to ask a couple more

2 questions and I'll tell you, anything you think is responsive,

3 you're free to tell me about it.  But the point is -- the

4 point of today's deposition is for me to get what information

5 I can from you about what happened on the day of the event and

6 your relationship with the Canton Police.

7  A. Right.

8  Q. And have your answers so far today been the truth to

9 the best of your knowledge?

10  A. Yes.

11  Q. And are they complete or does more information need

12 to be added in order for them to be complete answers?

13  A. No.  They are complete.

14  Q. As you sit here today, are there any other

15 conversations that you had with Capaldo or Krupa about this

16 incident on September 12th of 2002 that you haven't told me

17 about?

18  A. No.

19  Q. And as you sit here today, are there any other

20 incidents involving some type of contact between you and the

21 Canton Police Department that we haven't discussed?

22  A. Yes.

23  Q. Tell me about that?

24  A. Well, yesterday I am bringing my cement mixer back

25 to Bremar Rental.  They are building that big mall on Route

112

1    conflicting relationship with your wife?

2        A.   No.

3        Q.   But you described it as a cooling off period?

4        A.   I described it as changing the atmosphere, okay.

5        Q.   Well, you also called it a cooling off period,

6    didn't you?

7        A.   Yeah.  I called it that, but I said I wanted to

8    change the atmosphere so he wouldn't have to look at the

9    Canton Police going by my house and seeing other things going

10   on.  So, I just took him and I put him away.  I put him in

11   safe hands where I knew where he was.  We had seen him every

12   day.

13       Q.   Now, are you a student of the Bible?

14       A.   Yes, I am.  I am not a student, but I know the

15   Bible.

16       Q.   Because your wife made a statement to -- or it's at

17   least written in these reports that your wife made a statement

18   to Capaldo that says, "The Bible allows me to hit you,"

19   referencing Anthony.  Do you agree with that?

20       A.   I never heard her say that.  I wasn't there when she

21   talked to Capaldo.

22       Q.   Do you believe that the Bible allows parents to hit

23   children?

24       A.   I believe the Bible is supposed to give you

25   discipline for your children, yes.

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1          Q.   But that includes hitting, if that's what you decide

2     you want to do?

3          A.   If I have to discipline them, I will, yes.

4          Q.   In what way, physically?

5          A.   On their rear end, yes.

6               MR. GERARDE:  I don't have anything else.  Thank

7     you very much.

8

9               (Deposition Concluded at 12:30 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3          I, Christine E. Borrelli, a Notary Public and

4    Licensed Court Reporter for the State of Connecticut, do

5    hereby certify that the deposition of AUGUST PEZZENTI, JR.,

6    was taken before me pursuant to the Connecticut Practice Book

7    at the Law Offices of Howd & Ludorf, 65 Wethersfield Avenue,

8    Hartford, Connecticut, commencing at 10:20 a.m. on Thursday,

9    December 11, 2003.

10          I futher certify that the witness was first sworn by

11   me to tell the truth, the whole truth, and nothing but the

12   truth, and was examined by counsel, and his testimony was

13   stenographically reported by me and subsequently transcribed

14   as herein before appears.

15          I further certify that I am not related to the

16   parties hereto or their counsel, and that I am not in any way

17   interested in the events of said cause.

18          Witness my hand this 28th day of December, 2003.

19

20

21
                                    _____
22                                  Christine E. Borrelli
                                    Notary Public
23                                  CT License No. 117
     My Commission Expires:
24   June 30, 2006

25

              NIZIANKIEWICZ & MILLER REPORTING SERVICES