```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT


AUGUST PEZZENTI, JR.            :    NO: 3:03CV00419 (MRK)
INDIVIDUALLY, ET AL
                                :
vs.                             :

JOSEPH CAPALDO, ET AL           :    DECEMBER 11, 2003



              DEPOSITION OF:   ANTHONY PEZZENTI




APPEARANCES:


        WILLIAMS & PATTIS, LLC
            Attorneys for the Plaintiffs
            51 Elm Street
            New Haven, CT 06510
            (203) 562-9931
        BY: CHRISTY DOYLE, ESQ.


        HOWD & LUDORF
            Attorneys for the Defendants French
            65 Wethersfield Avenue
            Hartford, CT 06114
            (860) 249-1361
        BY: THOMAS R. GERARDE, ESQ.
            MELANIE DILLAN, ESQ.

IN ATTENDANCE:

August Pezzenti
Elizabeth Pezzenti


                    Christine E. Borrelli
                 Connecticut License No. 117
               Registered Professional Reporter




            NIZIANKIEWICZ & MILLER REPORTING SERVICES
```

# Exhibit E

1     . . . . . Deposition of ANTHONY PEZZENTI, a Plaintiff,
2     taken on behalf of the Defendants, in the herein before
3     entitled action, pursuant to the Connecticut Practice Book,
4     before Christine E. Borrelli, duly qualified Notary Public
5     in and for the State of Connecticut, held at the Law Offices
6     of Howd & Ludorf, 65 Wethersfield Avenue, Hartford,
7     Connecticut, commencing at 2:15 p.m. on Thursday, December
8     11, 2003.
9
10                    S T I P U L A T I O N S
11
12       It is hereby stipulated and agreed by and among counsel
13    for the respective parties that all formalities in
14    connection with the taking of this deposition, including
15    time, place, sufficiency of notice, and the authority of
16    the officer before whom it is being taken may be and are
17    hereby waived.
18       It is further stipulated and agreed that objections
19    other than as to form are reserved to the time of trial.
20       It is further stipulated and agreed that the reading and
21    signing of the deposition transcript by the deponent is
22    hereby waived.
23       It is further stipulated and agreed that the proof of
24    the qualifications of the Notary Public before whom the
25    deposition is being taken is hereby waived.

4

```
 1            ANTHONY PEZZENTI, called as a witness by the
 2   Defendants, having been first duly sworn by the Notary, was
 3   examined and testified on his oath as follows:
 4
 5            DIRECT EXAMINATION BY MR. GERARDE:
 6
 7       Q.   Would you tell me what your name is, please?
 8       A.   Anthony Pezzenti.
 9       Q.   And how old are you, Anthony?
10       A.   Twelve.
11       Q.   When is your birthday?
12       A.   The 26th of December.
13       Q.   And do you remember what year you were born?
14       A.   '90.
15       Q.   Okay.  So, you're going to be thirteen in a few
16   weeks?
17       A.   Yep.
18       Q.   Good.  All right.  Well, this thing that we are at
19   today is called a deposition, and I am going to ask you some
20   questions and you have to give me the answers to the best of
21   your ability.
22       A.   All right.
23       Q.   And you will agree to do that?
24       A.   Yep.
25       Q.   The Court Reporter just put you under oath.  Do you
```

5

```
 1   know what that means?
 2        A.   That I can't lie.  And if I do, then it will -- it
 3   well, I guess, ruin the case or something.
 4        Q.   Well, I don't know what it will do to the case.
 5   It's not going to help the case if you lie.
 6        A.   Yeah.
 7        Q.   But you can get in trouble if you lie.  It's against
 8   the law to lie if you're under oath.
 9        A.   Yeah.
10        Q.   Do you understand that?
11        A.   Yes, I do.
12        Q.   And you will agree to tell the truth?
13        A.   Yes.

14        Q.   And whatever that truth is, that's all we want you
15   to do.
16        A.   Yeah.
17        Q.   This is not going to take a long time, but I just
18   want you to know that you can stop and take a break any time
19   that you want.
20        A.   All right.
21        Q.   You don't have to even tell me what the reason is.
22   If you just feel like going out, you can go outside.  Your mom
23   and dad are here.  If you want to see them, that's okay, or it
24   can be because you want to talk to your attorney sitting next
25   to you.
```

8

```
 1      Q.   Okay.  Have you done anything to get ready for
 2  today's deposition?
 3      A.   What do you mean?
 4      Q.   Like have you talked to your parents about if I get
 5  asked this, this is what I am going to say?
 6      A.   Well, I think in my mind of what I am going to say
 7  to the questions and try to remember the whole incident and
 8  what happened.
 9      Q.   Okay.  All right.  Now, so you remember that there
10  was a time when you called the police?
11      A.   Yes, I do.
12      Q.   And then in response to that, the police came to
13  your house?
14      A.   Yes.
15      Q.   And that was Officer Capaldo and Sergeant Krupa?
16      A.   Yes.
17      Q.   And do you remember those two men coming to the
18  house?
19      A.   Yes, I do.
20      Q.   And did they talk to you?
21      A.   Yeah.
22      Q.   And did you answer all of their questions to the
23  best of your ability?
24      A.   Yes.
25      Q.   And did you tell them the truth?
```

9

```
 1        A.   Yes.
 2        Q.   And they took you in the police car towards the end
 3   of that event?
 4        A.   Yeah.
 5        Q.   And you went to the police station?
 6        A.   Yes.
 7        Q.   Well, let me ask you this.  How far away from your
 8   house is it to the police station?
 9        A.   I have no clue.  Probably about five minutes.
10        Q.   Okay.  And do you remember which one of the officers
11   that you rode with?
12        A.   I rode with Sergeant Krupa.
13        Q.   And where did you and Sergeant Krupa go when you
14   left your house?
15        A.   We went -- I don't know exactly.  We went from my
16   house -- we went out onto 177, Lovely Street, and we went from
17   there to where there were some electrical wires down.  He got
18   out of the car, took two or three steps, got back in the car.
19   I was sitting in the front seat, and then we went to the
20   police station.
21        Q.   Okay.  So, in other words, you guys were driving
22   along and you saw some wires were down?
23        A.   I guess he got called to it or whatever.  And he
24   pulled in a driveway, got out for a second, and came back in.
25        Q.   Okay.  So that, in a sense, was a detour you two
```

10

1  guys took on your way to the police station?
2      A.   Yes.
3      Q.   And then other than that, you basically went right
4  to the police station?
5      A.   Yes.
6      Q.   When you got to the police station, did you have
7  your music with you, your headphones and your --
8      A.   Yes.
9      Q.   Was it a Discman?
10     A.   Yes, it was a CD player.
11     Q.   And how many CDs did you have?
12     A.   I had one.
13     Q.   And is that something that you listened to when you
14 were at the police station?
15     A.   Yes.
16     Q.   What did the sergeant tell you was going to happen
17 when you were at the police station?
18     A.   He didn't really tell me anything.  He just said
19 that I was going to sit there for a while until they figured
20 out what was going on.
21     Q.   Okay.  And did he give you a place to sit?
22     A.   Yeah.  I sat at -- the dispatcher's desk was over
23 here, and I sat at the second desk over on the left-hand side.
24     Q.   Okay.  And from where you were, if someone was at
25 the glass looking in, would you be able to see them?

11

```
 1       A.    Yes.
 2       Q.    All right.
 3       A.    Which glass?  The bulletproof glass.
 4       Q.    Yes.
 5       A.    Yes.
 6       Q.    That would be the glass where someone from the
 7   public would come?
 8       A.    Yes.
 9       Q.    And was there a time when your dad came to that
10   glass and you were able to talk to him through the hand piece?
11       A.    I wasn't really able to talk to him at all.
12       Q.    Okay.  Did you know that there was a part in the
13   glass where people can hand in money or papers?
14       A.    Yes.
15       Q.    Did you ever stand up there and, like, hold hands
16   with your father or something?
17       A.    No.  I don't remember --
18       Q.    All right.
19       A.    -- if I did or not.
20       Q.    Was there a time when you knew that your father was
21   outside on the other side of the bulletproof glass?
22       A.    Yes.
23       Q.    And was there a time when Officer Capaldo brought
24   you out to see him?
25       A.    Yes.
```

12

```
 1      Q.   And how long were you out there with him for?
 2      A.   Maybe two, three minutes.
 3      Q.   And then what did you guys talk about when you were
 4   out there?
 5      A.   We sat down and prayed.
 6      Q.   And then what did you do when you came back?
 7      A.   Oh, I got back into the -- I went in and I was just
 8   sitting there.
 9      Q.   All right.  Now, were you in the actual dispatch
10   room?
11      A.   Yes, I was.
12      Q.   Did you see any of the equipment that the other
13   policeman was using?
14      A.   I saw where the dispatcher was sitting, all the
15   equipment that she used and stuff.
16      Q.   Okay.  Did you hear her take any calls?
17      A.   Yes.
18      Q.   Is that something that you were interested in, how
19   all those machines worked and everything?
20           MS. DOYLE:  Objection to the form.
21           THE WITNESS:  Not really.
22           MS. DOYLE:  Sorry, hon.  You have to answer.  I
23       have to put it on the record.
24           THE WITNESS:  Not really.
25      Q.   (By Mr. Gerarde)  Not really?
```

13

```
 1      A.   No.
 2      Q.   So, did you have anything with you besides your CD
 3 player?
 4      A.   I had my backpack, and I don't know what else was in
 5 my backpack.
 6      Q.   Was there any schoolwork in the backpack?
 7      A.   I think, yes.
 8      Q.   Did you do any schoolwork?
 9      A.   No, I didn't.
10      Q.   Do you remember being talked to by the person from
11 the state that came in; it was a man named Scott Harvey?
12      A.   Yeah.  I don't remember his name, but I remember
13 talking to him in the back room where the police would eat and
14 stuff.
15      Q.   And were you alone with Scott Harvey when you had
16 that talk?
17      A.   Yes.  I was, yes.
18      Q.   What did you and Mr. Harvey talk about?
19      A.   What happened and what my reaction was to it --
20      Q.   All right.
21      A.   -- to what happened.
22      Q.   What did you tell him your reaction was?
23      A.   I told him that my -- the reaction or what happened?
24      Q.   No.  We know what happened.  What did you tell him
25 your reaction was?
```

14

```
 1      A.   My reaction was just that he asked me if I had been
 2   hit a lot, and I said no.  I hadn't been hit a lot when I was
 3   -- it was discipline.  And like when -- instead of grounding
 4   me, they would discipline me.  And I had really no problem
 5   with it, but it was just a big mistake that day of calling the
 6   police.  That's what I told them.
 7      Q.   Okay.  So, in other words, when Scott Harvey asked
 8   you if you had been hit a lot, you said no, it was discipline?
 9      A.   Yes.
10      Q.   And did you mean that?  And the reality is, yes, I
11   was hit, but I considered it discipline so I don't consider it
12   being hit?
13      A.   Yes.  I considered it discipline because it says in
14   the Bible you're to discipline your kids.
15      Q.   But what you were talking about is you were, in
16   fact, being hit, but it was okay with you?
17      A.   Yes.
18      Q.   Is that what you're saying?
19      A.   Yes.
20      Q.   Because it was discipline?
21      A.   Yes.
22      Q.   All right.  And what did he say about that?
23      A.   I don't really remember what he said about it.
24      Q.   Now, after you spoke to Scott Harvey or, you know,
25   the state guy, how long after that was it before you got to go
```

20

1              C E R T I F I C A T E

2

3         I, Christine E. Borrelli, a Notary Public and

4   Licensed Court Reporter for the State of Connecticut, do

5   hereby certify that the deposition of ANTHONY PEZZENTI, was

6   taken before me pursuant to the Connecticut Practice Book at

7   the Law Offices of Howd & Ludorf, 65 Wethersfield Avenue,

8   Hartford, Connecticut, commencing at 2:15 p.m. on Thursday,

9   December 11, 2003.

10        I futher certify that the witness was first sworn by

11  me to tell the truth, the whole truth, and nothing but the

12  truth, and was examined by counsel, and his testimony was

13  stenographically reported by me and subsequently transcribed

14  as herein before appears.

15        I further certify that I am not related to the

16  parties hereto or their counsel, and that I am not in any way

17  interested in the events of said cause.

18        Witness my hand this 22nd day of December, 2003.

19

20

21

22

                                   _____
23                                 Christine E. Borrelli
                                   Notary Public
24                                 CT License No. 117
    My Commission Expires:
25  June 30, 2006