UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


AUGUST PEZZENTI, JR.          :     NO: 3:03CV00419 (MRK)
INDIVIDUALLY, ET AL
                             :
vs.                           :

JOSEPH CAPALDO, ET AL         :     DECEMBER 11, 2003



DEPOSITION OF:  JOHN C. MABEN




APPEARANCES:


        WILLIAMS & PATTIS, LLC
            Attorneys for the Plaintiffs
            51 Elm Street
            New Haven, CT 06510
            (203) 562-9931
        BY:  CHRISTY DOYLE, ESQ.


        HOWD & LUDORF
            Attorneys for the Defendants
            65 Wethersfield Avenue
            Hartford, CT 06114
            (860) 249-1361
        BY:  THOMAS R. GERARDE, ESQ.


                Christine E. Borrelli
              Connecticut License No. 117
            Registered Professional Reporter


        NIZIANKIEWICZ & MILLER REPORTING SERVICES


# Exhibit F

2

```
 1        . . . . . . Deposition of JOHN C. MABEN, a Plaintiff,

 2     taken on behalf of the Defendants, in the herein before

 3     entitled action, pursuant to the Connecticut Practice Book,

 4     before Christine E. Borrelli, duly qualified Notary Public

 5     in and for the State of Connecticut, held at the Law Offices

 6     of Howd & Ludorf, 65 Wethersfield Avenue, Hartford,

 7     Connecticut, commencing at 3:00 p.m. on Thursday, December

 8     11, 2003.

 9

10                 S T I P U L A T I O N S

11

12       It is hereby stipulated and agreed by and among counsel

13     for the respective parties that all formalities in

14     connection with the taking of this deposition, including

15     time, place, sufficiency of notice, and the authority of

16     the officer before whom it is being taken may be and are

17     hereby waived.

18       It is further stipulated and agreed that objections

19     other than as to form are reserved to the time of trial.

20       It is further stipulated and agreed that the reading and

21     signing of the deposition transcript by the deponent is

22     hereby not waived.

23       It is further stipulated and agreed that the proof of

24     the qualifications of the Notary Public before whom the

25     deposition is being taken is hereby waived.
```

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    two boys?

2        A.   Well, there are others.  I can't remember.  That's

3    the one that sticks out most in my mind.  Go ahead.  I'm sure

4    there are others.

5        Q.   Okay.  And --

6        A.   That was the most successful.

7        Q.   I understand.  And the case with Judge Dunnell, that

8    would be in adult court.  Correct?

9        A.   Yes.  He was just beating being a juvenile.

10       Q.   Was that --

11       A.   He was just a year or six months or a month older.

12       Q.   I'm not sure if they still have this, but they used

13   to have a program called the Youthful Offender Program.

14       A.   The YL, but they wouldn't allow it.  He had priors.

15       Q.   Okay.

16       A.   We tried.

17       Q.   When did you first meet August Pezzenti?

18       A.   Years ago.  One of the things that I told you I

19   did -- I am also a real estate broker.  I am also a rental

20   agent, and I always tried to garner people that owned a great

21   deal of real estate because it would make it easier rather

22   than the single or two-family property type of rent, type of

23   owner.  So, in Plainville, one of the people I met was my --

24   was Elmo Aiudi.  He owned a concrete company in Plainville,

25   Westbrook, West Hartford, and he had just bought Builders

1     Concrete in Manchester and Willington.  He has a vast amount

2     of residential property around his concrete plant, I think,

3     due to the case I think we all studied in law school, Boomer,

4     and the dust and particulates that sift out of the concrete

5     plant.  Rather than have all of the complaints, over time he

6     bought as many as he could, so he probably has forty to fifty

7     rentals, and Mr. Pezzenti was his property manager at the

8     time.  So, I worked with Elmo Aiudi's son, Steve Aiudi, who

9     managed the property at that point in time, August Pezzenti,

10    who actually did the fix up, painting up, and myself as a

11    rental agent.  That's how I met Auggie.

12         Q.    Okay.  Have you ever been retained by August

13    Pezzenti as his attorney?

14         A.    Absolutely.

15         Q.    And in what type of case were you retained to

16    represent him?

17         A.    I've handled one of his divorces.  I've handled

18    something where we had to go to the state police in Hartford

19    one day.  That was just a one day stop.  Hello, how do you do.

20    I handled some of his evictions, and I have also rented out

21    property for Mr. Pezzenti.

22         Q.    That would be in your capacity as broker?

23         A.    Right.

24         Q.    When you say one of his evictions, you mean when he

25    was evicting someone from one of his properties?

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1       A.    That's correct.

2       Q.    Anything else come to mind?

3       A.    No.  I didn't handle any of his closings.

4       Q.    And I take it you haven't been a lawyer for any of

5    the other Pezzenti family members except for what we are

6    talking about on September 12th of 2002?  In other words, have

7    you represented Mrs. Pezzenti ever?

8       A.    No.

9       Q.    And what about Anthony Pezzenti?

10      A.    Just for this September 12, 2002.

11      Q.    Okay.

12      A.    But things were of the nature there that it was -- I

13   wasn't allowed to even speak to Anthony Pezzenti, an

14   eleven-year-old boy.

15      Q.    I understand that.

16      A.    It's very difficult to represent someone if you

17   can't speak to them.

18      Q.    Do you advertise anywhere?

19      A.    No.

20      Q.    Do you have a Yellow Pages ad even?

21      A.    No.

22      Q.    You're number is in the phone book as a lawyer?

23      A.    In the residential section, yes.

24      Q.    In the White Pages?

25      A.    In the White Pages.

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1   have told me that if someone in the community heard about

2   this, the potential for damage to your reputation would exist?

3       A.   Absolutely.

4       Q.   But you agree with me that the community doesn't

5   know about it?

6       A.   That will likely change.

7       Q.   Well, excuse me.  At least as we sit here today,

8   your reputation hasn't been harmed.  Is that fair?  I don't

9   think she is trying to show you anything.

10      A.   I guess not.  That's a fair statement.

11      Q.   Why do you say that's about to change?

12      A.   Because I don't see this case settling, and Mr.

13  Pezzenti has -- is being continually harassed by the Canton

14  police force, and there is another probably -- I did some

15  research today that I knew a while back, but I thought this

16  was going to iron out.  And Mr. Pezzenti is probably going to

17  file another suit.

18      Q.   He has already alerted us to that, so that's okay.

19      A.   No, a different suit.

20      Q.   Against Canton?

21      A.   Yeah, absolutely.  An equal rights suit.

22      Q.   Based on the continued harassment?

23      A.   No.

24      Q.   Oh, okay.  Well, you don't have to disclose that

25  kind of stuff.

```
 1        A.   I don't intend to.

 2             MS. DOYLE:  Right.

 3        Q.   (By Mr. Gerarde)  Well, let's then just talk about

 4   the --

 5        A.   Matter at hand.

 6        Q.   -- what happened.

 7        A.   All right.

 8        Q.   I'm sorry.  Why is it that a lawyer's reputation is

 9   tarnished in your eyes because he is denied access by police

10   officers to see a client?

11        A.   Because Pete Soulby went in representing Mrs.

12   Pezzenti and he never showed a business card.  He never showed

13   a Connecticut Bar Association card.  They opened the doors and

14   he just walked right in.

15        Q.   But was Pete Soulby walking in to see a child they

16   had in protective custody and they let him walk right in?

17             MS. DOYLE:  Object to the form.  Go ahead and

18        answer --

19             THE WITNESS:  Pete --

20             MS. DOYLE:  -- to the best of your knowledge.

21             THE WITNESS:  To the best of my knowledge, Pete

22        Soulby was representing Mrs. Pezzenti --

23        Q.   (By Mr. Gerarde)  Right.

24        A.   -- and bringing her in, but he never identified

25   himself.  Right.
```

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    Q.    So, what you're saying is that Pete Soulby didn't

2    have to prove his identity the day they asked you for

3    identification?

4    A.    That's correct.

5    Q.    But you would agree with me that Peter Soulby wasn't

6    trying to visit Anthony Pezzenti who was being held by the

7    police at the time he went in.  Correct?

8    A.    Yes.  But would you agree with me that they both

9    went behind the bulletproof glass?  He was allowed behind

10   where I was not.

11   Q.    I'll grant you that.  Now, I still don't understand

12   the reputation point.  Are you saying that that makes -- that

13   the fact that you were not allowed to go see a minor that was

14   being held for D.C.F. purposes and Soulby was allowed to go in

15   without being asked for identification when he had an adult

16   with him, Mrs. Pezzenti, and he was representing her, that

17   that somehow makes you look like a bad lawyer?

18   A.    No.  Those are your words.

19   Q.    Well, your word is reputation.  I am trying to

20   get --

21        MS. DOYLE:  Wait a minute.  Let's have a

22        question and an answer.  I don't want a conversation.

23        I can't even object.  So, let's slow down and we will

24        pose a question and then I will have a chance to

25        object and then you will answer.

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1      Q.   (By Mr. Gerarde)  All right.  Go ahead.

2      A.   It makes me feel like a second-class citizen.

3      Q.   Okay.

4      A.   Is that a -- is it a fair statement?

5      Q.   Well, I can't comment on your feelings.

6      A.   That's okay.

7      Q.   Now, when did you hear from anyone in the Pezzenti

8  family on September 12, 2002?

9      A.   I have no idea.  Sometime around quarter after four,

10  4:30.  I arrived there approximately 5:00, 5:30.  I have

11  better notes at home.  This wasn't a subpoena duces tecum.  I

12  didn't bring my notes with me.  And he was held incommunicado

13  for approximately six hours while I looked through the

14  bulletproof glass.

15      Q.   And when you were looking through the glass, you

16  were able to see Anthony.  Is that right?

17      A.   Yes.  Except for the time that D.C.F. came and took

18  him into an interview room.

19      Q.   Okay.

20      A.   When D.C.F. came, I identified myself to Mr. Harvey,

21  told him I was Anthony's attorney and I wanted to be present.

22  He said okay.  But when he got inside, I wasn't allowed to be

23  present.

24      Q.   So, you're saying that Scott Harvey, who was the

25  D.C.F. man, said to you, Fine, come on in?

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    A.   It was -- excuse me.  It was between me and Mr.

2  Pezzenti for his child.

3    Q.   Okay.  So, you're saying that there is a retainer

4  agreement that exists somewhere that retains you to represent

5  Anthony Pezzenti?

6    A.   Yes.

7    Q.   And when was that prepared, approximately?

8    A.   The following day because of the exigent

9  circumstances, if you recall.

10    Q.   I do.

11    A.   Okay.  Fine.

12    Q.   Now, did you have a separate agreement going forward

13  after that day to represent either Mr. Pezzenti, Mrs. Pezzenti

14  or Anthony Pezzenti?

15    A.   We used the same agreement.

16    Q.   And how much did you get paid?

17    A.   And it was only to represent Anthony Pezzenti.

18    Q.   I understand.  How much did you get paid to

19  represent Anthony at this second D.C.F. interview?

20    A.   I would have to look at my notes.  You didn't ask me

21  to bring my -- subpoena duces tecum today.

22    Q.   Fair enough.  But you do believe that you charged a

23  fee and the fee was paid?

24    A.   Absolutely.

25    Q.   And you're saying that you did not represent Mr.

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1   Pezzenti or Mrs. Pezzenti at any time either the night of the

2   12th or after the subsequent D.C.F. interview?

3        A.   Mr. Soulby represented Mrs. Pezzenti.  Mr. Pezzenti

4   didn't need any representation at all.

5        Q.   All right.  Let me clarify the question.  I

6   understand that Peter Soulby represented Mrs. Pezzenti on the

7   criminal charge of breach of peace.

8        A.   That's correct.

9        Q.   What I'm focusing on is representation during the

10  night of September 12th at the police station and then

11  approximately a few weeks later at the second D.C.F. hearing

12  -- I'm sorry.  The second D.C.F. interview in which you said

13  that you represented Anthony.

14       A.   Yes.

15       Q.   And I'm asking you, did you have any representation

16  of Mr. or Mrs. Pezzenti associated with the second D.C.F.

17  interview?

18       A.   No.

19            MS. DOYLE:  Asked and answered, but go ahead.

20            THE WITNESS:  No.

21       Q.   (By Mr. Gerarde) So, the only -- well, let me ask

22  you now.  Is there any other fee that you have earned in

23  representation of Anthony Pezzenti other than these two events

24  that you're telling me about?

25       A.   That's correct, what you said.

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1     Q.   Okay.  When is the last time that you were August

2     Pezzenti's lawyer for any purpose?

3     A.   I have no idea.  Must have been at a divorce hearing

4     for one of his ex-wives.

5     Q.   And I know you wouldn't know the date, but can you

6     give me an idea?  Was it five years ago, ten years ago?

7     A.   Twenty years ago, three years ago.  It could be a

8     year ago.

9     Q.   One year ago?

10    A.   I started that.  You're nailing me down again.  I

11    believe she can read it back.  It says I had no idea and --

12    Q.   I asked for a general --

13    A.   A general?  Approximately a year, maybe twelve,

14    fourteen months ago, maybe less.

15    Q.   Okay.  How long have Mr. and Mrs. Pezzenti been

16    married?

17    A.   Don't know.

18    Q.   In other words, Elizabeth Pezzenti and --

19    A.   Don't know.  I have no clue.

20    Q.   -- August Pezzenti?  You have no clue?

21    A.   No.

22    Q.   Do you know if Elizabeth Pezzenti is the biological

23    mother of Anthony Pezzenti?

24         MS. DOYLE:  Do you know?

25         THE WITNESS:  Yes, I do know.

NIZIANKIEWICZ & MILLER REPORTING SERVICES

35

1      Q.   (By Mr. Gerarde)  She is his mother?

2      A.   Yes.

3      Q.   So, when you say that you represented Mr. Pezzenti

4  in a divorce-related issue sometime within the last few years,

5  when did the actual divorce that was the subject of that

6  hearing take place?

7           MS. DOYLE:  I am going to object to the

8      question.  Again, relevancy.  You can answer if you

9      know.

10          THE WITNESS:  I have known Auggie maybe five or

11      seven years, and this was a prior wife.  Twelve,

12      fifteen years ago.

13      Q.   (By Mr. Gerarde)  Coming back for some modification

14  of a decree?

15      A.   Yes.

16      Q.   Is August Pezzenti the biological father of Anthony?

17      A.   Yes.

18      Q.   Now, do you claim that you have a constitutional

19  right to practice law?

20      A.   I claim I have a license to practice law.

21      Q.   All right.  I'm just wondering if you were able to

22  articulate it for me.  You believe your constitutional rights

23  were violated?

24      A.   I was hired to represent -- I was hired by Mr.

25  Pezzenti to represent his son.  I identified myself as an

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    attorney with photograph I.D..  Sergeant Michael Krupa refused

2    to allow me to speak to Anthony Pezzenti, an eleven-year-old

3    boy, and held him incommunicado for six hours.

4        Q.   All right.  So, if we accept for the purpose of this

5    question that there was no doubt you were a lawyer, there was

6    no doubt you were telling the Canton Police that you were

7    Anthony Pezzenti's lawyer, and there is no doubt that they

8    refused to let you in to see him, are you able to tell me how

9    that violated your constitutional rights?

10       A.   I have a right to speak to a client, and a client

11   has a right to speak to an attorney.

12       Q.   I don't want to get messed up with the client's

13   rights with this question.  I am just talking about your

14   rights right now.

15       A.   Right.  Well, I have a right once I am hired to

16   speak to the client.

17       Q.   A right under the constitution?

18       A.   I believe so.

19       Q.   Are you able to --

20       A.   Articulate it?

21       Q.   Be a little more --

22       A.   No.  I believe that's what Mr. Williams will do.

23       Q.   Now, I have read police reports that indicate that

24   the police did not take a statement from Anthony Pezzenti.  Do

25   you know that to be true or untrue?  Do you quarrel with that

1   at all?

2       A.   That they did not take a statement from Anthony

3   Pezzenti?

4       Q.   Correct.

5       A.   There was a time when Anthony Pezzenti was behind

6   closed doors, and I don't know what was said or done.

7       Q.   All right.  So, in other words, I know there was

8   conversations between you and Sergeant Krupa in the lobby

9   where Sergeant Krupa said, We would not be taking a statement

10  from him.  And I am just wondering if you think that that was

11  true or untrue based on some information that you might have?

12      A.   I don't know how -- you're asking me to answer what

13  is in Sergeant Krupa's head.

14      Q.   I'm sorry.  Let me say it differently.  I didn't

15  mean to confuse you.  I'm just wondering if you yourself have

16  any information that the police, in fact, took a statement

17  from Anthony even though it was represented to you that they

18  would not be taking a statement from Anthony?

19      A.   No.

20      Q.   Okay.

21      A.   But like I said, I don't know what went on behind

22  closed doors.

23      Q.   I understand.

24      A.   Okay.  Great.

25      Q.   Now, have you had a chance to read any of the police

1    reports in this case?

2         A.   I read it out there in the alcove.  And I didn't get

3    a chance a year and three months ago to read one police

4    report.

5         Q.   And was it one of the reports that detailed what had

6    happened out at the home, that Anthony had telephoned the

7    police and they responded and interviewed the mother and

8    Anthony and then made a decision to transport Anthony?

9         A.   Yes.

10        Q.   Okay.  Now --

11        A.   That's how he got to the station.

12        Q.   Okay.  When you sat with Anthony when he was

13   interviewed by the Department of Children & Families --

14        A.   Yes.

15        Q.   -- did Anthony relate what happened that day that

16   caused him to be transported to the police department?

17        A.   Yes.

18        Q.   And did he say anything that you thought was

19   inconsistent with what was written down in the police report?

20             MS. DOYLE:  Object to the form.  If you know.

21             THE WITNESS:  Well, this is a rare circumstance.

22        I would have to read every single police report

23        again, and I haven't read them all.  I only read one.

24        I didn't know there was more than one.  Apparently

25        for this case, there are three police reports.  I

                NIZIANKIEWICZ & MILLER REPORTING SERVICES

42

1    driven by it three or four or possibly five times, I got out

2    of my car and Mr. Krupa was out in the parking lot and Mr.

3    Pezzenti greeted me.  I said hello to Mr. Pezzenti.  Mr. Krupa

4    came along and said, Are you his attorney?  I said, Yes,

5    meaning the attorney that Mr. Pezzenti hired to represent his

6    son, yes.  He looks at me, looks at my car, says, Nice car.

7    Looks at Mr. Pezzenti and says, You bought it for him.

8         Q.    What car are you driving?

9         A.    A 1998 Mercedes C280.

10         Q.    And I am not going to ask you why Krupa said that.

11   He said to Mr. Pezzenti, you bought it for him by paying legal

12   fees?  Is that your impression?

13         A.    You have to ask Mr. Krupa.  But he said, Nice car.

14   Looked at Mr. Pezzenti and said, You bought it for him.  That

15   was how I met Mr. Krupa.

16         Q.    And then how did it go between the two of you after

17   that?

18         A.    We walked from the parking lot into the foyer of the

19   police station.  I showed him my Connecticut Bar Association

20   card, photo I.D..  I said I did quite a bit of criminal work.

21   The guards like it in places like Cheshire and they like it in

22   like New Britain lockup or in places like that because a

23   business card can mean that you took it from somebody's desk,

24   but a photo I.D. absolutely helps.  And so I showed him my

25   Connecticut Bar Association photo I.D..  Of course, I had a

                NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    corresponding photo I.D., Connecticut driver's license.  He

2    didn't ask to see that, I don't believe.  And he said, Okay.

3    So I said, I want to speak to that eleven-year-old boy.  And

4    he says, Have you ever represented Mr. Pezzenti in the past?

5         Q.   Meaning the father?

6         A.   Meaning the father.

7         Q.   Yes.

8         A.   I said yes.  He says, Well, you can't represent his

9    son.  You have a conflict.  I said, Do you see the little boy

10   in there with credit cards, a phone, or any cash?  He said,

11   No.  I said, Well, then, I am hired by his father to represent

12   him.  He says, You can't speak to him.  I was exceedingly

13   agitated, but at all costs, I'm a gentleman.  Maybe some

14   people might have done other things to create a disturbance to

15   get arrested, but I would not.  And I walked over to him and I

16   said, You're a sergeant.  Is there a lieutenant, a captain, or

17   a chief of police around?  He took a half step towards me --

18   he is taller than I, younger than I, and outweighs me.  He is

19   in good shape.  He took a half step towards me, pushed out his

20   chest and screams, I am in charge here.  I wear the stripes.

21   I make the decisions, much louder than that.

22        Q.   Okay.

23        A.   Okay.  So, I am going to tell you, without you

24   asking me, did I feel threatened?  I absolutely did.  Do I

25   think an eleven-year-old boy should be held incommunicado?

NIZIANKIEWICZ & MILLER REPORTING SERVICES

44

1    No.  Do I think Mr. Krupa needs some sensitivity training?

2    Absolutely.  Go ahead.

3         Q.   Okay.  Did you have any reason to believe that there

4    was, in fact, a superior officer on duty at that time?

5         A.   No, none at all.  I didn't.

6         Q.   Okay.

7         A.   I just thought someone with more experience or a

8    higher rank would understand that I should be able to speak to

9    an eleven-year-old boy.

10        Q.   All right.  But, in other words, your position is

11   not that Krupa lied to you about him being in charge, you just

12   don't like the way he delivered the message?

13             MS. DOYLE:  Object to the form.

14             THE WITNESS:  Yeah.  I don't know whether or not

15        he was in charge.  Apparently, he was by his answer.

16        My understanding would be then and now that he was

17        the highest ranking officer on site and it was his

18        decision and he makes those decisions and he was in

19        charge.  There was no mistaking that.

20        Q.   (By Mr. Gerarde)  Okay.  Now, as we sit here today,

21   do you have an existing lawyer/client relationship with August

22   Pezzenti?

23        A.   What, if anything, do you mean by that?

24        Q.   Like, if I were to ask you about this other action

25   that Mr. Pezzenti is contemplating, would you tell me -- I am

                  NIZIANKIEWICZ & MILLER REPORTING SERVICES

1          on-site at 63 Canton -- Secret Lake Road in Canton,

2          who was not in that house when this transpired, the

3          phone call or the preceding incidents, to talk to his

4          own son.  This is how things are handled.  And there

5          is a history of this in Canton.

6          Q.    (By Mr. Gerarde)  Are you aware that Anthony had

7     advised the police that his father had struck him with a belt?

8          A.    There was something in one of the police reports

9     about demerits and a belt, yes.

10         Q.    And are you aware that Anthony was, in fact, allowed

11    to go into the lobby and talk to his father and pray with his

12    father before you arrived?

13         A.    Before I arrived?  No.  I was not aware of that.

14         Q.    Okay.

15         A.    But while I was there, he was not allowed out to the

16    lobby.

17         Q.    Okay.  And did you have a conversation with Mr.

18    Pezzenti while you were waiting during the time that Anthony

19    was behind the glass of the dispatch area --

20         A.    Of course.

21         Q.    -- on several occasions?

22         A.    Well, there were very few people to talk to.  The

23    police wouldn't let me speak to Anthony and the police, other

24    than pointing at their stripes and telling me that they make

25    the decision, they are in charge, they were running the show,

NIZIANKIEWICZ & MILLER REPORTING SERVICES

54

1    they didn't want to talk to me.

2         Q.   Did you talk to Mr. Pezzenti about the subject of

3    what happened that day and what was going on now?

4         A.   Well, he didn't have many answers.  Again, Mr.

5    Pezzenti was not at the house.

6         Q.   All right.  But did you talk to him about the fact

7    that you guys were waiting for a D.C.F. representative to

8    come?

9         A.   We were wondering what would be next, absolutely.

10        Q.   Did you know that Mr. Pezzenti had contacted a

11   family friend, and it's a couple who are, in fact, eligible to

12   be foster parents in the event Anthony needed to be placed

13   outside the home?

14        A.   Yes.  He told me about them, yes.  In fact, they

15   showed up there.

16        Q.   Okay.  And did you talk to him about whether or not

17   you could assist if Anthony couldn't be returned to the home

18   to have Anthony go with this family friend versus some other

19   location?

20        A.   I'll answer your question.  I don't quite understand

21   it, but to sum it up, those two people that were there were

22   members of Mr. and Mrs. Pezzenti's church.  And, yes, their

23   qualifications -- whatever you said were true.  And Mr.

24   Pezzenti and myself felt exceedingly threatened by Mr. Krupa

25   as to how he handled everything pointing to his stripes,

1   screaming at the top of his lungs, keeping us at bay that we

2   didn't think that any of us were safe.  And Mr. Pezzenti and

3   Mrs. Pezzenti chose to have Anthony go to this couple's

4   house --

5       Q.   Okay.

6       A.   -- because they were afraid of the Canton Police

7   Department.

8       Q.   When did they choose to have Anthony go to that

9   couple's house?

10      A.   I wasn't made a party to that decision.

11      Q.   When was the decision made?

12      A.   Shortly thereafter.

13      Q.   After you ended that night and left the department,

14  you mean?

15      A.   Yeah, somewhere.  It was within a twenty-four hour

16  period.  He basically went within twenty-four hours to that

17  couple's home.

18      Q.   Did you talk to Sergeant Krupa about the fact that

19  you and he are both from New Britain?

20      A.   Sergeant Krupa is from New Britain?

21      Q.   Did you have a conversation with him about that?

22      A.   Sergeant Krupa is from New Britain?

23      Q.   Well, you're going to have to assume it for the

24  purpose of question because I have asked it.

25          MS. DOYLE:  He is asking whether or not you have

                NIZIANKIEWICZ & MILLER REPORTING SERVICES