**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

March 1

AUGUST PEZZENTI, JR.,
INDIVIDUALLY, ET AL
          :   NO.: 3:03 CV 0419 (MRK) ANW

v.

JOSEPH CAPALDO, ET AL    :   FEBRUARY 27, 2004

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56(c) and D. Conn. L. R. 7(a)1, the defendants,

Joseph Capaldo and Michael Krupa, hereby submit the following Memorandum of Law

in support of their Motion for Summary Judgment dated February 27, 2004.

The defendants have filed a D. Conn. L. R. 56(a)(1) Statement of Material Facts

Not In Dispute, along with exhibits and affidavits, and rely on the same for the basis of

their Motion for Summary Judgment.

The present Memorandum of Law is in support of the defendants' Motion for

Summary as to the claims of John Maben, only. The defendants have filed a separate

Motion for Summary Judgment with a supporting Memorandum of Law as to the claims

of August and Anthony Pezzenti. Both Motions and both Memoranda rely on the single

Local Rule 56(a)(1) Statement

I.   **STATEMENT OF FACTS**

On March 11, 2003, August Pezzenti, Jr., individually and as next friend of his

minor son, Anthony Pezzenti, and John C. Maben (collectively "plaintiffs") filed a four

count complaint against the defendants, Officer Joseph Capaldo and Sergeant Michael

Krupa, in their individual capacities. The plaintiffs alleged that the defendants were

police officers employed by the Town of Canton and were acting under color of law, that is, under color of the constitution, statutes, laws, ordinances, rules, regulations, customs and usage of the State of Connecticut and Town of Canton. (Complaint, Counts One – Four, ¶¶ 4-5).

The plaintiffs alleged that as a result of Anthony Pezzenti's telephone call to the Canton Police Department on September 12, 2002, in which he complained that his mother had disciplined him by striking him, the defendants visited the minor plaintiff's home and took him into custody. (Complaint, Counts One – Two, ¶¶ 7-8). The plaintiffs also alleged that the defendants held Anthony Pezzenti incommunicado for several hours before returning him to his parents. (Complaint, Counts One-Two, ¶ 8). August Pezzenti, Jr., and Attorney Maben further claim that, although they requested to speak with Anthony, the defendants refused to allow them to do so. (Complaint, Counts One – Two, ¶ 8).

### A.    PLAINTIFF'S COMPLAINT

In Count Four, Attorney John Maben alleged that the defendants took his client, Anthony Pezzenti, into custody for the purpose of interrogating him about allegations against his mother. (Complaint, Count Four, ¶ 7). Attorney Maben claims that the defendants refused to permit him to visit or speak to his client for a period of several hours during which time they detained and interrogated his client. (Complaint, Count Four, ¶ 8). As a result of the defendants' conduct, Attorney Maben alleges that he suffered economic loss, humiliation and emotional distress. (Complaint, Count Four, ¶ 9). Attorney Maben also alleges that the defendants interfered with his First and Fourteenth Amendment right to practice his profession. (Complaint, Count Four, ¶ 10).

2

Attorney Maben further alleges that defendants intentionally, knowingly and irrationally treated him differently from other attorneys seeking to meet with clients undergoing interrogation at Canton Police Headquarters, thereby depriving him of his Fourteenth Amendment right to equal protection of the laws. (Complaint, Count Four, ¶ 11).

## B. UNDISPUTED FACTS

On September 12, 2002, Anthony Pezzenti placed a telephone call to the Canton Police Department complaining that his mother hit him and threw a phone at him. (Exhibit A). The defendants responded to the Pezzenti home to investigate the allegations that Mrs. Pezzenti had hit Anthony. (Exhibit A & B).

Anthony met with Sergeant Krupa while Mrs. Pezzenti met with Officer Capaldo and each of them provided explanations to the defendants with respect to what happened that afternoon. (Exhibit A & B). Mrs. Pezzenti admitted that she slapped Anthony twice with an open hand and that she "tossed" the telephone "toward" him after he stated that he was going to call the police. (Exhibit A; Exhibit C, pp. 13-16, 22-23). The defendants also observed that Anthony had sustained a minor cut to his upper lip as a result of the phone hitting him in the mouth. (Exhibit A & B).

In light of the objective evidence demonstrating that Anthony had recently been hit by his mother, the defendants determined that it was in Anthony's best interest to take him into protective custody pending an investigation of the matter by the Department of Children and Families (hereinafter "DCF"). (Exhibit A & B). The defendants informed Mrs. Pezzenti that they were taking Anthony into protective custody until the DCF arrived to interview him. (Exhibit A & B).

3

Sergeant Krupa transported Anthony to the Canton Police Department. (Exhibit A & B). Upon arrival at the police department, Anthony sat in the dispatch room, which is visible to anyone waiting in the lobby of the police department, and listened to his compact disc player. (Exhibit A & B; Exhibit E, pp. 9-10). Although Mr. Pezzenti and Attorney Maben arrived at the police department requesting to talk and/or meet with Anthony, the defendants informed them that no one would meet with Anthony until after DCF arrived and interviewed him. (Exhibit B; Exhibit D, pp. 62-63,85-86).

Sergeant Krupa informed Attorney Maben that Anthony was in protective custody and that *no one* would be speaking with Anthony until DCF arrived to interview him. (Exhibit B; Exhibit F, pp. 42-43). Sergeant Krupa also had concerns about a potential conflict of interest because **Attorney Maben admitted that he had represented Mr. Pezzenti in the past, a person suspected of hitting Anthony with a belt**. (Exhibit B; Exhibit F, p. 43). Additionally, Sergeant Krupa was suspicious that Mr. Pezzenti, who was also a suspect, had hired Attorney Maben to represent his son so quickly when his son was not being accused of any crime but was in protective custody based on allegations of child abuse. (Exhibit B). Sergeant Krupa has not allowed any attorneys to meet with children in protective custody at the Canton Police Department. (Exhibit B).

It is undisputed that Anthony was not arrested but taken into protective custody pending further investigation by the DCF based on Anthony's complaint that his parents disciplined him by hitting him, Mrs. Pezzenti's admission that she slapped Anthony twice and "tossed" a phone at him, and the visible cut to Anthony's lip. (Exhibit A & B). The defendants did not interview, interrogate or take a statement from Anthony while they were waiting for DCF to arrive. (Exhibit A & B). Anthony was briefly allowed into the

4

lobby to sit and pray with his father. (Exhibit A; Exhibit D, pp. 59-60). Mr. Pezzenti was also able to hold Anthony's hand through the pass through in the window that separates the dispatch room from the lobby. (Exhibit D, pp. 59-60).

Following the interview by DCF social worker, Scott Harvey, it was determined that Anthony could return home with his parents that evening. (Exhibit A & B; Exhibit C, pp. 38, 41). Mr. Harvey advised Mr. and Mrs. Pezzenti to discuss another form of discipline other than spanking. (Exhibit A & B; Exhibit C, pp. 38, 41). Prior to releasing Anthony to his parents, Officer Capaldo also advised Mr. and Mrs. Pezzenti that it was illegal to discipline their children the way they have in the past and that it was illegal to strike their children with any types of items or in a way that can cause injury. (Exhibit A; Exhibit D, p. 92).

The defendants, Joseph Capaldo and Michael Krupa, now move for summary judgment as to Count Four of the plaintiffs' Complaint.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) requires the entry of summary judgment ". . . if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A factual dispute is "genuine" when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A "material fact" is one whose resolution will affect the ultimate determination of the case. Id. In determining whether a material issue of fact exists, the court must resolve all ambiguities and draw all inferences

5

against the moving party. Id. at 255, 106 S.Ct. at 2513; J.F. Feeser, Inc. v. Servi-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990), cert. denied, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991). However "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Samuels v. Smith, 839 F.Supp. 959, 962 (D.Conn. 1993).

The party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256, 106 S.Ct. 1570, 94 L.Ed.2d 763 (1987); Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980). Thus, once the moving party has satisfied its burden of identifying evidence which demonstrates the absence of a genuine issue of material fact, the non-moving party is required to go beyond the pleadings by way of affidavits, depositions, and answers to interrogatories in order to demonstrate specific material facts which give rise to a genuine issue. Celotex Corp. V. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed. 25 (1986). "Neither courts nor defendants should be subjected to trials which can be little more than harassment." Applegate v. Top Associates, Inc., 425 F.2d 92, 96 (2d Cir. 1970).

Where evidence is submitted in support of, or in opposition to, a motion for summary judgment, such evidence must be presented in a manner consistent with its admissibility at trial. See First National Bank of Clinton, Ill. v. Insurance Co. of North America, 606 F.2d 760 (7th Cir. 1979) (in ruling on summary judgment motion, the district court properly relied on documents and exhibits identified by affidavit). Unsworn

6

statements of the parties, letters addressed to litigants from third persons, and hearsay

that does not fall under one or more of the exceptions listed in Rules 803-805 of the

Federal Rules of Evidence, may not properly be considered.  *See* Adickes v. S.H. Kress

& Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Beyene v. Coleman

Security Services, Inc., 854 F.2d 1179 (9th Cir. 1988).

III.   **LAW AND ARGUMENT**

    A.    **THE UNDISPUTED FACTS DEMONSTRATE THAT THE
DEFENDANTS DID NOT INTERFERE WITH ATTORNEY
MABEN'S FIRST AND FOURTEENTH AMENDMENT RIGHTS TO
PRACTICE HIS PROFESSION.**

    The plaintiff, John Maben, alleges that the defendants interfered with his First

and Fourteenth Amendment right to practice his profession because they refused to

allow him to meet with Anthony Pezzenti on September 12, 2002. Attorney Maben

further alleges that he suffered humiliation, economic loss and emotional distress as a

result of the defendants' conduct on September 12, 2002.

    At the outset, the defendants' review of the relevant case law does not reveal a

First Amendment right to practice his profession or occupation as stated by the plaintiff.

While the First Amendment protects many things such as the press, association, and

speech, and these issues may arise in the employment context, *see generally* Pickering

v. Bd. of Educ., 391 U.S. 563 (1968), the defendant submit that the plaintiff's reliance in

this instance on the First Amendment is as misplaced as his co-plaintiffs' reliance on the

First Amendment in addition to the Fourteenth Amendment in the context of their

claimed rights of familial association. Similarly, the defendants argue that the analysis

below of the plaintiff's claims under the Fourteenth Amendment would apply to the

claims under the First Amendment. Under either theory, the defendants submit they are entitled to summary judgment.

### 1.    Right To Pursue Occupation Or Calling.

"The concept of liberty protected by the due process clause has long included occupational liberty – the liberty to follow a trade, profession or other calling. . . . The due process clause of the Fourteenth Amendment secures the liberty to pursue a calling or occupation, and not the right to a specific job." (Citations omitted; internal quotation marks omitted.) Ulichny v. Merton Comm. School Dist., 249 F.3d 686, 704 (7th Cir. 2001). "In order to state a section 1983 claim for deprivation of the liberty interest, a plaintiff must show state action that significantly altered or denied him or her the opportunity to pursue a particular calling or occupation." Kepler v. Mirza, 102 F. Supp.2d 617, 623 (W.D. Pa. 1999). See also Greene v. McElroy, 360 U.S. 474, 492 (1959).

The Supreme Court has concluded that the "the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation." Conn v. Gabbert, 526 U.S. 286, 291-292 (1999).

> ### i.    *Brief Interruptions in Ability to Practice Profession Do Not Rise to the Level of a Substantive Due Process Violation of Fourteenth Amendment Right to Pursue Occupation.*

In Conn v. Gabbert, 526 U.S. 286 (1999), Mr. Gabbert "contended that his Fourteenth Amendment right to practice his profession without unreasonable government interference was violated when the prosecutors executed a search warrant

8

at the same time his client was testifying before the grand jury." Id., 289. The Supreme Court stated that "[n]o case of this Court has held that such an intrusion can rise to the level of a violation of the Fourteenth Amendment's liberty right to choose and follow one's calling. That right is simply not infringed by the inevitable interruptions of our daily routine as a result of legal process, which all of us may experience from time to time." Id., 292.

In the present case, Attorney Maben contends that the defendants interfered with his right to practice his profession by preventing him from meeting with Anthony, a potential client, despite admitting to the police officers that he had represented Anthony's father, August, in the past, who was suspected of hitting Anthony frequently with a belt. The undisputed facts demonstrate that the defendants would not allow Attorney Maben to meet with Anthony Pezzenti because Anthony was being held in protective custody until DCF could arrive to interview him. Sergeant Krupa was aware that Attorney Maben was hired by Mr. Pezzenti and that Mr. Pezzenti was also suspected of child abuse based on Anthony's allegations that his father had hit him with a belt ten times and that he was hit by one of his parents at least once a week. Furthermore, Attorney Maben admitted to Sergeant Krupa that he had represented August Pezzenti, Jr., in the past and, therefore, Sergeant Krupa was concerned about a potential conflict of interest. Sergeant Krupa's awareness of a possible conflict of interest as a layperson is something that Attorney Maben should have known as a matter of course.

Surprisingly, Attorney Maben admitted to Sergeant Krupa that he had represented Mr. Pezzenti with respect to a divorce proceeding and evictions. (Exhibit F,

9

p. 14). Attorney Maben conceded that he represented **Mr.** Pezzenti as recently as one year ago, maybe less. (Exhibit F, p. 34). Attorney Maben, in his capacity as a real estate broker, had also assisted Mr. Pezzenti in renting out property. (Exhibit F, p. 14). Indeed, the potential conflict of interest could have prevented Attorney Maben from representing Anthony at all!

Attorney Maben told Sergeant Krupa that he had represented Mr. Pezzenti before and, therefore, Sergeant Krupa viewed it as a potential conflict of interest to allow Attorney Maben to meet with Anthony prior to the arrival of the social worker from DCF. (Exhibit A & C; Exhibit F, p. 43). Although Sergeant Krupa would not allow Attorney Maben to meet with Anthony Pezzenti, Attorney Maben remained on the premises and waited with Mr. Pezzenti until Anthony was released to his parents following the interview with DCF.  (Exhibit B; Exhibit F, pp. 53-54).

Although Attorney Maben may have been prevented from meeting with Anthony Pezzenti on September 12, 2002, Mr. Pezzenti paid him for his representation of Anthony on September 12, 2002, in the amount of $800.00, pursuant to fee agreement between Mr. Pezzenti and Attorney Maben. (Exhibit F, p.31). Additionally, Attorney Maben continued to represent Anthony during a subsequent interview with DCF and he received payment from Mr. Pezzenti for those services as well. (Exhibit F, p. 32). Attorney Maben, therefore, has continued to practice law and could not identify any instance in which he was unable to practice his profession as a result of the September 12, 2002 incident.

In light of the circumstances on September 12, 2002, the defendants were acting reasonably and determined that Anthony Pezzenti's interests were paramount to those

10

of Mr. Pezzenti and Attorney Maben. The only alleged interference with Attorney
Maben's right to practice his profession was "merely a brief interruption" in his ability to
pursue his occupation. See Dittman v. California, 191 F.3d 1020, 1029 (9th Cir. 1999).
The actions of the defendants did not "completely prohibit" Attorney Maben's right to
engage in the practice of law. See id.

Accordingly, the defendants did not violate Attorney Maben's First and
Fourteenth Amendment right to pursue his occupation, and they are entitled to judgment
as a matter of law with respect to Count Four.

        *ii.*      ***The Right to a Specific Job is Not Protected by the
Fourteenth Amendment.***

The Court of Appeals for the Third Circuit succinctly states why Attorney Maben's
claims fail as a matter of law:

> The right to hold specific private employment and to follow a chosen
> profession free from unreasonable governmental interference comes
> within both the liberty and property concepts of the Fifth and Fourteenth
> Amendments. . . . [T]he Constitution only protects this liberty from state
> actions that threaten to deprive persons of the right to pursue their chosen
> occupation. State actions that exclude a person from one particular job are
> not actionable in suits . . . brought directly under the due process clause.

Piecknick v. Commonwealth of Pennsylvania, 36 F.3d 1250, 1259 (3d Cir. 1994).

    "It is the liberty to pursue a calling or occupation, and not the right to a specific
job, that is secured by Fourteenth Amendment." Piecknick, 36 F.3d at1259.  *See also*
Latessa v. New Jersey Racing Commission, 113 F.3d 1313,1318 (3d Cir. 1997);
Bernard v. United Township High School Dist. No. 30, 5 F.3d 1090, 1092 (7th Cir.
1993). "It is well settled that **one must have no ability to practice one's profession at
all in order to state a claim for deprivation of a liberty interest**." Rodriguez v.
Margotta, 71 F.Supp.2d 289, 297 (S.D.N.Y. 1999).

In <u>Bernard v. United Township High School Dist. No. 30</u>, 5 F.3d 1090, 1092 (7th Cir. 1993), the plaintiff "made a drawing of the high school and offered copied of his artwork for sale at local stores." 5 F.3d at 1091. Although the plaintiff and defendant attempted to enter into a profit sharing agreement, the parties were unable to do so. <u>Id.</u> After the plaintiff began selling the prints on his own, the defendant sent a letter to area retailers informing them that the school had not authorized or endorsed the sell of these prints. <u>Id.</u>, 1092 Following the receipt of the letter, many of the retailers refused to continue stocking the prints and the plaintiff lost substantial sales as a result. <u>Id.</u> The plaintiff claimed that defendant interfered with "his occupation as an artist and marketer of prints and thus deprived him of liberty and property without due process of law." <u>Id.</u>

> [O]ur cases show that the Constitution not only protects this liberty from state actions that threaten to deprive person of the right to pursue their occupation. State actions that exclude a person from one particular job are not actionable in suits like [the plaintiff's] that are brought directly under the due process clause.

<u>Bernard</u>, 5 F.3d at 1092.

The <u>Bernard</u> court determined that although the defendants may have interfered with his efforts to market one particular print, the defendant did not prevent the plaintiff from selling the print altogether and it did not prevent him from selling other prints. <u>Bernard</u>, 5 F.3d at 1092. Accordingly, the court held that the defendant's actions "did not impede [the plaintiff's] right to pursue the 'architectural drawings' trade in any way recognized by the Fourteenth Amendment." <u>Id.</u>

Similarly, in the present case, the defendants' refusal to allow Attorney Maben to meet with his "client" did not prevent him from practicing law altogether. Attorney Maben admittedly was unable to meet with Anthony Pezzenti but he remained at the Canton Police Department and was paid for his services. Furthermore, Attorney Maben

continued to represent Anthony during subsequent DCF interviews and he received compensation for the same. Attorney Maben continues to practice law and could not identify any instance in which the incident on September 12, 2002 prevented him from practicing his profession.

Accordingly, the defendants are entitled to summary judgment with respect to Attorney Maben's claim that they interfered with his right to practice his profession in violation of the Fourteenth Amendment.

### B.   THE UNDISPUTED FACTS DEMONSTRATE THERE WAS NO VIOLATION OF ATTORNEY MABEN'S FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION.

Attorney Maben alleges that the defendants "intentionally, knowingly and irrationally" treated him differently from other attorneys seeking to meet with clients undergoing interrogation at Canton Police Headquarters, thereby depriving him of his Fourteenth Amendment right to equal protection of the laws. Plaintiff has no competent evidence, let along a properly defined class of one, that this court could conclude that he was intentionally treated differently in violation of the Equal Protection clause.

### 1.   Equal Protection

The plaintiff appears to press an equal protection claim pursuant to a "class of one" theory. The defendants submit that they are entitled to summary judgment as to a "class of one" claim for the following reasons: (i) the plaintiff cannot maintain an equal protection "class of one" claim absent evidence of malice or bad faith; and (ii) there is no evidence that other similarly situated attorneys were treated differently by the defendants in the context of a child abuse investigation.

13

In <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 565 (2000), the plaintiff alleged that "the Village intentionally demanded a 33-foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15-foot easement from other similarly situated property owners." The plaintiff further alleged that said demand was irrational and wholly arbitrary. <u>Id</u>. The Court held that these allegations were sufficient to survive a 12(b)6 motion for failure to state a cognizable claim under the Equal Protection Clause. <u>Id</u>. at 563, 565.

Prior to <u>Willowbrook</u>, the rule in the Second Circuit was that a selective enforcement claim under the Equal Protection Clause required a showing that: "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." <u>Giordano v. City of New York</u>, 274 F.3d 740, 750-51 (2nd Cir. 2001); <i>see also</i>, <u>Harlen Associates v. Incorporated Village of Mineola</u>, 273 F.3d 494, 499 (2nd Cir. 2001). To date, the Second Circuit has expressly declined to address the issue of whether <u>Willowbrook</u> has changed this Circuit's long-standing requirement that a "class of one" plaintiff show malice or bad faith. <i>See</i> <u>Giordano</u>, 274 F.3d at 751; <u>Harlen</u>, 273 F.3d at 500. This Circuit has, however, stated that a "class of one" plaintiff must still show "not only 'irrational and wholly arbitrary' acts, but also <b><i>intentional</i></b> disparate treatment." <u>Giordano</u>, 274 F.3d at 751 (internal citations omitted).

        **2.**    <u>**Attorney Maben's Equal Protection Claim Fails**</u>

            *i.*    ***There Is No Evidence Of Malice Or Bad Faith.***

In this case, there is no evidence, nor even an allegation, that the defendants acted out of vindictiveness or ill will towards the plaintiff. As such, the plaintiff's claim should fail. Justice Breyer wrote the following in his concurring opinion in <u>Willowbrook</u>:

> The Solicitor General and the village of Willowbrook have expressed concern lest we interpret the Equal Protection Clause in this case in a way that would transform many ordinary violations of city or state law into violations of the Constitution. It might be thought that a rule that looks only to an intentional difference in treatment and a lack of a rational basis for that different treatment would work such a transformation…. This case, however, does not directly raise the question of whether the simple and common instance of a faulty zoning decision would violate the Equal Protection Clause…because the respondent had alleged an extra factor as well - a factor that the Court of Appeals called "vindictive action," "illegitimate animus," or "ill will."… [T]he presence of that added factor in this case is sufficient to minimize any concern about transforming run-of-the-mill zoning cases into cases of constitutional right.

<u>Willowbrook</u>, 528 U.S. at 565-66 (*Breyer, J.,* concurring).

Prior to <u>Willowbrook</u>, the Second Circuit consistently held that malice or bad faith was essential to proving a "class of one" equal protection claim. *See* <u>Giordano</u>, 274 F.3d at 750-51; <u>Harlen</u>, 273 F.3d at 499; <u>Lisa's Party City, Inc. v. Town of Henriettta</u>, 185 F.3d 12, 16 (2nd Cir. 1999); <u>LeClair v. Saunders</u>, 627 F.2d 606, 609-10 (2d Cir. 1980). That law is unchanged. As stated above, the Second Circuit has yet to address the issue of whether a plaintiff must prove malice of bad faith in light of <u>Willowbrook</u>. It is important to note, however, that in <u>Willowbrook</u>, the Court was deciding only whether the plaintiff's complaint could survive a 12(b)6 motion. Moreover, Justice Breyer noted that personal animus was alleged in <u>Willowbrook</u>. Other circuits have interpreted <u>Willowbrook</u> as not eliminating the personal animus requirement. *See* <u>Harlen</u>, 273 F.3d at 500, *citing,* <u>Hilton v. City of Wheeling</u>, 209 F.3d 1005, 1008 (7th Cir. 2000), *cert. denied,* 531 U.S. 1080 (2001); <u>Shipp v. McMahon</u>, 234 F.3d 907, 916 (5th Cir. 2000).

15

The defendant urges this court to do the same. Absent any evidence of malicious intent, the plaintiff's "class of one" claim should fail.

### ii.    Maben is not a Class of One.

An essential element of a "class of one" claim is that the plaintiff was **treated differently from all others similarly situated**. *See* Willowbrook, 528 U.S. at 564; Jackson v. Burke, 256 F.3d 93, 96-97 (2nd Cir. 2001); Giordano, 274 F.3d at 750-51; and Harlen, 273 F.3d at 499. When plaintiffs seek to draw inferences of discrimination by showing that they were "similarly situated in all material respects" to the individuals to whom they compare themselves, Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997), their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances. Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000); *see also* McGuinness v. Lincoln Hall, 2001 WL 993572 (2d Cir. 2001). What is key is that they be similar in significant respects. Id. *Accord*, Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001).

In support of his claim that he was treated differently than others similarly situated, Attorney Maben asserts that Attorney Pete Soulsby, representing Elizabeth Pezzenti – then a person who was arriving at the Caton Police Department to surrender herself on an arrest warrant - was allowed to enter the Canton Police Department without any identification. (Exhibit F, pp. 22-23.) Attorney Maben conceded that Attorney Soulsby was not representing a child in protective custody pending investigation by the DCF, but rather he was representing Elizabeth Pezzenti in connection with her arrest for Breach of Peace. (Exhibit F, pp. 22-23).

Attorney Maben has failed to provide any evidence that other attorneys were allowed to enter the Canton Police Department without presenting photo identification and meet with a child in protective custody pending an interview with the DCF. Furthermore, Sergeant Krupa avers that he has not allowed other attorneys to meet with children in protective custody pending a child abuse investigation by DCF. (Exhibit B). Attorney Maben is comparing an incident in which he attempted to meet with a child in protective custody pending an interview with DCF due to allegations of child abuse to an entirely different situation in which an attorney representing an individual accused of criminal activity was allegedly allowed to enter the Canton Police Department without presenting photo identification. Attorney Maben does not even consider the open and obvious conflict of interest between his representation of Anthony's father, August, and his claimed present representation of Anthony – something that was apparent to a layperson, Sergeant Krupa.

There are "profound differences between arrest and protective custody, and between the treatment accorded children taken into protective custody and adults arrested on suspicion of crime. . . . " Jordan by Jordan v. Jackson, 15 F.3d 333, 350 (4th Cir. 1994). When children are taken into protective custody based on allegations of child abuse, "[c]ustody is assumed not to be a preliminary step to punishment, but as a measure intended to avert impending and serious danger to the innocent child." Id.

In the present case, Anthony Pezzenti was not accused of any criminal activity nor was he being interrogated. The defendants did not interrogate, interview or ask Anthony to sign a statement while he was in protective custody pending the arrival of DCF. (Exhibits A & B). Anthony was in protective custody pending the arrival of DCF

17

due to his allegations that his parents hit him as a form of discipline and due to objective physical evidence, i.e. the cut on his lip, that he had recently been hit. (Exhibit A & B). Furthermore, Mrs. Pezzenti conceded that she had slapped her son twice in the face and that she tossed a phone at him. (Exhibit A & B; Exhibit C, pp. 12-21). The particular situation with which the defendants were faced on September 12, 2002, was entirely different from the situation in which an attorney escorts an individual accused of criminal activity into the Canton Police Department.

Based on the inherent differences between an adult arrested on criminal charges and a child taken into protective custody pending an investigation into allegations of child abuse, Attorney Maben cannot compare his situation to that of Pete Soulsby. Additionally, in the absence of any facts that demonstrate that the defendants treated Attorney Maben differently than other attorneys attempting to meet with children held in protective custody due to allegations of child abuse, Attorney Maben's claim that he was treated differently than similarly situated individuals fails as a matter of law.

"If no other similarly situated individuals exist, then plaintiffs have no claim for equal protection. Moreover, the plaintiffs have not alleged lack of rational basis, animus or other impermissible criteria as the basis for differential treatment or facts that could lead the court to infer those prohibited considerations." <u>Tuchman v. State of Connecticut</u>, 185 F.Supp.2d 169, 173 (D.Conn. 2002). In the present case, the undisputed facts demonstrate that no other similarly situated individuals exist and that the defendants actions were in furtherance of the legitimate state interest of protecting children from child abuse.

18

Therefore, the claim that the defendants violated Attorney Maben's Fourteenth Amendment right to equal protection fails as a matter of law and the defendants are entitled to summary judgment on this claim.

**B.     THE DOCTRINE OF QUALIFIED IMMUNITY IS A COMPLETE BAR TO THE CLAIMS BROUGHT BY MABEN IN COUNT FOUR.**

### 1.     The Doctrine of Qualified Immunity.

The defense of qualified immunity shields government agents "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." McEvoy v. Spencer, 124 F.3d 92, 97 (2d Cir. 1997), *quoting* Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It is more than just a defense; the doctrine of qualified immunity is an immunity from suit. (Emphasis added.) Locurto v. Safir, 264 F.3d at 163.

A right is "clearly established" when "[t]he contours of the right [are] . . . sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . [T]he unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987). See, e.g. Malley v. Briggs, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly break the law"); Mitchell v. Forsyth, 472 U.S. 511, 528 (1985) (officials are immune unless "the law clearly proscribed the actions they took").

Recently, the Supreme Court has re-emphasized the need to look carefully at the "contours" of the right allegedly violated by a public official when undertaking the qualified immunity analysis. Saucier v. Katz, 533 U.S. 194, 202 (2001). For example, there is no doubt that the case of Graham v. Connor, 490 U.S. 386 (1989), clearly

19

establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet, the Supreme Court has concluded that observation of that general principle is simply not enough when undertaking a qualified immunity analysis.

In <u>Saucier</u>, the Supreme Court reiterated the need for a careful examination of the particular constitutional right alleged to have been violated when considering the defense of qualified immunity. 533 U.S. at 202. Not only should the right itself be identified with a higher degree of specificity, the precise contours of the application of that more specific right to the facts at hand must be made by the district court reviewing a defense of qualified immunity. <u>Id.</u> The <u>Saucier</u> Court reiterated the admonition from <u>Anderson</u> that:

> [t]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

<u>Saucier</u>, 533 U.S. at 202.

Since the decision in <u>Saucier</u>, the Supreme Court decided <u>Hope v. Pelzer</u>, 536 U.S. 730 (2002), providing additional guidance to litigants and courts examining the issues within and part of the defense of qualified immunity. In <u>Hope</u>, the Supreme Court reversed the Court of Appeals for the Eleventh Circuit which had affirmed the district court's grant of summary judgment based on qualified immunity.

The Supreme Court in <u>Hope</u> rejected the Eleventh Circuit's rule that the test for the existence of a clearly established right that would allow a public official to understand the potential wrongfulness of his conduct should be evaluated in light of federal law that was "pre-existing, obvious and mandatory." *See* <u>Hope</u>, 536 U.S. at 734.

20

In reversing the Court of Appeals for the Eleventh Circuit, the Supreme Court rejected the gloss placed on the <u>Saucier</u> analysis for qualified immunity by that Circuit that there must be reported cases that are "materially similar" before a violation is found. In so holding, the Supreme Court adopted the "fair warning" standard found in <u>United States v. Lanier</u>, 520 U.S. 259 (1997) as an additional methodology to evaluate the second prong of the qualified immunity analysis. In so holding, the Supreme Court emphasized the need for the detailed, searching and thorough analysis each and every time the defense based on the doctrine of qualified immunity is raised. The decision in <u>Hope</u> is, in one sense, a continuation of the Supreme Court's admonition that the most important part of any qualified immunity decision is the examination of the constitutional right at issue and "the precise contours of the application of that more specific right to the facts at hand must be made." <u>Saucier</u>, 533 U.S. 194 at 202. In rejecting the "materially similar" standard espoused by the Eleventh Circuit, the Court has done nothing more than demand a high standard – not in pleading or proof – but in the continued, searching, and thorough, step-by-step examination of the defense of qualified immunity in the manner long-established by clear and unequivocal precedent.

Not long after the decision in <u>Hope</u>, the Second Circuit stated:

> Our analysis of a qualified immunity claim consists of a three step inquiry. . . . . First, we must determine whether plaintiff has alleged a violation of a constitutional right. Then we consider if the violated right was clearly established at the time of the conduct. . . . Finally, if plaintiff had a clearly established, constitutionally protected right that was violated by the actions of the [defendants], he or she must demonstrate that defendants' actions were not objectively reasonable. . . . This three step inquiry should typically be done in sequential order.

(Citations omitted.) <u>Harhay v. Town of Ellington, et al.</u>, 323 F.3d 206, 211 (2d Cir. 2003).

21

This statement of the law succinctly captures just the sort of step-by-step, orderly methodology mandated by twenty years of Supreme Court precedent. Furthermore, this Court recognized that the failure to establish any one step of the analysis grants qualified immunity to the defendant in question. Harhay, 323 F.3d at 211-2. Therefore, before applying the qualified immunity standard, the Court must ask whether there was a constitutional violation in the first instance. See Stuto v. Fleishman, 164 F.3d 820, 825 (2d Cir. 1999).

     2.    **Plaintiff's Claimed Constitutional Rights Are Not Clearly Established.**

The Supreme Court mandates the careful examination of the claimed constitutional rights in question when examining the defense of qualified immunity. Attorney Maben claims not only a violation of his Fourteenth Amendment Right to Practice his Profession but also a violation of his right to equal protection under the Fourteenth Amendment.[1]

     i.    *Attorney Maben's Right to Pursue His Occupation or Calling Without Any Reasonable Governmental Regulation was not Clearly Established as a Matter of Law.*

The undisputed facts of the present case establish that there was no constitutional violation of Attorney Maben's right to practice his profession under the Fourteenth Amendment because brief interruptions of one's ability to pursue their occupation do not rise to the level of a constitutional violation. The defendants are

---

[1]As discussed earlier, the First Amendment protects people in the employment context but the defendants could not uncover any support for the plaintiff's claims that said right offers some protection of his right to practice his occupation. Nevertheless, the defendants submit that the analysis advanced under the same claims under the Fourteenth Amendment are applicable and would serve as appropriate reasons to grant summary judgment on the First Amendment claims as well as the Fourteenth Amendment claims.

22

immune from suit for their actions because the right to occupational liberty in the context of a child abuse investigation is not a clearly established right – either under the First or Fourteenth Amendments.

For a constitutional right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right. Saucier v. Katz, 533 U.S. at 202. In Conn v. Gabbert, the court noted that "the liberty component of the Fourteenth Amendment's due process clause includes some generalized due process right to choose one's field of employment, but a right which is nevertheless subject to reasonable governmental regulation." 526 U.S. at 291-92. The court further noted that most of the cases "deal with a complete prohibition of the right to engage in a calling, and not the sort of brief interruption that occurred here." Id., 292.

Based on the holding of Conn v. Gabbert, it is clear that one has a right to practice their profession but they are subject to reasonable governmental regulation and only complete prohibitions of the right to engage in a calling implicates the Fourteenth Amendment. Accordingly, Attorney Maben did not have a clearly established right to practice his profession without any reasonable governmental regulation and the defendants did not have "fair warning" that their actions might violate Attorney Maben's right to practice his profession – especially under the facts and circumstances of the present case – Maben's admitted conflict, the suspicion of abuse by August and the pending warrant for the mother, Elizabeth.

In the absence of a clearly established right to practice one's profession without any governmental regulation, the defendants did not have fair warning that their actions

23

would violate Attorney Maben's right to occupational liberty and, therefore, are entitled to qualified immunity.

Accordingly, summary judgment should enter against the plaintiff with respect to Count Four.

### ii.    Attorney Maben's Right to Equal Protection in the Context of Child Abuse Investigation was not Clearly Established.

Attorney Maben has alleged that the defendants' refusal to allow him to meet with his client while he was in protective custody pending the arrival of DCF violated his right to equal protection. There is, however, no case law addressing the issue of whether a state actor's decision to not allow an attorney to meet with a child in protective custody pending a child abuse investigation violates an attorney's rights to equal protection. This is not to say that the absence of case law holding that a right exists equates to the summary granting of qualified immunity, *see generally* <u>Hope v. Pelzer</u>, nothing in the law would give the defendant officers fair warning that their conduct might impinge upon Attorney Maben's First or Fourteenth Amendment rights as alleged in the complaint.

To determine whether a right was clearly established, a court should consider "the specific context of the case," not whether the right was clearly established "as a broad general proposition." <u>Saucier,</u> 533 U.S. at 201. "[T]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." <u>Id.</u>

It is recognized that the Equal Protection Clause generally requires that the government treat similarly situated people alike and that individuals should not be

24

subjected to invidious discrimination at the hands of governmental officials. It was not clear to the defendants that preventing Attorney Maben from meeting with Anthony Pezzenti while he was in protective custody pending the arrival of DCF to conduct further investigation would violate Maben's equal protection rights, especially under the circumstances of the potential conflict of interest.

Accordingly, the defendants are entitled to qualified immunity and summary judgment should enter against the plaintiff with respect to Count Four.

### 3.    The Defendants' Actions were Objectively Reasonable

If a governmental official can remove a child from the custody of his parents pending a child abuse investigation provided that there is a reasonable basis for a finding of child abuse, then it logically follows that an attorney could be denied access to the child as well, particularly when the soliciting attorney has admitted representing a potentially adverse party and that party is a suspect of child abuse. The particular facts of the present case are unique to the extent that there are no cases where attorneys have filed suit against governmental officials for their refusal to allow an attorney to meet with a child during a child abuse investigation.

This Circuit has determined that "[w]here . . . there is an objectively reasonable basis for believing that parental custody constitutes a threat to the child's health or safety, government officials may remove a child from his or her parent's custody at least pending investigation." Gottlieb v. Orange County Department of Social Services, 84 F.3d 511, 518 (2d Cir. 1996). The Second Circuit has recognized the unusual need for deference in child abuse investigation cases and *"held that an investigation will pass constitutional muster provided simply that the case workers have a reasonable*

25

*basis for their finding of abuse.*" (Emphasis added; internal quotation marks omitted.)

Kia P. v. McIntyre, 235 F.3d 749, 758-59 (2d Cir. 2000).

The Canton Police did not prevent Attorney Maben from accessing Anthony in an arbitrary manner, they did so in connection with their affirmative duties under the law. Pursuant to Conn. Gen. Stat. § 17a-101 et seq., the defendant police officers are charged with an obligation to protect children from child abuse. As mandatory reporters of child abuse under §§ 17a-101 (b) and 17a-101a, the defendants are required to prepare an oral or written report, if they have reasonable cause to suspect a child has been abused or neglected, has sustained non-accidental physical injury or is in imminent risk of harm. Conn. Gen. Stat. §§ 17a-101 (b) and 17a-101a.[2]

In the present case, the defendants acted in accordance with their obligation to protect children from child abuse in accordance with the laws of Connecticut. The

---

[2]Conn. Gen. Stat. § 17a-101 (a), provides:

The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse, investigation of these reports by a social agency, and provision of services, where needed, to such child and family.

Conn. Gen. Stat. § 17a-101(b) provides in relevant part: "The following persons shall be mandated reporters: . . . police officer. . . ."

Additionally, Conn. Gen. Stat. § 17a-101a provides:

Any mandated reporter, as defined in section 17a-101, who in the ordinary course of such person's employment or profession has reasonable cause to suspect or believe that any child under the age of eighteen years (1) has been abused or neglected, as defined in section 46b-120, (2) has had nonaccidental physical injury, or injury which is at variance with the history given of such injury, inflicted upon such child, or (3) is placed at imminent risk of serious harm, shall report or cause a report to be made in accordance with the provisions of sections 17a-101b to 17a-101d, inclusive. Any person required to report under the provisions of this section who fails to make such report shall be fined not less than five hundred dollars nor more than two thousand five hundred dollars and shall be required to participate in an educational and training program pursuant to subsection (d) of section 17a-101.

26

defendants were justified in not allowing contact between Anthony Pezzenti and Attorney Maben when DCF had not had a chance to speak with Anthony about the alleged abuse. Additionally, the defendants had no reason to believe that they were violating Attorney Maben's right to practice his profession when they denied him access to Anthony Pezzenti while he was in protective custody pending a DCF interview. Therefore, qualified immunity bars Attorney Maben's claim that the defendants interfered with his right to practice his profession.

The defendants contend that their actions in preventing Attorney Maben from meeting with a child held in protective custody pending a DCF investigation was objectively reasonable. The defendants had determined that no one, not even Anthony's father, would be allowed to meet and/or speak with Anthony until DCF arrived to interview Anthony. At the time, the defendants were primarily concerned with Anthony Pezzenti's safety and they had no reason to believe that their actions would violate Attorney Maben's right to equal protection of the law. Accordingly, Attorney Maben's claim that he was denied equal protection of the law because the defendants intentionally, knowingly and irrationally treated him differently from other Attorneys seeking to meet with clients undergoing interrogation at Canton Police Department is barred by the doctrine of qualified immunity.

The defendants are entitled to qualified immunity and summary judgment should enter against the plaintiff with respect to Count Four.

27

## IV.    CONCLUSION

For all of the foregoing reasons, the defendants' motion for summary should be granted.

THE DEFENDANTS,
JOSEPH CAPALDO and MICHAEL KRUPA

/s/ Melanie A. Dillon
Melanie A. Dillon, ct24786
Thomas R. Gerarde, ct05640
HOWD & LUDORF
65 Wethersfield Avenue
Hartford, CT 06114
(860) 249-1361
(860) 249-7665 (Fax)

## CERTIFICATION

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via US Mail to the following counsel of record this 27th day of February, 2004.

John R. Williams, Esquire
Williams and Pattis, LLC
51 Elm Street
New Haven, CT 06510

/s/ Melanie A. Dillon
Melanie A. Dillon