# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| AUGUST PEZZENTI, JR., | : | |
| INDIVIDUALLY, ET AL | : | NO.: 3:03 CV 0419 (MRK) |
| | : | |
| v. | : | |
| | : | |
| JOSEPH CAPALDO, ET AL | : | FEBRUARY 27, 2004 |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56(c) and D. Conn. L. R. 7(a)1, the defendants, Officer Joseph Capaldo and Sergeant Michael Krupa, hereby submit the following Memorandum of Law in support of their Motion for Summary Judgment dated February 27, 2004.

The defendants have filed a D. Conn. L. R. 56(a)(1) Statement of Material Facts Not In Dispute, along with exhibits and affidavits, and rely on the same for the basis of their Motion for Summary Judgment.

The present Memorandum of Law is in support of the defendants' Motion for Summary as to the claims of August Pezzenti, Jr., individually and as next friend of his minor son, Anthony Pezzenti, only. The defendants have filed a separate Motion for Summary Judgment with a supporting Memorandum of Law as to the claims of Attorney John Maben. Both Motions and both Memoranda rely on the single Local Rule 56(a)(1) Statement.

## I.    STATEMENT OF FACTS.

On March 11, 2003, August Pezzenti, Jr., individually and as next friend of his minor son, Anthony Pezzenti,[1] and John C. Maben (collectively "plaintiffs") filed a four count complaint against the defendants, Joseph Capaldo and Michael Krupa, in their individual capacities. The plaintiffs alleged that the defendants were police officers employed by the Town of Canton and were acting under color of law, that is, under color of the constitution, statutes, laws, ordinances, rules, regulations, customs and usage of the State of Connecticut and Town of Canton.  (Complaint, Counts One – Four, ¶¶ 4-5).

The plaintiffs alleged that as a result of Anthony Pezzenti's telephone call to the Canton Police Department on September 12, 2002, in which he complained that his mother had disciplined him by striking him, the defendants visited the minor plaintiff's home and took him into custody. (Complaint, Counts One – Two, ¶¶ 7-8). The plaintiffs also alleged that the defendants held Anthony Pezzenti incommunicado for several hours before returning him to his parents. (Complaint, Counts One-Two, ¶ 8). August Pezzenti, Jr., and Attorney Maben further claim that, although they requested to speak with Anthony, the defendants refused to allow them to do so. (Complaint, Counts One – Two, ¶ 8).

### A.    PLAINTIFF'S COMPLAINT.

In Count One, Anthony Pezzenti alleged that the defendants falsely arrested and imprisoned him without a warrant in violation of his rights under the Fourth Amendment of the United States Constitution. (Complaint, Count One, ¶ 10). Anthony Pezzenti also

---

[1]While the claims asserted by Anthony Pezzenti, a minor, are technically brought through his father, August Pezzenti, Jr., as his next friend, we refer to those claims as if they were brought by Anthony in order to avoid any confusion with the claims brought by his father.

alleged that he suffered emotional distress as a result of the defendants' actions. (Complaint, Counts One – Two, ¶ 9).

In Count Two, Anthony Pezzenti alleged that the defendants' conduct was extreme and outrageous and that it was carried out with the knowledge that it would probably cause him to suffer emotional distress. (Complaint, Count Two, ¶ 10).

In Count Three, August Pezzenti, Jr., alleged that the defendants refused to permit him to visit or speak to his son for a period of several hours during which time they detained and interrogated the child. (Complaint, Count Three, ¶ 8). Mr. Pezzenti also alleged that he suffered emotional distress as a result of the defendants' conduct. (Complaint, Count Three, ¶ 9). Mr. Pezzenti further alleged that the defendants interfered with his First Amendment right of family association and his Fourteenth Amendment right to substantive due process of law. (Complaint, Count Three, ¶ 10).[2]

## B.   UNDISPUTED FACTS.

On September 12, 2002, Anthony Pezzenti placed a telephone call to the Canton Police Department complaining that his mother hit him and threw a phone at him. (Exhibit A). The defendants responded to the Pezzenti home to investigate the allegations that Mrs. Pezzenti had hit Anthony. (Exhibits A & B).

Anthony met with Sergeant Krupa while Mrs. Pezzenti met with Officer Capaldo and each of them provided explanations to the defendants with respect to what happened that afternoon. (Exhibits A & B). Mrs. Pezzenti admitted that she slapped Anthony twice with an open hand and that she "tossed" the telephone "toward" him after

---

[2]The claims brought by Attorney Maben in Count Four of the complaint are addressed in a separate Motion for Summary Judgment and supporting Memorandum of Law. Both the Motion and Memorandum addressed to Attorney Maben's claims were filed simultaneous with the present pleadings addressing Anthony and August's claims.

he stated that he was going to call the police. (Exhibit A; Exhibit C, pp. 13-16, 22-23). The defendants also observed that Anthony had sustained a minor cut to his upper lip as a result of the phone hitting him in the mouth. (Exhibits A & B).

In light of the objective evidence demonstrating that Anthony had recently been hit by his mother, the defendants determined that it was in Anthony's best interest to take him into protective custody pending an investigation of the matter by the Department of Children and Families (hereinafter "DCF"). (Exhibits A & B). The defendants informed Mrs. Pezzenti that they were taking Anthony into protective custody until the DCF arrived to interview him. (Exhibits A & B).

Sergeant Krupa transported Anthony to the Canton Police Department. (Exhibits A & B). Upon arrival at the police department, Anthony sat in the dispatch room, which is visible to anyone waiting in the lobby of the police department, and listened to his compact disc player. (Exhibits A & B; Exhibit E, pp. 9-10). Although Mr. Pezzenti and Attorney Maben arrived at the police department requesting to talk and/or meet with Anthony, the defendants informed them that no one would meet with Anthony until after DCF arrived and interviewed him. (Exhibit B; Exhibit D, pp. 62-63,85-86).

It is undisputed that Anthony was not arrested but taken into protective custody pending further investigation by the DCF based on Anthony's complaint that his parents disciplined him by hitting him on a regular basis, Mrs. Pezzenti's admission that she slapped Anthony twice and "tossed" a phone at him, and the visible cut to Anthony's lip. (Exhibits A & B). The defendants did not interview, interrogate or take a statement from Anthony while they were waiting for DCF to arrive. (Exhibits A & B). Anthony was briefly allowed into the lobby to sit and pray with his father. (Exhibit D, pp. 59-60). Mr. Pezzenti

was also able to hold Anthony's hand through the pass-through in the window that separated the dispatch room from the lobby. (Exhibit D, pp. 59-60).

Following the interview by DCF social worker, Scott Harvey, it was determined that Anthony could return home with his parents. (Exhibits A & B; Exhibit C, pp. 38, 41). Mr. Harvey advised Mr. and Mrs. Pezzenti to discuss another form of discipline other than spanking. (Exhibits A & B; Exhibit C, pp. 38, 41).

The defendants, Officer Joseph Capaldo and Sergeant Michael Krupa, now move for summary judgment as to Counts One, Two and Three of the plaintiffs' Complaint.

## II.    STANDARD OF REVIEW.

Federal Rule of Civil Procedure 56(c) requires the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A factual dispute is "genuine" when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A "material fact" is one whose resolution will affect the ultimate determination of the case. Id. In determining whether a material issue of fact exists, the court must resolve all ambiguities and draw all inferences against the moving party. Id. at 255, 106 S.Ct. at 2513; J.F. Feeser, Inc. v. Servi-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990), cert. denied, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991).

However "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Samuels v. Smith, 839 F.Supp. 959, 962 (D.Conn. 1993).

The party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256, 106 S.Ct. 1570, 94 L.Ed.2d 763 (1987); Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980). Thus, once the moving party has satisfied its burden of identifying evidence which demonstrates the absence of a genuine issue of material fact, the non-moving party is required to go beyond the pleadings by way of affidavits, depositions, and answers to interrogatories in order to demonstrate specific material facts which give rise to a genuine issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed. 25 (1986). "Neither courts nor defendants should be subjected to trials which can be little more than harassment." Applegate v. Top Associates, Inc., 425 F.2d 92, 96 (2d Cir. 1970).

Where evidence is submitted in support of, or in opposition to, a motion for summary judgment, such evidence must be presented in a manner consistent with its admissibility at trial. See First National Bank of Clinton, Ill. v. Insurance Co. of North America, 606 F.2d 760 (7th Cir. 1979) (in ruling on summary judgment motion, the district court properly relied on documents and exhibits identified by affidavit). Unsworn statements of the parties, letters addressed to litigants from third persons, and hearsay that does not fall under one or more of the exceptions listed in Rules 803-805 of the

Federal Rules of Evidence, may not properly be considered. *See* <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); <u>Beyene v. Coleman Security Services, Inc.</u>, 854 F.2d 1179 (9th Cir. 1988).

## III.   <u>LAW AND ARGUMENT</u>.

### A.   THE UNDISPUTED FACTS DEMONSTRATE THAT THE DEFENDANTS HAD PROBABLE CAUSE TO TAKE ANTHONY PEZZENTI INTO PROTECTIVE CUSTODY AND, THEREFORE, DID NOT VIOLATE HIS FOURTH AMENDMENT RIGHTS.

"The Fourth Amendment protects individuals against unreasonable searches and seizures." <u>Anthony v. City of New York</u>, 339 F.3d 129, 135 (2d Cir. 2003). "The threshold question in a Fourth Amendment inquiry is whether the governmental conduct in question constitutes a search and seizure within the meaning of the amendment's text." <u>Doe v. Heck</u>, 327 F.3d 492, 509 (7th Cir. 2003). "A person has been seized within the meaning of the Fourth Amendment if, in view of all of the circumstances surrounding the incident, a reasonable person would not have believed that he was free to leave." <u>Id.</u>, 510.

The undisputed facts demonstrate that Anthony Pezzenti was taken into protective custody following a telephone call to the Canton Police Department in which he stated that his mother had hit him. (Exhibits A & B). Mrs. Pezzenti admitted that she had slapped Anthony twice in the face and "tossed" a phone "toward" him, but they also observed a cut on Anthony's lip. (Exhibits A & B, Exhibit C, pp. 12-21). Anthony Pezzenti also reported that his father, August Pezzenti, Jr., had recently hit him with a belt ten times on his rear end, after he received demerits at school. (Exhibit B).

The defendants determined it was in Anthony's best interest to take him into protective custody until DCF had the opportunity to interview him. (Exhibits A & B). The

defendants transported Anthony to the Canton Police Department and waited for DCF

to arrive and interview Anthony. (Exhibits A & B). Accordingly, there is no factual dispute

that Anthony was temporarily removed from his home and taken to the Canton Police

Department based on the defendants' suspicions of abuse and pending further

investigation of the matter by DCF.

"In the context of removing a child from his home and family, a seizure is

reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is

justified by exigent circumstances, meaning that state officers have reason to believe

that life or limb is in jeopardy." (Internal quotation marks omitted.) Brokaw v. Mercer

City, 235 F.3d 1000, 1010 (7th Cir. 2000). "There is at least a hint in [the Second

Circuit], too, that probable cause is required of caseworkers seizing children without

judicial authorization." Tenenbaum v. Williams, 193 F.3d 581, 603 (2d Cir. 1999), cert.

denied, 529 U.S. 1098 (2000).

> The term "probable cause" has . . . been imported from the warrant clause
> of the Fourth Amendment and applied to its "unreasonable searches and
> seizures" clause. The term "probable cause" is thus not only the explicit
> Fourth Amendment requirement for obtaining a warrant, but also
> descriptive of what seizures are "reasonable," when . . . no warrant has
> been obtained.

(Citations omitted.) Id., 602-603.

"In general, probable cause to arrest exists when the officers have knowledge or

reasonably trustworthy information of facts and circumstances that are sufficient to

warrant a person of reasonable caution in the belief that the person to be arrested has

committed or is committing a crime." Tenenbaum, 193 F.3d at 603. "Probable cause is a

flexible term. There is no rigid demand that specific tests be satisfied." Id. "In dealing

with probable cause, . . . as the very name implies, we deal with probabilities. These are

not technical; they are the factual and practical considerations of everyday life on which

reasonable and prudent men, not legal technicians, act." Id.

> Probable cause does not require finding that a preponderance of the
> evidence supported an action. Nor does it guarantee accuracy. It permits
> action based on an objectively reasonable belief that an offense has been
> committed. As the Supreme Court has . . . stated, reasonable suspicion
> and probable cause are not finely tuned standards comparable to the
> standards of proof beyond a reasonable doubt or of proof by a
> preponderance of the evidence. . . . The fact that certain individuals are
> required by state law to file reports of suspected child abuse makes any
> other governing standard unworkable, since the statutory mandate of
> required reporting in and of itself will inevitably result in some – if not many
> – erroneous reports.

(Citations omitted; internal quotation marks omitted.) Dietz v. Damas, 948 F. Supp. 198,
207 (E.D.N.Y. 1996).

In Tenenbaum, a five-year-old girl, Sarah Tenenbaum, told her teacher, Mary

Murphy, that her father was sexually abusing her. 193 F.3d at 588. Ms. Murphy reported

the allegations of sexual abuse to her supervisors who, in turn, reported the matter by

telephone to the New York State Department of Social Services Central Register of

Child Abuse as required by law. Id. 588-589. Two case workers investigated the matter

further by meeting with and interviewing Mr. and Mrs. Tenenbaum at their home;

however, the defendants did not inform the Tenebaums of the allegations of sexual

abuse. Id., 589.  The defendant case workers ultimately decided to remove Sarah from

her school in order to have her physically examined by a doctor to rule out the

possibility of abuse. Id., 591.

The defendants did not seek consent from Sarah's parents and they did not

consider seeking a custody order from the court. Tenenbaum, 193 F.3d at 590. Sarah

was removed from school around noon and was returned to her parents between 7:30

and 8:30 that same day after the doctors at the hospital to which she was taken determined that there was no evidence of child abuse. Id., 591.

In Tenenbaum, the court declined to grant summary judgment to the defendants on the basis that the removal of Sarah from school without her parents' permission and without a warrant was justified by probable cause, reasonable cause and/or exigent circumstances. 193 F.3d 581 at 605. In Tenenbaum, however, the defendants did not make a decision to remove Sarah from her school until approximately five days after the initial allegations of abuse were reported. Id., 589-590. Furthermore, there was no other evidence that corroborated Sarah's allegations of abuse prior to the removal and Sarah actually denied that her father had abused her when her teacher questioned her again during a meeting with the caseworker. Id. Thus, the removal was not only delayed for several days but it was only based on the teacher's report regarding Sarah's allegations of abuse. Id.

The present case differs from Tenenbaum, to the extent that the defendant police officers had evidence that the alleged abuse had actually occurred not only based on Mrs. Pezzenti's own admissions that she had slapped her son twice in face and "tossed" a phone at him, but also physical evidence, i.e., Anthony's cut lip, demonstrating recent physical abuse had occurred. (Exhibits A & B; Exhibit C, pp. 12-21). Additionally, Mr. Pezzenti admitted that he had struck Anthony with a belt across his rear end as a means of discipline. (Exhibit B; Exhibit D, p. 87). Furthermore, there was no information available to the defendants at that time that the reported incident had not actually occurred or that Anthony had not been subjected to physical abuse in the past. In contrast, the abuse allegations in Tenenbaum were not corroborated and the

defendants did not inform the parents of the allegations. Thus, in <u>Tenenbaum</u>, the plaintiffs were not even given an opportunity to deny the allegations made by their daughter.

In <u>Taylor v. Evans</u>, 72 F.Supp.2d 298, 301 (S.D.N.Y 1999), the court found that plaintiffs' Fourth Amendment rights were not violated by the children's removal. In that case, the defendants removed two children from their mother's custody based on medical reports concerning the mother's foster child that were indicative of child abuse. Accordingly, the hospital filed a Report of Suspected Abuse and Maltreatment, which prompted concern that the mother's "two natural children. . . . might also be at risk in [her] custody. Following an investigation, the two children were removed from their home based, in large part ,on [the foster child's] serious and unexplained injuries. <u>Id.</u>, 303.

The <u>Taylor</u> court held that the "plaintiffs' Fourth Amendment rights were not violated by the children's removal." <u>Taylor</u>, 72 F.Supp.2d at 310. The court reasoned that a report "filed by an identified, disinterested person with cause to know of abuse and a legal obligation to report it, confirmed by the treating resident physician, constitutes objectively reasonable evidence of an emergency to child protective personnel." <u>Id.</u>

The evidence that justified removal of the two children from their mother was based solely on the evidence of medical reports regarding another child in the mother's care that were indicative of child abuse. Nonetheless, the <u>Taylor</u> court found that it was objectively reasonable evidence of an emergency and, therefore, the plaintiffs' Fourth Amendment rights were not violated. <u>Taylor</u>, 72. F.Supp. at 310. If evidence of abuse to

a child other than those children removed from the custody of their mother was objectively reasonable evidence justifying that removal, then surely the evidence in the present case justified Anthony Pezzenti's removal.

In the present case, the evidence supporting a decision to remove the child is even more compelling because the reports of child abuse came directly from Anthony Pezzenti, the victim of the abuse. The Ninth Circuit has found that a victim's report of abuse "is significantly more compelling evidence to support the social worker's reasonable belief that abuse had occurred and that the child was still in danger of future harm than . . . where a neighbor's report formed the basis of suspicion of child abuse." Mabe v. San Bernandino County, 237 F.3d 1101, 1108 (9th Cir. 2001).

Furthermore, "a police officer may rely upon the statements of victims or witnesses to determine that existence of a probable cause for [an] arrest, regardless of the ultimate accurateness or truthfulness of the statements." Bourguignon v. Guintau, 247 F.Supp.2d 189, 193 (D.Conn. 2003). The standard should be no different with respect to seizures in the context of a child abuse investigation. Therefore, Anthony's statements with respect to both of his parents disciplining him is sufficient evidence to support a finding of probable cause for the defendants' decision to take Anthony into protective custody, particularly, that his parents substantiated those statements.

The defendants' temporary removal of Anthony Pezzenti from his parents' custody on September 12, 2002, is supported by probable cause. The defendants possessed reliable evidence, *i.e.*, Anthony's statements that were corroborated by his parents and physical evidence of abuse consistent with his description of what happened that day, that supports the police officers' belief that Anthony should be

removed from his home and the custody of his parents pending further investigation by DCF.

Accordingly, the defendants did not violate Anthony Pezzenti's Fourth Amendment rights and are entitled to summary judgment with respect to Count One.

**B.    THE UNDISPUTED FACTS DEMONSTRATE THE DEFENDANTS DID NOT INTERFERE WITH AUGUST PEZZENTI, JR.'S FIRST AMENDMENT RIGHT TO FAMILY ASSOCIATION OR HIS FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS RIGHT OF FAMILIAL ASSOCIATION.**

While August Pezzenti, Jr., alleges that the defendants interfered with his relationship with his minor child in violation of his First Amendment right of family association and his Fourteenth Amendment right to substantive due process of law, it is clear that his claims are properly analyzed under the Fourteenth Amendment. It is unclear that August Pezzenti, Jr. has any First Amendment right in this context. Recent decisions by this Circuit, particularly, Patel v. Searles, 305 F.3d 130 (2d Cir. 2002) and, more importantly, Adler v. Pataki, 185 F.3d 35 (2d Cir. 1999), leave even the casual reader to conclude that the rights claimed by August are properly analyzed under the Fourteenth Amendment. *See* Adler v. Pataki, 185 F.3d 35, 42-44 (concluding that the First Amendment rights to intimate and familial association under the First Amendment are not authoritatively determined, are complicated and generally best analyzed under the Fourteenth Amendment). The Tenth Circuit, in Griffin v. Strong, 983 F.2d 1544 (10th Cir. 1993), reached a similar conclusion that the rights to familial association are properly founded in the Fourteenth, not First Amendment. Therefore, the defendants submit that the following analysis, while couched in terms of the Fourteenth Amendment, applies equally to August Pezzenti's claims under the First Amendment.

### 1.    The Right To Familial Association

"Choices about marriage, family life, and upbringing of children are among associational rights [the Supreme] Court has ranked as of 'basic importance in our society,' . . . rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard and disrespect." Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999). "The liberties protected by the Due Process Clause include the fundamental right of parents to make decisions concerning the care, custody, and control of their children." Tower v. Leslie-Brown, 326 F.3d 290, 298 (1st Cir. 2003). "As a general matter, this fundamental right is inviolate, and the deprivation of such right would constitute a violation of substantive due process. . . . However, because the welfare of the child is paramount, ***an objectively reasonable suspicion of abuse justifies protective measures***." (Citation omitted; emphasis added.) Id.

"Although parents may enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." (Internal quotation marks omitted.) Wilkinson Ex Rel. Wilkinson v. Russell, 182 F.3d 89, 104 (2d Cir. 1999). "***The right to familial integrity, in other words, does not include the right to remain free from child abuse investigations***." (Emphasis added.) Croft v. Westmoreland County Children & Youth, 103 F.3d 1123,1125 (3d Cir. 1997).

"Where . . . there is an objectively reasonable basis for believing that parental custody constitutes a threat to the child's health or safety, government officials may remove a child from his or her parent's custody at least pending investigation." Gottlieb

v. Orange County Department of Social Services, 84 F.3d 511, 518 (2d Cir. 1996).

"Indeed, evidence of **even a single instance of abuse may constitute an exigent circumstance sufficient to warrant immediate state action on the child's behalf**."

(Emphasis added.) Hatch v. Department for Children, 274 F.3d 12, 21 (1st Cir. 2001).

> **i.      The Brief Removal of Anthony Pezzenti from the Custody of his Parents Does Not Rise to the Level of a Substantive Due Process Violation of Mr. Pezzenti's Fourteenth Amendment Right to Familial Association.**

Prior to determining whether the defendants' actions were justified by an "objectively reasonable suspicion of abuse," the court must determine whether the temporary removal of Anthony Pezzenti from the custody of his parents was a "significant infringement" of Mr. Pezzenti's substantive due process right to family integrity. *See* Tenenbaum, 193 F.3d at 599-601. The defendants contend that the brief removal of Anthony from his home in order to conduct a further investigation into his allegations of child abuse does not rise to the level of a substantive due process violation.

In Nicholson v. Scoppetta, 344 F.3d 154 (2d Cir. 2003), several actions brought by mothers of children who were removed by the Administration for Children's Services (hereinafter "ACS") either temporarily or permanently from the custody of their parents were consolidated into one action. Id., 158, 161. ACS bears the primary responsibility for child protection in New York City. Id., 158. "In each case of each plaintiff, at least one of the grounds for removal was that the custodial mother had been assaulted by another individual, and had failed to prevent the child from being exposed to that incident of violence." Id., 161. Some of the removals were ordered by the court while others were not. Id.

The <u>Nicholson</u> court found that the plaintiffs' substantive due process challenge

to the ***ex parte removals*** does not present a serious constitutional question. <u>Nicholson</u>,

344 F.3d at 172. "[B]rief removals generally do not rise to level of a substantive due

process violation, at least where the purpose of the removal is to keep the child safe

during the investigation and court confirmation of the basis for the removal." <u>Id.</u> The

<u>Nicholson</u> court relied in part on the decision in <u>Tenenbaum</u> to conclude that brief

removals of children from the custody of their parents do not constitute a substantive

due process violation. <u>Id.</u>

In <u>Tenenbaum v. Williams</u>, discussed in Section III A, supra, the minor

plaintiff, Sarah Tenenbaum, was removed from the custody of her parents for

approximately 7-8 hours.  192 F.3d at 591. The <u>Tenenbaum</u> court concluded that

the "temporary separation of Sarah from her parents did not result in the

Tenenbaums' wholesale relinquishment of their right to raise Sarah. ***The***

***interference was not severe enough to constitute a violation of their***

***substantive due process rights.***" (Emphasis added.) <u>Id.</u>, 601.

> The Tenenbaums ask us to extrapolate . . . a rule that the separation of
> child and parent for a short period of time, no matter what procedural
> protections accompany it, constitutes a violation of the right to family
> integrity. There is no basis for us to do so. It does not follow from the
> principle that brief seizures of people may be unreasonable and
> therefore violate the Fourth Amendment that brief removals of children
> from their parents to protect them from abuse are "without any
> reasonable justification in the service of a legitimate governmental
> objective,". . . under the Due Process Clause.

<u>Id.</u>

In the present case, the defendants removed Anthony Pezzenti from the custody

of his parents for approximately 5-6 hours pending an investigation by DCF. (Exhibits A

& B). While waiting for the DCF social worker to arrive, Anthony Pezzenti sat in the

dispatch room of the police department. (Exhibits A & B; Exhibit D, pp. 59-63; Exhibit E, pp. 10-11; & Exhibit F, p. 24). The dispatch room is separated from the lobby where August Pezzenti, Jr. and Attorney John Maben waited for DCF to arrive and interview Anthony. (Exhibits A & B; Exhibit D, pp. 59-63; Exhibit E pp. 10-11; Exhibit F, p. 24). Mr. Pezzenti admitted that he was able to hold hands with his son through the pass-through area below the glass. (Exhibit D, pp. 59-60). Mr. Pezzenti conceded that he could observe Anthony through the glass while they waited and that Anthony was listening to his CD player. (Exhibit D, pp. 59-63).

Moreover, Mr. Pezzenti admitted Anthony was allowed to sit in the lobby with him for a brief period of time during which they prayed. (Exhibit D, pp. 59-60). While allegedly so interested in being with his child, Mr. Pezzenti admitted that he briefly left the police department to get Anthony's dinner from McDonald's. (Exhibit D, pp. 65-66). Although Mr. Pezzenti was not allowed to sit with his child during the entire time in which they awaited DCF's arrival at the Canton Police Department, the undisputed evidence demonstrates that Mr. Pezzenti was able to observe Anthony the entire time and to briefly speak with him. (Exhibit A; Exhibit D, pp. 59-60). The temporary physical separation of Anthony from his father when his father could see and briefly speak with him does not constitute a "complete deprivation" or "wholesale relinquishment" of Mr. Pezzenti's parental rights. Tenenbaum,193 F.3d at 591.

Scott Harvey, a social worker from the DCF, arrived at the Canton Police Department at approximately 9:20 p.m. (Exhibits A & B). Following an interview of Anthony as well as Mr. and Mrs. Pezzenti, Anthony was released to his parents. (Exhibits A & B; Exhibit C, pp. 38, 41; Exhibit D, pp. 90-91). Thus, Anthony was held in

protective custody for approximately 5-6 hours, which is even less than the eight hours in which Sarah Tenenbaum was temporarily separated from her parents. Tenenbaum, 193 F.3d at 591. As in Tenenbaum, the removal of Anthony from his home and his parents' custody on a temporary basis for a few hours was not severe enough to rise to the level of a substantive due process violation. Id., 601.

Accordingly, the defendants are entitled to summary judgment with respect to Count Three.

> ### ii. The Defendants' Actions Did Not Violate Mr. Pezzenti's Substantive Due Process Right to Familial Association Because They Had a Reasonable and Articulable Suspicion of Child Abuse.

"Recognizing the need for unusual deference in the abuse investigation context, *[the Second Circuit] has held that an investigation will pass constitutional muster provided simply that the case workers have a reasonable basis for their finding of abuse.*" (Emphasis added; internal quotation marks omitted.) Kia P. v. McIntyre, 235 F.3d 749, 758-59 (2d Cir. 2000). "[C]ourts must apply the reasonable basis test to permit investigators considerable discretion in the abuse context. This is in keeping with the basic precept that a mere failure to meet local or professional standards without more should generally not be elevated to the status of a constitutional violation." (Internal quotation marks omitted.) Wilkinson, 182 F.3d at 106.

In Berman v. Young, 291 F.3d 976, 978-79 (7th Cir. 2002), the minor plaintiff, Amanda Hebein, was removed from her home by the Calumet City Police Department (hereinafter "CCPD") after her daycare teacher noticed bruises on Amanda and reported the possible child abuse. The Illinois Department of Children and Family Services (hereinafter "DCFS") placed Amanda with her maternal grandparents, where

she remained "for eight months until a state court ordered her return to her mother and stepfather, Pilar and Norman Berman." Id.

After Amanda and her grandparents left daycare that day, the daycare center telephoned the DCFS hotline to report the bruises on Amanda and to report the suspicion that Norman, Amanda's stepfather, had caused the injuries. Berman, 291, F.3d at 979. At approximately 7:00 p.m. that same evening, two CCPD officers arrived at the Berman residence to investigate the report of possible child abuse. Id. Although Amanda did not appear to be in any pain and had not received any medical treatment for her bruises, "the officers asked Amanda questions about Norman abusing her to which Amanda responded affirmatively." Id. "Within ten minutes, the officers decided to take Amanda into protective custody based on the information from the hotline call, their observation of the bruises, and their conversation with Amanda." Id. DCFS authorized CCPD to place Amanda temporarily with her grandparents and CCPD instructed them not to let Amanda's mother take her home. Id.

Amanda was ultimately returned to her parents after the court determined that Amanda would be safe with them. Berman, 291 F.3d at 981. "In February 1998, DCFS voluntarily entered an order providing that the abuse report against the Bermans was unfounded because it was unclear who was responsible for Amanda's bruises." Id. Subsequently, Amanda and her parents filed a complaint against the CCPD police officers, DCFS workers, and Amanda's maternal grandparents. Id. The complaint alleged, *inter alia*, "a violation of substantive due process rights to family association, family autonomy, family integrity and family privacy." Id., 983.

Specifically, the plaintiffs asserted that the DCFS investigators, Jackie Young and Sandy Threatt, lacked a rational and reasonable basis to continue the separation for over eight months. Id. The Court of Appeals for the Seventh Circuit ultimately held:

> [t]he district court was correct in determining that Young and Threatt had a reasonable basis for their belief that Amanda was being abused and needed to be removed from her home. Young and Threatt reasonably relied on reports from [the day care] workers about the bruises and on the comments Amanda made in response to questioning concerning the bruises. The CCPD officers also documented their observations of the bruises and Amanda's answers to their questions about Norman. . . . Young personally observed the marks on Amanda that would be consistent with prior abuse. ***Given this background, it was reasonable for Young and Threatt to suspect abuse.***

Id., at 984.

The Berman court also noted that "Amanda and Pilar failed to produce evidence creating a genuine issue of fact as to the reasonableness of Young and Threatt's suspicions of abuse." Id.

The facts of the present case are similar to Berman to the extent that the defendants obtained a first-hand account of the alleged abuse from the victim and the defendants observed physical evidence of recent abuse, *i.e.*, Anthony's cut lip. The facts in the present case, however, provide even more support for the defendants' actions because neither Mr. Pezzenti nor Mrs. Pezzenti denied Anthony's allegations. Mrs. Pezzenti admitted that she slapped Anthony twice and that she "tossed" a phone at him and Mr. Pezzenti admitted that he struck Anthony with a belt on his rear end and that it was common for him to discipline his children by hitting them with a belt across their rear end. (Exhibits A & B; Exhibit C, pp. 13-23; Exhibit D, p. 87).

In Berman, the parents denied the allegations of abuse and there were no allegations that the mother had abused Amanda, yet the Berman court still concluded that the DCFS investigators had a reasonable suspicion based mostly on the

statements of a young child, observation of bruises and third-party reports of abuse. Therefore, the evidence in the present case is sufficient to support a finding that the defendants' suspicions of abuse were reasonable and they did not violate Mr. Pezzenti's constitutional rights when they took Anthony Pezzenti into protective custody pending further investigation by the DCF.

The circumstances under which the defendants were called to the Pezzenti's household and the subsequent confirmation of the events that led up to Anthony Pezzenti's phone call to the Canton Police Department demonstrate that there was "definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." Berman, 291 F.3d at 983-84; *See also* Croft v. Westmoreland County Children & Youth, 103 F.3d at 1126.

Accordingly, the defendants are entitled to summary judgment as a matter of law with respect to Count Three.

**C.    THE DOCTRINE OF QUALIFIED IMMUNITY IS A COMPLETE BAR TO THE CLAIMS BROUGHT BY AUGUST AND ANTHONY PEZZENTI IN COUNTS ONE AND THREE.**

**1.    The Doctrine of Qualified Immunity.**

The defense of qualified immunity shields government agents "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." McEvoy v. Spencer, 124 F.3d 92, 97 (2d Cir. 1997), *quoting* Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It is more than just a defense; the doctrine of qualified immunity is an immunity from suit. (Emphasis added.) Locurto v. Safir, 264 F.3d 154, 163 (2d Cir. 2001).

A right is "clearly established" when "[t]he contours of the right [are] . . . sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . [T]he unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987). *See, e.g.* Malley v. Briggs, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly break the law"); Mitchell v. Forsyth, 472 U.S. 511, 528 (1985) (officials are immune unless "the law clearly proscribed the actions they took").

Recently, the Supreme Court has re-emphasized the need to look carefully at the "contours" of the right allegedly violated by a public official when undertaking the qualified immunity analysis. Saucier v. Katz, 533 U.S. 194, 202 (2001). For example, there is no doubt that the case of Graham v. Connor, 490 U.S. 386 (1989), clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet, the Supreme Court has concluded that observation of that general principle is simply not enough when undertaking a qualified immunity analysis.

In Saucier, the Supreme Court reiterated the need for a careful examination of the particular constitutional right alleged to have been violated when considering the defense of qualified immunity. 533 U.S. at 202. Not only should the right itself be identified with a higher degree of specificity, the precise contours of the application of that more specific right to the facts at hand must be made by the district court reviewing a defense of qualified immunity. Id. The Saucier Court reiterated the admonition from Anderson that:

> [t]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense:

The contours of the right must be sufficiently clear that a reasonable
official would understand that what he is doing violates that right.

Saucier, 533 U.S. at 202.

Since the decision in Saucier, the Supreme Court decided Hope v. Pelzer, 536

U.S. 730 (2002), providing additional guidance to litigants and courts examining the

issues within and part of the defense of qualified immunity. In Hope, the Supreme Court

reversed the Court of Appeals for the Eleventh Circuit which had affirmed the district

court's grant of summary judgment based on qualified immunity.

The Supreme Court in Hope rejected the Eleventh Circuit's rule that the test for

the existence of a clearly established right that would allow a public official to

understand the potential wrongfulness of his conduct should be evaluated in light of

federal law that was "pre-existing, obvious and mandatory." *See* Hope, 536 U.S. at 734.

In reversing the Court of Appeals for the Eleventh Circuit, the Supreme Court rejected

the gloss placed on the Saucier analysis for qualified immunity by that Circuit that there

must be reported cases that are "materially similar" before a violation is found. In so

holding, the Supreme Court adopted the "fair warning" standard found in United States

v. Lanier, 520 U.S. 259 (1997) as an additional methodology to evaluate the second

prong of the qualified immunity analysis. In so holding, the Supreme Court emphasized

the need for the detailed, searching and thorough analysis each and every time the

defense based on the doctrine of qualified immunity is raised. The decision in Hope is,

in one sense, a continuation of the Supreme Court's admonition that the most important

part of any qualified immunity decision is the examination of the constitutional right at

issue and "the precise contours of the application of that more specific right to the facts

at hand must be made." Saucier, 533 U.S. 194 at 202. In rejecting the "materially

similar" standard espoused by the Eleventh Circuit, the Court has done nothing more

than demand a high standard – not in pleading or proof – but in the continued, searching, and thorough, step-by-step examination of the defense of qualified immunity in the manner long-established by clear and unequivocal precedent.

Not long after the decision in <u>Hope</u>, the Second Circuit stated:

> Our analysis of a qualified immunity claim consists of a three step inquiry. . . . . First, we must determine whether plaintiff has alleged a violation of a constitutional right. Then we consider if the violated right was clearly established at the time of the conduct. . . . Finally, if plaintiff had a clearly established, constitutionally protected right that was violated by the actions of the [defendants], he or she must demonstrate that defendants' actions were not objectively reasonable. . . . This three step inquiry should typically be done in sequential order.

(Citations omitted.) <u>Harhay v. Town of Ellington, et al.</u>, 323 F.3d 206, 211 (2d Cir. 2003).

This statement of the law succinctly captures just the sort of step-by-step, orderly methodology mandated by twenty years of Supreme Court precedent. Furthermore, this Court recognized that the failure to establish any one step of the analysis grants qualified immunity to the defendant in question. <u>Harhay</u>, 323 F.3d at 211-2. Therefore, before applying the qualified immunity standard, the Court must ask whether there was a constitutional violation in the first instance. *See* <u>Stuto v. Fleishman</u>, 164 F.3d 820, 825 (2d Cir. 1999).

## 2. **<u>Plaintiffs' Claimed Constitutional Rights Are Not Clearly Established.</u>**

### i. *Anthony has not Alleged a Clearly Established Constitutional Right Under The Fourth Amendment.*

The Second Circuit has determined that the "Fourth Amendment applies in the context of the seizure of a child by a government-agency official during a civil child-abuse or maltreatment investigation." <u>Nicholson v. Scoppetta</u>, 344 F.3d at 172. The Second Circuit has not determined, however, whether an *ex-parte* removal of a child

can be justified by probable cause or reasonableness due to special needs or exigent

circumstances. *See* Tenenbaum v. Williams, 193 F.3d at 604.

> In *Tenenbaum*, we declined to decide which of the three modes of
> determining whether a seizure was "reasonable" under the Fourth
> Amendment should apply in cases where the state seizes a child in order
> to prevent abuse or neglect. Whether such a seizure requires probable
> cause, or whether it is subject to a "less stringent reasonableness
> requirement" due to the "special needs" of child protection agencies, or
> whether a seizure must be justified by "exigent circumstances" was
> unnecessary because all three analyses supported our holding that the
> seizure in that case was constitutional.

Kia P. v. McIntyre, 235 F.3d at 762.

"Although it is now clear that the removal of a child indeed constitutes a seizure

under the Fourth Amendment, it is unclear under what circumstances a removal would

violate the Fourth Amendment." Taylor v. Evans, 72 F.Supp.2d 298, 310 (S.D.N.Y

1999).

In Tenenbaum, the court declined to grant summary judgment to the defendants

on the basis that the removal of Sarah from school without her parents' permission and

without a warrant was justified by probable cause, reasonable cause and/or exigent

circumstances. 192 F.3d at 604. The court, however, held that "[q]ualified immunity

protects the individual defendants from liability under the Fourth Amendment for Sarah's

removal." Id.  The court reasoned that there "was no clearly established law under the

Fourth Amendment from which the individual defendants could have concluded that

they did not have probable cause to remove Sarah from [her school] on an emergency

basis." Id.

In the present case, the following facts are undisputed:

- Anthony Pezzenti was taken into protective custody following a
  telephone call to the Canton Police Department in which he stated
  that his mother had hit him. (Exhibits A & B);

25

- Mrs. Pezzenti admitted that she had slapped Anthony twice in the face and "tossed" a phone "toward" him. (Exhibits A & B, Exhibit C, pp. 12-21);

- The defendants also observed a cut on Anthony's lip. (Exhibits A & B);

- Anthony informed the defendants that Mr. Pezzenti recently struck Anthony with a belt ten times on his rear end. (Exhibits A & B).

Based on the foregoing facts, the defendants determined it was in Anthony's best interest to take him into protective custody until DCF had the opportunity to interview him. (Exhibits A & B). The defendants transported Anthony to the Canton Police Department and waited for DCF to arrive and interview Anthony. (Exhibits A & B). Accordingly, there is no factual dispute that Anthony was temporarily removed from his home and taken to the police department based on the defendants' suspicions of abuse and pending further investigation of the matter by DCF.

Although the undisputed facts demonstrate the Anthony was taken into protective custody, it is not clearly established under what circumstances the "seizure" of Anthony during a child abuse investigation would be considered unreasonable because the Second Circuit has not determined whether such seizures can be justified by "probable cause" or "reasonableness" or "exigent circumstances." Furthermore, the law does not establish what set of facts during a child abuse investigation would be insufficient to support a finding of "probable cause" or "reasonableness" or "exigent circumstances." Therefore, at the time that the defendants took Anthony into protective custody pending a further investigation of child abuse by a DCF social worker, Anthony's rights were not clearly established under the Fourth Amendment. The defendants had no reason to conclude that the evidence available to them at the time of the investigation did not support a finding of "probable cause" or "reasonableness" or "exigent circumstances."

Accordingly, the defendants are protected by qualified immunity for their actions and summary judgment should enter in their favor with respect to Count One.

### ii.     August Pezzenti, Jr.'s Right to Familial Association Under the Fourteenth Amendment was not Clearly Established at the Time of the Incidents Alleged in the Complaint.

The undisputed facts of the present case establish that there was no constitutional violation of August Pezzenti's right to familial integrity under the Fourteenth Amendment because the temporary separation of Anthony Pezzenti from his father did not rise to the level of a substantive due process violation or a violation of the First Amendment right to familial association. The defendants are immune from suit for their actions because the right to familial association under the Fourteenth Amendment (or the First Amendment) in the context of a child abuse investigation was not clearly established at the time of incidents alleged in the complaint.[3]

The contours of the substantive due process right to familial association during child abuse investigations have not been clearly established in this circuit or elsewhere.[4]

> [T]he liberty interest in familial relations is limited by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves. . . The need to continually subject the assertion of this abstract due process right to a balancing test, which weighs the

---

[3]It is abundantly clear that any right claimed by August Pezzenti, Jr., under the First amendment is anything but clearly established. It is unclear that August Pezzenti, Jr., has any First Amendment right in this context. *See* Patel v. Searles, 305 F.3d 130 (2d Cir. 2002); Adler v. Pataki, 185 F.3d 35, 41-45 (2d Cir. 1999) (concluding that the First Amendment rights to intimate and familial association under the First Amendment are not authoritatively determined, are complicated and generally best analyzed under the Fourteenth Amendment). See also, Griffin v. Strong, 983 F.2d 1544 (10th Cir. 1993), (rights to familial association are properly founded in the Fourteenth, not First Amendment).

[4]In Tenenbaum, the Second Circuit held that "it is unconstitutional for state officials to effect a child's removal on an emergency basis where there is reasonable time safely to obtain judicial authorization consistent with the child's safety . . ." 193 F.3d 596. This holding, however, only pertained to the plaintiff's' claim that the defendants had violated their Fourteenth Amendment procedural due process right to a pre-deprivation hearing prior to removal of their child from their custody. In the present case, August Pezzenti has not alleged a violation of his procedural due process right to familial association.

interest of the parent against the interests of the child and the state, make the qualified immunity test difficult to overcome. ***Moreover, the requirement that the right be clearly established at the time of the alleged violation is particularly formidable. . . . [I]t is for this reason that many courts have found that, in context of child case workers investigating and bringing child abuse proceedings, there are no 'clearly established' substantive due process rights held by parents.***

(Emphasis added.) <u>Manzano v. South Dakota Dept. of Social Services</u>, 60 F.3d 505, 510 (8th Cir. 1995).

The <u>Manzano</u> court would not go "so far as to say there are no clearly established substantive due process rights held by parents in the context of child abuse investigations. However . . . we did recognize the problem of defining such rights. " <u>Id.</u>, 510. The court also noted that "it is nearly impossible to separate the constitutional violation analysis from the clearly established right analysis." <u>Id.</u>

The Court of Appeals for the Eleventh Circuit has determined that

> ***state officials who act to investigate or to protect children where there are allegations of child abuse almost never act within the contours of clearly established law. . . . Thus, it is no surprise that state officials who investigate allegations of child abuse and in so doing have disrupted a family have been entitled to qualified immunity.***

 (Emphasis added.) <u>Foy v. Holston</u>, 94 F.3d 1528, 1536 (11th Cir. 1996).

Consistent with the decisions in the Eighth and Eleventh Circuit, the Court of Appeals for the Second Circuit has recognized the lack of clearly established law with respect to the substantive due process right to familial association in the context of a child abuse investigation. In <u>Wilkinson Ex Rel. Wilkinson v. Russell</u>, the court stated that

> [c]ase workers cannot be free to substantiate a claim of abuse, for instance, by ignoring overwhelming exculpatory information or by manufacturing false evidence. . . ***The difficulty of balancing the weighty interests apparent in the abuse context, however, has prompted courts to impose few concrete restrictions on case workers, in exercising their discretion, short of these obvious extremes.***

(Citations omitted; emphasis added.) <u>Wilkinson</u>, 182 F.3d at 104.

Although the <u>Wilkinson</u> court concluded that there was no violation of the plaintiffs' substantive due process right to familial association, the court decided to "***undertake a qualified immunity analysis demonstrating the extent to which there has been an absence of clearly established law in this area***." (Emphasis added.) <u>Wilkinson</u>, 182 F.3d at 107. Following its review of the case law, the court recognized that "few if any of [the] opinions provide any clear guidance as to the degree of investigative deficiencies that might rise to the level of a constitutional concern." (Emphasis added.) <u>Id.</u>, 108. The court "attempted . . . to make clear that the reasonable basis test places certain constitutional limitations on caseworkers, *i.e.*, their decisions to declare claims of abuse substantiated must be consistent with some significant portion of their evidence before them." <u>Id.</u>

Therefore, the case law has established that defendants must have a reasonable basis for their suspicion of child abuse prior to removing a child from the custody of his parents; however, the case law has not clearly defined the right so that a defendant would have "fair warning" that his actions were unreasonable and, therefore, in violation of the substantive due process right to familial association.

<u>Tenenbaum v. Williams</u>, 193 F.3d 581 (2d Cir. 1999), is the most analogous case to the present case because it involved the temporary removal of a child from the custody of her parents for approximately 7-8 hours based on allegations of sexual abuse. Based on the minor plaintiff's temporary removal from their custody, the Tenenbaums alleged a violation of their substantive due process right to familial association. With respect to that claim, the court concluded that the "temporary separation of Sarah from her parents did not result in the Tenenbaums' wholesale

relinquishment of their right to raise Sarah. The interference was not severe enough to constitute a violation of their substantive due process rights." Id., 601.

Because the court concluded that there was no constitutional violation of the Tenenbaum's substantive due process right to familial association, the court did not define what would constitute unreasonable or reasonable conduct in the context of a removal of a child from the custody of her parents during a child abuse investigation. Thus, the Tenenbaum court failed to provide any further guidance on what conduct would violate a parent's substantive due process right to familial association.

Other circuit court decisions have also failed to provide significant guidance on what conduct would violate the substantive due process right to familial association in the context of the removal of a child from the custody of his or her parents during a child abuse investigation. There are, however, Seventh Circuit cases that are instructive on this issue and further support the defendants' claim that no clearly established right exists from which they would have had "fair warning" that their conduct was in violation of Mr. Pezzenti's substantive due process right to familial association.

In Berman v. Young, supra, the court concluded that "determining whether the constitutional right was clearly established requires [the court] to conclude that [the defendants] are entitled to qualified immunity." 291 F.3d at 984. The plaintiffs argued that the DCFS investigators failed to conduct an adequate investigation and "assert that their decision to remove Amanda was overbroad given the accusation that only Norman (and not Pilar) abused Amanda." Id. The court held that the "neither the extent of [the DCFS investigators'] obligations, nor the extent of the right to family integrity and

association were so well developed as to place them on notice that their actions were unlawful." Id.

Conversely, when the facts surrounding the removal of children by government actors from their parents' custody are so outrageous, courts have declined to shield the governmental actors from liability with the protection of qualified immunity. One such case, Brokaw v. Mercer City, 235 F.3d 1000 (7th Cir. 2000), declined to dismiss an action against the government officials based on qualified immunity where the minor plaintiffs were forcibly removed from their home and their parents' custody by two unidentified men. Id., 1007. Both the minors and the parents thought the children were being kidnapped. Id. The case also involved "baseless and scurrilous" claims of child abuse against the parents by extended family members who encouraged the father of the minor children to leave his family. Id.

Although the court in Brokaw denied the defendants' motion to dismiss due to the egregious facts and manner in which the children were removed, the court noted that

> [s]everal circuit courts have concluded that because the balance between a child's liberty interest in familial relations and a state's interest in protecting the child is nebulous at best, ***social workers and other state actors who cause a child's removal are entitled to qualified immunity because the alleged constitutional violation will rarely – if ever – be clearly established.***

(Emphasis added.) Brokaw, 235 F.3d at 1023.

> While we agree that that is generally the case . . . some governmental actions are so clearly beyond the pale that a reasonable person should have known of their unconstitutionality even without a closely analogous case. Thus, cases claiming governmental interference with the right of family integrity are properly analyzed by placing them, on a case-by-case basis, along a continuum between the state's clear interest in protecting children and a family's clear interest in privacy. When the facts of the case place it in the center of the continuum where the two interests overlap and create a tension, the right to family integrity may properly be characterized

as nebulous, and thus a defendant may claim the protection of qualified immunity.

Brokaw, 235 F.3d at 1023.

Analyzing the present case along a continuum between reasonable and unreasonable conduct, it is clear that the present case was much more similar to Berman, where the Seventh Circuit determined that the DCFS investigators' obligation and the parents' right to familial association were not so well developed as to place the defendants on notice that there actions were unlawful. The facts of the present case are also clearly distinguishable from the situation in Brokaw. In other words, the defendants' actions were "not so clearly beyond the pale that a reasonable person should known of their unconstitutionality." Id., 1023.

There was no clearly established law from which the defendants could have concluded that the facts known to them at that time did not constitute a reasonable suspicion of abuse and, therefore, violated Mr. Pezzenti's right to familial association. In the absence clearly established rights from which the defendants could have concluded their actions violated Mr. Pezzenti's right to familial association; the defendants are entitled to qualified immunity with respect to Count Three.

>        3.    **The Actions of the Canton Police Were Objectively Reasonable.**

>             i.    ***The Defendants Acted in Accordance with Their Obligation as Mandated Reporters of Suspected Child Abuse Under Connecticut Law.***

In the event that the court concludes that there was a clearly established right under the Fourth Amendment from which the defendants could have concluded that the that their decision to remove Anthony Pezzenti from his home was not justified by probable cause or reasonable cause or exigent circumstances, the defendants would

still be entitled the protection qualified immunity because their actions were objectively reasonable. "The objective reasonableness test is met – and the defendant is entitled to immunity – if officers of reasonable competence could disagree on the legality of the defendant's actions." Tenenbaum v. Williams, 193 F.3d 581, 596 (2d Cir. 1999)

Pursuant to Conn. Gen. Stat. § 17a-101 et seq., the defendants are charged with an obligation to protect children from child abuse.

> The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse, investigation of these reports by a social agency, and provision of services, where needed, to such child and family.

Conn. Gen. Stat. § 17a-101 (a).

As mandated reporters of child abuse under §§ 17a-101 (b) and 17a-101a, the defendants are required to prepare an oral or written report, if they have reasonable cause to suspect a child has been abused or neglected, has sustained non-accidental physical injury or is in imminent risk of harm. General Statutes §§ 17a-101 (b) and 17a-101a.[5]

---

[5]Conn. Gen. Stat. § 17a-101(b) provides in relevant part: "The following persons shall be mandated reporters: . . . police officer. . . ."

Additionally, Conn. Gen. Stat. § 17a-101a provides:

Any mandated reporter, as defined in section 17a-101, who in the ordinary course of such person's employment or profession has reasonable cause to suspect or believe that any child under the age of eighteen years (1) has been abused or neglected, as defined in section 46b-120, (2) has had nonaccidental physical injury, or injury which is at variance with the history given of such injury, inflicted upon such child, or (3) is placed at imminent risk of serious harm, shall report or cause a report to be made in accordance with the provisions of sections 17a-101b to 17a-101d, inclusive. Any person required to report under the provisions of this section who fails to make such report shall be fined not less than five hundred dollars nor more than two thousand five hundred dollars and shall be required to participate in an educational and training program pursuant to subsection (d) of section 17a-101.

Analyzing the defendants' actions in light of their statutory obligation as mandated reporters of child abuse demonstrates that their actions were objectively reasonable and, therefore, did not violate Anthony Pezzenti's Fourth Amendment rights.

In Smart v. Morgillo, Civ. No. 3:00cv1281, slip op, at 1 (D.Conn. July 10, 2001) (copy attached), the defendant, Morgillo, the principal of Quinnipiac Elementary School, contacted DCF and "expressed concern of possible abuse of Marcia Smart by her father, Michael Smart. DCF Social Worker Julie Sitro went to the school to assess the allegation. Id. She conducted interviews with school personnel, Marcia Smart, and Marcia's sister, Mariah. Sitro checked both girls for bruises." Id. Marcia and Mariah's parents sued the defendants on behalf of their daughters, asserting that "Sitro conducted highly unauthorized, highly intrusive strip searches that violated Marcia and Mariah's rights under the Fourth Amendment to the United States Constitution. Plaintiffs assert that neither defendant Morgillo nor Divillio, the school nurse, intervened to prevent these searches." Id.

Although the particular action challenged in Smart is the defendants' failure to prevent a DCF search, the case is instructive because the court concluded that in light of the defendants' obligations as mandated reporters of child abuse under § 17a-101 that the defendants actions were objectively reasonable. Smart v. Morgillo, Civ. No. 3:00cv1281, slip op, at 2 (D.Conn. July 10, 2001)

The minor plaintiff in Smart also reported allegations of child abuse similar to the allegations made by Anthony Pezzenti in the present case. Specifically, "Marcia Smart told Sitro that, whenever she brings home a 'bad note' from school, her father beats her

by hitting her with a belt on her buttocks and legs." <u>Smart v. Morgillo</u>, Civ. No. 3:00cv1281, slip op, at 2-3 (D.Conn. July 10, 2001). The court held that "it is reasonable for a school personnel to refrain from interfering with a DCF's social worker's decision to conduct a non-invasive search for bruises where a child reports that her father beats her." <u>Id.</u>, 2.

In the present case, the challenged action involves the removal of Anthony from the custody of his parents rather than a search of a child for bruises. The present case is similar to <u>Smart</u>, however, in that the defendant officers are mandated reporters of child abuse under § 17a-101 and they, like the <u>Smart</u> defendants, are subject to penalties for failure to report allegations of child abuse. In light of the defendants obligations as mandated reporters and the evidence demonstrating that Anthony's mother had hit him, it was objectively reasonable for the defendants to take Anthony into protective custody pending further investigation by the DCF. The fact that DCF responded so quickly and sent a Social Worker to interview Anthony within hours of the incident also demonstrates that the defendants' actions were objectively reasonable in light of the circumstances.

> ***The question is whether the defendants could be found to have acted with an unreasonable belief that the removal would not violate plaintiffs' rights***. Even with the benefit of all reasonable inferences, it is held that the defendants could not be so found. Further investigation could result in delay during which the described abuse could have continued. . . . The removal prevented repetition, a reasonable likelihood based on what the defendants knew. Defendants were entitled to qualified immunity. ***Their action was "taken to prevent harm" to [the plaintiff]***. Thus, they are insulated from liability for civil damages insofar as their conduct does not violated clearly established statutory or constitutional rights of which a reasonable person would have known.

(Citations omitted; emphasis added.) <u>John Doe v. Conn. Dept. of Child. & Youth Services</u>, 712 F. Supp. 277, 285 (D.Conn. 1989).

In light of the evidence and the facts available to the defendants at the time as well as their obligation as mandated reporters to report suspected child abuse, it was objectively reasonable for them to believe that Anthony should be taken into protective custody pending further investigation and that taking Anthony into custody would not violate his rights under the Fourth Amendment. The defendants were forced to choose between difficult alternatives: (1) remove Anthony Pezzenti from the custody of his parents to protect him from further harm or (2) leave him in the custody of his parents and at risk for further abuse. The defendants erred on the side of caution and should not be held accountable for actions that they believed to be in the best interest of the child.

Accordingly, the defendants are entitled to judgment as matter of law with respect to Count One based on the doctrine of qualified immunity.

> **ii.    The Defendants had Reliable Information to Support a Reasonable Suspicion of Abuse When They Took Anthony Pezzenti Into Protective Custody.**

Should the court conclude that there was a violation of August Pezzenti's substantive due process right to familial association and that there were "clearly established rights" from which the defendants could have determined that their actions violated Mr. Pezzenti's substantive due process right to familial association, the defendants would still be entitled to qualified immunity because there actions were objectively reasonable.

"In cases where the safety of the child is at risk, there are competing liberty interests, and so the parents' rights are not absolute. Based on this principle, we have frequently upheld immunity for state actors who investigate child abuse allegations and take emergency action to protect a child." Suboh v. D.A.'s Office, Suffolk District, 298 F.3d 81, 91 (1st Cir. 2002).

> Protective services caseworkers must choose between difficult alternatives. . . . If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights. ***It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it***.

Tenenbaum, 191 F.3d at 596.

Although Hatch v. Department for Children, 274 F.3d 12 (1st Cir. 2001),[6] addressed a parent's *procedural due process right to familial association*, its holding with respect to whether the actions of the defendant case workers were objectively reasonable is instructive in evaluating the actions of the defendants in the present case despite the fact that a violation of substantive due process rather than procedural due process is alleged.

In Hatch, the court considered whether the caseworker had "reliable information, sufficient to support a reasonable suspicion of abuse, when he removed [a minor, John Doe,] from his father's custody." Hatch, 274 F.3d at 24. The minor reported allegations of child abuse to his school nurse and principal, who then contacted Department for Children, Youth and Families ("DCYF"). Id. The DCYF caseworker determined that John should be taken into protective custody before his father, the Appellant, picked him up from school. Id. The Hatch court reviewed the plaintiff's allegation that his procedural due process right to familial association was violated when the DCYF took his child into temporary custody prior to obtaining a court order.

---

[6]The defendants emphasize that Hatch focused solely on the appellant's procedural due process right to familial association rather than the substantive due process right. Accordingly, the Hatch court's determination that there was a "clearly established right" does not affect this court's decision on whether the law was "clearly established" with respect to substantive due process.

Under the third step of the qualified immunity analysis, the <u>Hatch</u> court determined that Brown's actions were objectively reasonable because he had a reasonable basis for suspecting child abuse.

> When he took custody, Brown knew, at the very least, that two responsible faculty members (the principal and school nurse) took John's claim of abuse seriously; that John had repeated the claim to the police; that he bore marks consistent with his claim; that the boy had expressed fear for his safety should he be forced to return home; that he was complaining of headaches and dizziness; and that a neutral physician, after examining John, had reported that his injuries were consistent with abuse and had placed him under a "physician's hold."

<u>Id</u>., 24-25.

Accordingly, the <u>Hatch</u> court found that the foregoing evidence "was more than sufficient to raise a reasonable suspicion of abuse (and, thus, to justify a temporary assumption of custody)." <u>Id.</u>

The defendants in the present case had similar ample evidence to support a reasonable belief that Anthony was subjected to child abuse.

- Anthony Pezzenti claimed that his mother had hit him and thrown a telephone at him. (Exhibits A & B; Exhibit C, pp. 12-21);

- Mrs. Pezzenti admitted that slapped Anthony twice in the face and "tossed" a phone at him causing a minor cut to his lip. (Exhibits A & B; Exhibit C, pp. 12-21);

- Anthony's cut lip was consistent with the claim that his mother "tossed " a phone at him. (Exhibits A & B);

- Anthony was crying during the police officers investigation at the Pezzenti residence. (Exhibits A & B);

- Anthony reported that one of his parents hit at least one time per week. (Exhibit A);

- Anthony also reported that his father had recently hit him ten times with a belt across his rear end. (Exhibit B);

- Mr. Pezzenti admitted to Sergeant Krupa that it was common for him to discipline Anthony by hitting him with a belt across his rear end. (Exhibit B).

The present case is similar to <u>Hatch</u> in that the cut on Anthony's lip was consistent with his story of what happened. Additionally, during the investigation at the Pezzenti residence following Anthony's phone call to the police department, Anthony met with Officer Capaldo separately from Sergeant Krupa and related the same story to each officer. (Exhibit sA & B). Perhaps even more compelling was the fact that Mrs. Pezzenti did not deny what happened and her story of what happened was consistent with Anthony's version of events. Upon Mr. Pezzenti's arrival at the Canton Police Department after the defendants took Anthony into protective custody, Sergent Krupa informed Mr. Pezzenti that Anthony had reported that Mr. Pezzenti disciplined him with a belt across the rear end. Mr. Pezzenti admitted that he did discipline Anthony in this manner.

Thus, the facts in the present case were not only reported by Anthony Pezzenti but the two individuals suspected of abuse, Mr. and Mrs. Pezzenti, also corroborated them. The defendants, therefore, had no information that would seem to suggest that Anthony was not being truthful or that there was another explanation for the cut on Anthony's lip.

Accordingly, the court should find that the defendants' actions were objectively reasonable because they had a reasonable suspicion of abuse and grant summary judgment in their favor based on the doctrine of qualified immunity.

C.    **PLAINTIFF'S STATE LAW CLAIM FOR THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS IN COUNT TWO FAILS AS MATTER OF LAW BECAUSE THE DEFENDANTS' CONDUCT WAS NOT EXTREME AND OUTRAGEOUS AS A MATTER OF LAW.**

Anthony Pezzenti alleges that the defendants' actions on September 12, 2002, were extreme and outrageous and that they should have known that their conduct would cause him extreme emotional distress.

"Intentional infliction of emotional distress requires a plaintiff to allege (1) [the] defendant intended to inflict emotional distress, or knew or should have known that it was a likely result of its conduct, (2) extreme and outrageous conduct, (3) the conduct caused plaintiff's distress and (4) plaintiff's emotional distress was severe. . . . In order to state a cognizable cause of action, Plaintiff must not only allege each of the four elements, but also must allege facts sufficient to support them." Barton v. City of Bristol, Civil No. 3:02cv1210 (PCD) (D. Conn. 2003).

"Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society." Carrol v. Allstate Ins. Co., 262 Conn. 433, 443 (2003). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. "Generally the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim, Outrageous!" Id.

"*Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine.* . . . Only where reasonable minds disagree does it become an issue for the jury." (Emphasis in original.)

Heim v. California Federal Bank, 78 Conn. App. 351, 365, cert. denied, 266 Conn. 911 (2003). Furthermore, courts of this District have previously held that whether a defendant's conduct can be characterized as "extreme or outrageous" is for determination by the court in the first instance. Kintner v. Nidec-Torin Corp., 662 F.Supp. 112, 114 (D.Conn. 1987); Reed v. Signode Corp., 652 F.Supp. 129, 137 (D.Conn. 1986); Collins v. Gulf Oil Corp., 605 F.Supp. 1519, 1522 (D.Conn. 1985); *See also* RESTATEMENT (SECOND) OF TORTS § 46, comment (h) (1965).

In Carrol, the plaintiff's house caught fire after he inadvertently stored gasoline in his house and the defendant determined that the "fire had resulted from arson and initiated an investigation to determine whether the plaintiff had purposely started the fire. Carrol, 262 Conn. at 436. The defendant also hired two investigators to conduct interviews, collect samples from the premises and examine the scene. Id., 437. While the Caucasian investigators apparently determined that the fire was the result of arson, the investigators also made comments concerning the plaintiff's race which could leave the impression the investigators' report of arson was motivated by the plaintiff's race. The plaintiff filed suit alleging, *inter alia*, intentional infliction of emotional distress. Id.

The Connecticut Supreme Court concluded that "[a]s distressing as this insurance investigation may have been to the plaintiff . . . it simply as not so atrocious as to trigger liability for *intentional* infliction of emotional distress," even when coupled with the racial overtones by the investigators. Id., 444. This is consistent with other state court decisions on the subject. *See*, *e.g.*, Appleton v. Board of Education, 254 Conn. 205 (2000) (no cause of action for intentional infliction of emotional distress where principal made condescending comments to teacher in front of fellow colleagues,

questioned her vision and ability to read, telephoned her daughter and represented that teacher had been acting differently and should take time off work, and then telephoned police, who escorted teacher out of building, and where teacher subjected to psychiatric examinations at request of board of education); Dollard v. Board of Education, 63 Conn. App. 550 (2001) (no cause of action for intentional infliction of emotional distress where board of education examined every detail of psychologist's personal and professional conduct, transferred her to school where she did not wish work, replaced her at school she had been transferred from, and publicly chastised her for chewing gum, being habitually late, and being disorganized. Conduct possibly hurtful and distressful, but not extreme and outrageous.).

As mandated reporters of child abuse under §§ 17a-101 (b) and 17a-101a, the defendants are required to prepare an oral or written report, if they have reasonable cause to suspect a child has been abused or neglected, has sustained non-accidental physical injury or is in imminent risk of harm. In this case, there was objective evidence of recent physical abuse, including evidence of a non-accidental physical injury, *i.e.* the cut on Anthony Pezzenti's lip. Additionally, Anthony had also accused his father of prior physical abuse and, therefore, both parents were suspected of abuse of Anthony. In light of these facts, the defendants were not only attempting to prevent Anthony from the possibility of future harm, but they were also complying with their statutory duty to report suspected abuse to DCF in a timely manner. The defendants' actions on September 12, 2002, with respect to suspected abuse of Anthony Pezzenti were consistent with their duty to protect children from abuse and, therefore, were not extreme and outrageous.

Accordingly, the defendants are entitled to judgment as a matter of law with respect to Count Two of the plaintiffs' complaint because the undisputed facts demonstrate that their actions were not extreme and outrageous.

### D. ALTERNATIVELY, THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION OVER THE STATE LAW CLAIMS

In addition and in the alternative, this Court, having decided that the plaintiff has failed to state valid federal claims or that defendants are protected by qualified immunity and/or granted summary judgment on all federal claims, should decline to exercise jurisdiction over the pendant state law claims, including the state constitutional claims. See United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in the jurisdictional sense, the state claims should be dismissed as well."); Lennon v. Miller, 66 F.3d 416, 426 (2d Cir. 1995) (same).

## IV. CONCLUSION

For all of the foregoing reasons, the defendants' motion for summary should be granted.

THE DEFENDANTS,
JOSEPH CAPALDO and MICHAEL KRUPA

/s/ Melanie A. Dillon
Melanie A. Dillon, ct24786
Thomas R. Gerarde ct05640
HOWD & LUDORF
65 Wethersfield Avenue
Hartford, CT 06114
(860) 249-1361
(860) 249-7665 (Fax)

## **CERTIFICATION**

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via US Mail to the following counsel of record this 27th day of February, 2004.

John R. Williams, Esquire
Williams and Pattis, LLC
51 Elm Street
New Haven, CT 06510

/s/ Melanie A. Dillon
Melanie A. Dillon