UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

AUGUST PEZZENTI, JR.,
INDIVIDUALLY, ET AL.

    Plaintiff, :   NO. 3:03cv419 (MRK)

v.

JOSEPH CAPALDO, ET AL.

    Defendant.

# MEMORANDUM OF DECISION

This is a § 1983 action against two police officers by Plaintiff August Pezzenti Jr., individually and as next friend of his minor son, Anthony Pezzenti, and by his attorney Plaintiff John Mayben. Presently before the Court are Defendants' Motions for Summary Judgment [doc. ## 21, 23]. For the reasons stated below, Defendants' Motions for Summary Judgment are GRANTED.

## I.

The relevant facts are drawn from the parties' pleadings submitted in connection with the pending motions.[1] At all relevant times, the Defendants, Officer Joseph Capaldo and Sergeant

---

[1] These pleadings consist of the following: Plaintiffs' Complaint [doc. #1] ("Compl."); Defendants' Memorandum of Law in Support of Motion for Summary Judgment [doc. #22] ("Defs.' Mem. of Law 1"); Defendants' Local Rule 56(a)1 Statement [doc. #25] ("Defs.' 56(a)1 Statement"); Defendants' Memorandum in Support of Motion for Summary Judgment [doc. #27] ("Defs.' Mem. of Law 2"); Plaintiffs' Brief in Opposition to Motions for Summary Judgment [doc. #31] ("Pls.' Brief"); Plaintiffs' Local Rule 56 Statement [doc. #32] ("Pls.' 56(a)2 Statement"); Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment [doc. #36] ("Defs.' Reply"); Plaintiffs' Supplemental Brief in Opposition to Motions

Michael Krupa, were police officers employed by the Town of Canton, Connecticut. Defendants are sued in their individual capacities only. Defs.' 56(a)1 Statement ¶ 1; Pls.' 56(a)2 Statement ¶ 1.

On September 12, 2002, Plaintiff Anthony Pezzenti ("Anthony"), who was 11 years old at the time, called the Canton Police Department at approximately 4:30 p.m. Defs.' 56(a)1 Statement ¶ 4; Pls.' 56(a)2 Statement ¶ 4. Anthony reported to police that his mother, Elizabeth Pezzenti, had just hit him in the face and thrown a telephone at him. Defs.' 56(a)1 Statement ¶ 5; Pls.' 56(a)2 Statement ¶ 5. The call was transferred to Officer Capaldo, who promptly responded to the call, along with Sergeant Krupa, by visiting the Pezzenti residence to investigate the matter. Defs.' 56(a)1 Statement ¶¶ 6-7; Pls.' 56(a)2 Statement ¶¶ 6-7.

Mrs. Pezzenti met the officers at the front door, and Officer Capaldo spoke with Mrs. Pezzenti about the incident while Sergeant Krupa spoke with Anthony. Anthony told Sergeant Krupa that he and his mother had argued and that she had slapped him twice in the face. Defs.' 56(a)1 Statement ¶ 8; Pls.' 56(a)2 Statement ¶ 8. Anthony also said that he told Mrs. Pezzenti that he was going to call the police because she had hit him and that Ms. Pezzenti had then thrown the telephone toward Anthony, causing a cut to his upper lip. *Id.* Mrs. Pezzenti admitted to Officer Capaldo that she and Anthony had been arguing and that she had slapped him twice. Defs.' 56(a)1 Statement ¶¶ 13-14; Pls.' 56(a)2 Statement ¶¶ 13-14. Sergeant Krupa observed the cut to Anthony's upper lip. Defs.' 56(a)1 Statement ¶ 8; Pls.' 56(a)2 Statement ¶ 8.

Sergeant Krupa asked Anthony about his family life and whether he got along with his parents. Anthony stated that his parents routinely hit him as a form of punishment and that he

---

for Summary Judgment [doc. #39] ("Pls.' Supp. Brief.").

-2-

was struck by one of his parents at least one time per week. Defs.' 56(a)1 statement ¶¶ 11,16; Pls.' 56(a)2 Statement ¶¶ 11, 16. Officer Capaldo also spoke with Anthony, who told Officer Capaldo several times that he did not want to get hit anymore. Defs.' 56(a)1 Statement ¶ 15; Pls.' 56(a)2 Statement ¶ 15. Office Capaldo also observed Anthony's cut lip. Defs.' 56(a)1 Statement ¶ 15; Pls.' 56(a)2 Statement ¶ 15. Anthony stated that his father strikes him with a belt occasionally. When asked if he was afraid to be at home, Anthony stated, "No, I just don't want to get hit anymore." Defs.' 56(a)1 Statement ¶ 16; Pls.' 56(a)2 Statement ¶ 16. Mrs. Pezzenti told the officers that she had no idea when Mr. Pezzenti would be home but that it would probably be late. Defs.' 56(a)1 Statement ¶ 17; Pls.' 56(a)2 Statement ¶ 17.

Sergeant Krupa and Officer Capaldo then decided to remove Anthony from his home and take him into protective custody until the State of Connecticut Department of Children and Families ("DCF") could interview Anthony. Defs.' 56(a)1 Statement ¶ 18; Pls.' 56(a)2 Statement ¶ 18. After explaining this to Mrs. Pezzenti, Sergeant Krupa and Officer Capaldo took Anthony to the Canton Police Department to await an interview with a DCF caseworker.

Mrs. Pezzenti notified her husband August Pezzenti, Jr., that Anthony has been taken to the police station, and upon learning this, Mr. Pezzenti drove to the Canton Police Department. See August Pezzenti Dep. [doc. #25, Ex. D] at 52. Shortly after Mr. Pezzenti reached the police station,[2] Sergeant Krupa and Officer Capaldo arrived with Anthony. Id. at 53. Sergeant Krupa

---

[2] As Defendants have noted, there is some ambiguity as to precisely when Mr. Pezzenti and Anthony Pezzenti arrived at the police station. See Defs.' Reply at 3-4. Plaintiffs admitted to Defendants' version of the facts in their Rule 56(a)2 Statement, which would place Anthony's call to the police at about 4:30 p.m. See Defs' 56(s)1 Statement ¶ 4; Pls.' 56(a)2 Statement ¶ 4. However Mr. Pezzenti's deposition testimony, also cited by the Plaintiffs in their Rule 56(a)2 Statement, indicates that Anthony called the police prior to 3:30 p.m, and that Mr. Pezzenti arrived at the station by 4:30 p.m. See August Pezzenti Dep. [doc. #25, Ex. D] at 52 . In any

told Mr. Pezzenti of Anthony's complaint and that DCF had been contacted. Mr. Pezzenti told Sergeant Krupa that it was common for him to strike Anthony with a belt across his rear end. Defs.' 56(a)1 Statement ¶ 21; Pls.' 56(a)2 Statement ¶ 21. Mr. Pezzenti also saw Anthony's cut lip at the police department. *See* August Pezzenti Dep. [doc. #25, Ex. D] at 100. Mr. Pezzenti asked to speak with Anthony, but Sergeant Krupa told Mr. Pezzenti that they were not going to do anything until a DCF representative arrived and interviewed Anthony. Defs.' 56(a)1 Statement ¶ 20; Pls.' 56(a)2 Statement ¶ 20. Anthony remained in the dispatch area listening to his compact disc player along with Dispatcher Judy Lockwood. Defs.' 56(a)1 Statement ¶ 19; Pls.' 56(a)2 Statement ¶ 19.

On the day of the incident, Mr. Pezzenti retained John Mayben to represent Anthony. Defs.' 56(a)1 Statement ¶ 23; Pls.' 56(a)2 Statement ¶ 23. Mr. Mayben had previously represented Mr. Pezzenti in divorce proceeding and in connection with real estate transactions. Defs.' 56(a)1 Statement ¶ 26; Pls.' 56(a)2 Statement ¶ 26. Mr. Mayben came to the police station and informed Sergeant Krupa that he was there to represent Anthony and wanted to speak with his client. Mr. Mayben also told Sergeant Krupa that he had represented Mr. Pezzenti previously. Sergeant Krupa informed Mr. Mayben that no one would speak to Anthony until DCF arrived, and the Sergeant asked Mr. Mayben to wait in the lobby. Defs.' 56(a)1 Statement ¶ 23; Pls.' 56(a)2 Statement ¶ 23.

Anthony waited in the dispatch area until DCF arrived and while he waited, both Mr. Mayben and Mr. Pezzenti could see Anthony. Defs.' 56(a)1 Statement ¶ 30; Pls.' 56(a)2 Statement ¶ 30. At around 8:30 p.m., Mr. Pezzenti got Anthony dinner from McDonald's.

---

event, for purposes of this motion, the precise timing is irrelevant.

-4-

Anthony was not interrogated, interviewed or asked to sign a statement by police while he was at the Police headquarters. Defs.' 56(a)1 Statement ¶ 31; Pls.' 56(a)2 Statement ¶ 31.

Scott Harvey, a social worker with DCF, did not arrive at the Canton Police Department until after 9:00 p.m. to conduct an interview with Anthony. Mr. Harvey privately interviewed Anthony for approximately 20 minutes. He then spoke with Mr. and Mrs. Pezzenti separately (Mr. Pezzenti had previously gone to pick up Mrs. Pezzenti and bring her down to police headquarters). Defs.' 56(a)1 Statement ¶ 33; Pls.' 56(a)2 Statement ¶ 33. Mr. Harvey decided that Anthony could return to his home that evening and advised Mr. and Mrs. Pezzenti to discuss another form of discipline other than spanking. Defs.' 56(a)1 Statement ¶ 34; Pls.' 56(a)2 Statement ¶ 34.

Officer Capaldo informed Mrs. Pezzenti that he would be preparing a warrant for her arrest, and he applied for an arrest warrant on September 13, 2002, for Breach of Peace. Defs.' 56(a)1 Statement ¶¶ 35-36; Pls.' 56(a)2 Statement ¶¶ 35-36. On October 2, 2002, Mrs. Pezzenti turned herself in after being advised of an active warrant for her arrest and a court date was set for October 3, 2002. Defs.' 56(a)1 Statement ¶ 37; Pls.' 56(a)2 Statement ¶ 37. Attorney Peter Soulsby represented Mrs. Pezzenti at the time of her with respect to her arrest, and he was allowed to enter the Canton Police Department with his client when she surrendered for her arrest. Defs.' 56(a)1 Statement ¶ 41; Pls.' 56(a)2 Statement ¶ 41. On October 3, 2002, the Connecticut Superior Court issued a Family Violence Protective Order, directing Mrs. Pezzenti to refrain from imposing any restraint on the personal liberty on Anthony, to refrain from threatening, harassing, assaulting, molesting, or sexually assaulting Anthony, and to comply with the recommendations made by DCF. Defs.' 56(a)1 Statement ¶ 38; Pls.' 56(a)2 Statement ¶ 38.

Mr. Pezzenti paid Mr. Mayben $800 for his services on September 12, 2002 in connection with his representation of Anthony, even though Mr. Mayben was unable to meet with Anthony prior to the DCF interview. Defs.' 56(a)1 statement ¶ 39; Pls.' 56(a)2 Statement ¶ 39. Mr. Mayben continued to represent Anthony at follow up interviews with DCF. Mr. Mayben received payment from Mr. Pezzenti for those services as well. Defs.' 56(a)1 Statement ¶ 40; Pls.' 56(a)2 Statement ¶ 40.

## II.

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(b). A genuine issue of fact exists when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome if the substantive law renders them so. *Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, the party opposing summary judgment "may not rest upon mere allegations or denials," rather the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The Court must draw all ambiguities and inferences in favor of the plaintiffs. *See Andersen*, 477 U.S. at 255. However, to defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment

may be granted." *Andersen,* 477 U.S. at 249-50.

### III.

Mr. Pezzenti sued Defendants in his own right and as next friend of his minor son. Mr. Pezzenti's sole claim against Defendants in his own right is for violation of his substantive due process right to family association. However, at oral argument and in a supplemental pleading,[3] Mr. Pezzenti conceded that the Second Circuit's decision in *Tenenbaum v. Williams,* 193 F.3d 581 (2d Cir. 1999), *cert. denied,* 529 U.S. 1098 (2000) "control[s] this case" and thus forecloses his substantive due process claim. As the Second Circuit held in *Tenenbaum,* "[t]here is no basis for us to hold that a temporary separation of [a minor child] from her parents in an effort to obtain assurance that she had not been abused would have been so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Id.* at 600. Accordingly, the Court grants Defendants' judgment on Mr. Pezzenti's substantive due process claim.

Mr. Pezzenti's claims against Defendants as next friend of his minor son Anthony are for falsely arresting Anthony in violation of the Fourth Amendment and for intentional infliction of emotional distress under state law.

**False Arrest.** Defendants conceded at oral argument that their removal of Anthony from his home constituted a custodial seizure that should be analyzed under the Fourth Amendment. It is also undisputed that Defendants removed Anthony from his home without a court order. Additionally, at oral argument, Defendants conceded that for the purposes of this motion, the Court should assume that Defendants acted without consent of his parents.

---

[3] Pls.' Supp. Brief. [doc.# 39].

Therefore, the only issue is whether the seizure was nonetheless permissible under the Fourth Amendment. The Second Circuit has declined to delineate the precise analytical framework for determining when removal of a minor child "of whom abuse is suspected" is justified. *See Tenenbaum*, 193 F.2d at 604. Specifically, the Second Circuit has refrained from deciding categorically "whether such a seizure requires probable cause, or whether it is subject to a 'less stringent reasonableness requirement' due to the 'special needs' of child protection agencies, or whether a seizure must be justified by 'exigent circumstances.' " *Kia P. v. McIntyre*, 235 F.3d 749, 762 (2d Cir. 2000) (citing *Tenenbaum*, 193 F.3d at 603-05). In this case, the Court concludes on the basis of the undisputed facts that Defendants' actions were justified under any of the analytical frameworks discussed by the Second Circuit.

"In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). The Second Circuit tailored this standard to fit the child abuse context in *Tenenbaum* as follows: "If the information possessed by [government actors] would have warranted a person of reasonable caution in the belief that [the child] was subject to danger of abuse if not removed [from the premises] before court authorization could reasonably have been obtained" then there was probable cause to remove the child without a court order. *See* 193 F.2d at 604.

The undisputed facts show that this standard was met in this case. Defendants visited the Pezzenti home in response to a 911 call made by 11-year old Anthony himself. Defs.' 56(a)1 Statement ¶ 4; Pls. 56(a)2 Statement ¶ 4. It is also undisputed that when Defendants arrived at

-8-

Anthony's home, they observed his freshly wounded lip and that they were told by Mrs. Pezzenti that she had slapped Anthony twice across the face and had thrown a telephone at him. Defs.' 56(a)1 Statement ¶¶ 8, 12; Pls.' 56(a)2 Statement ¶¶ 8, 12. Anthony told Defendants, "I just don't want to get hit anymore" and that he was struck by one of his parents at least once a week. Defs.' 56(a) ¶ 9; Pls.' 56(a)2 Statement ¶ 9.

The police officers were faced with a child who had just been injured and was sufficiently afraid of his personal well being to have dialed 911 and summon the police to his home to confront his own mother. The officers were also told that the child was hit by his parents at least once per week and that the child did want to be hit anymore. Based on the undisputed facts, a person of reasonable caution would have been warranted in the belief that Anthony was subject to abuse if he was not removed from his home before a court order was obtained.[4]

Having determined that Defendants had probable cause to remove Anthony, the Court also finds that Defendants' actions meet the "less stringent reasonableness requirement due to the special needs of child protection agencies." *See, e.g., Kia P.*, 235 F.3d at 762. Furthermore, as *Tenenbaum* explains, "it is core Fourth Amendment doctrine that a seizure without consent or a warrant is a 'reasonable seizure' if it is justified by exigent circumstances." *Tenenbaum*, 193 F.3d at 604 (citations omitted). The Second Circuit has held:

> Where information possessed by a state officer would warrant a person of

---

[4] In *Tenenbaum*, there was a day or more delay between the time that the government actors obtained information regarding abuse and the time of removal. In those circumstances, the Second Circuit concluded that a reasonable jury could have concluded that the defendants should have obtained a court order during that delay. Here, plaintiffs argue that police could have obtained a court order within the nearly five hours that elapsed before DCF arrived to interview Anthony. The Court is unpersuaded. The record does not reveal that the officers knew how long DCF would be delayed.

> reasonable caution in the belief that a child is subject to the danger of abuse if not removed from school before court authorization can reasonably be obtained, the "exigent circumstances" doctrine too permits removal of the child without a warrant equivalent and without parental consent.

*Id.* at 605 (citing *Hurlman*, 927 F.2d at 80). Because probable cause, reasonable cause and exigent circumstances justified Anthony's immediate removal from the Pezzenti home pending evaluation by DCF, his removal complied with Fourth Amendment requirements despite the absence of a court order or consent. *Tenenbaum*, 193 F.3d at 605.

In any event, the Court concludes that the doctrine of qualified immunity shields Defendants from liability in the circumstances of this case. "The qualified immunity doctrine protects government officials from suits seeking to impose personal liability for money damages based on unsettled rights or on conduct that was not objectively unreasonable." *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998). Government officials "enjoy qualified immunity when the perform discretionary functions if either (1) their conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that [their] acts did not violate these clearly established rights." *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998) (internal quotation marks and citations omitted); *see Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) ("the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause; 'arguable probable cause' will suffice to confer qualified immunity for the arrest").

Defendants conceded at oral argument that after *Tenenbaum*, application of Fourth Amendment standards in the child-abuse context is clearly established. Therefore, Defendants assert qualified immunity solely on the ground that their actions were objectively reasonable on the basis of the undisputed facts. The Court agrees with Defendants. In reaching this

-10-

conclusion, the Court is guided by the Second Circuit's statement emphasizing "the importance of the availability of qualified immunity where child welfare workers are seeking to protect children from abuse. If caseworkers of 'a reasonable competence could disagree on the legality of [a] defendant['s] actions' their behavior is protected." *Tenenbaum*, 193 F.3d at 605 (citing *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995)). As Judge Newman has pointed out, government actors, such as the Defendants in this case, must often choose between difficult alternatives:

> If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights. It is precisely the function of qualified immunity to protect state official in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it.

*Van Emrik v. Chemung County Dep't of Soc. Servs.*, 911 F.2d 863, 866 (2d Cir. 1990) (footnote omitted) (quoted in *Tenenbaum*, 193 F.3d at 596); *see also Defore v. Premore*, 86 F.3d 48, 50 (2d Cir. 1996) ( the defense of qualified immunity is important to insure that publicly employed caseworkers have adequate latitude to exercise their professional judgment in matters of child welfare).

On the basis of the undisputed facts discussed above, this Court concludes that at a bare minimum, caseworkers -- or as in this case, police officers -- of reasonable competence could disagree on the legality of the Defendants' actions. At worst, Defendants may have acted out of an abundance of caution in removing Anthony from his home and placing him in protective custody until he could be interviewed by a case worker from DCF. As in *Van Emrik*, "[t]he issue is whether it was objectively reasonable for the defendants to make the decision they made and no rational jury could find that it was not." 911 F.2d at 866. Accordingly, the Court grants

-11-

Defendants' motion for summary judgment on Plaintiff's Fourth Amendment claim for false arrest.

**Intentional Infliction of Emotional Distress.**  At this point, Anthony Pezzenti has no remaining federal claims in this case over which this Court has original jurisdiction. "Under 28 U.S.C. § 1367(c)(3), district courts 'may decline to exercise supplemental jurisdiction over a claim under [§ 1367(a)] if the district court has dismissed all claims over which it has original jurisdiction.' " *Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 105 (2d Cir. 1998).

While a district court has discretion to exercise supplemental jurisdiction even when all federal claims have been dismissed, *see Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir.1994), "[i]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Castellano v. Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

In this case, the Court does not find that considerations of judicial economy, convenience, fairness, and comity weigh in favor of exercising supplemental jurisdiction over Anthony Pezzenti's state law claim for intentional infliction of emotional distress, particularly since, as explained below, the Court has also decided to grant Defendants judgment on all of the federal claims of the only other remaining plaintiff. Therefore, the Court dismisses without prejudice the remaining state law cause of action. *See Barnes v. CCH Corp. Sys.*, No. 01 Civ. 2575 (AKH),

2004 WL 1516791, at *8 (S.D.N.Y. July 7, 2004) (dismissing state law claims after summary judgment granted on all federal claims); *see also Braheney v. Town of Wallingford*, No. 300CV2468 (CFD), 2004 WL 721834, at *6 (D. Conn. Mar. 30, 2004) (declining to exercise supplemental jurisdiction over plaintiff's state law claims after court dismissed as a matter of law all federal claims over which it had original jurisdiction).

## IV.

Mr. Mayben claims that Defendants violated his First and Fourteenth Amendments rights when they denied him the opportunity to speak with his client Anthony Pezzenti while Anthony was in protective custody on September 12.

**Right To Practice One's Profession.** Mr. Mayben first asserts that Defendants denied him his right to practice his profession in violation of both the First and Fourteenth Amendments. However, that right is properly analyzed under the Fourteenth Amendment, not the First Amendment. *See Lange-Kessler v. Dep't of Educ. of N.Y.*, 109 F.3d 137, 140 (2d Cir. 1997) ("The right to follow a chosen profession is a property interest protected by the Fifth and Fourteenth Amendments.") (citing *Greene v. McElroy*, 360 U.S. 474, 492 (1959)); *Ulichny v. Merton Cmty. Sch. Dist.*, 249 F.3d 686, 704 (7th Cir. 2001). While the First Amendment supports a right of expressive association, Mr. Mayben did not plead an expressive association claim in his complaint. *See* Compl. Therefore, Mr. Mayben has asserted no viable First Amendment claim.

As for Mr. Mayben's claim that he was denied the right to practice his profession in violation of the Fourteenth Amendment, the Supreme Court explained in *Conn v. Gabbert*, 526 U.S. 286 (1999), that the "due process right to choose one's field of private employment" protects

-13-

only "complete prohibition[s] of the right to engage in a calling," and not "brief interruption[s]." *Id.* at 291-92; *see also Rodriguez v. Margotta*, 71 F. Supp. 2d 289, 296 (S.D.N.Y. 1999) ("It is well settled that one must have no ability to practice one's profession at all in order to state a claim for deprivation of a liberty interest."). Therefore, "[s]tate actions that exclude a person from one particular job are not actionable in suits. . .brought directly under the due process clause." *Piecknick v. Commonwealth*, 36 F.3d 1250, 1259 (3d Cir. 1994).

Mr. Mayben bases his claim of a violation of his right to practice his profession on a five-hour period, on a single day, September 12, 2002, during which Defendants refused to allow Mr. Mayben to speak with Anthony prior to a DCF caseworker interviewing Anthony. *Gabbert* also dealt with a lawyer's inability to confer with his client. In that case, government officials executed a search warrant on attorney Paul Gabbert while Mr. Gabbert and his client, Traci Baker, were waiting outside the grand jury room for Ms. Baker's scheduled grand jury appearance. *Gabbert v. Conn*, 131 F.3d 793, 798-99 (9th Cir. 1997), *rev'd,* 526 U.S. 286 (1999). Moments after the search warrant was executed, the district attorney called Ms. Baker before the grand jury to testify. Ms. Baker tried to consult with Mr. Gabbert twice during the course of her testimony, but she was unable to speak with him because he was being searched at that time. *Id.* The Supreme Court held that this disruption of the attorney's ability to counsel his client amounted only to a "brief interruption" and did not rise to the level of preventing the attorney from practicing his profession in violation of the Fourteenth Amendment. *Gabbert*, 526 U.S. at 292-93.

Although the five hours during which Defendants prevented Mr. Mayben from speaking with Anthony was longer than the period of time involved in *Gabbert*, the Court is nonetheless

-14-

convinced that this case also involves only a "brief interruption" and that the Defendants' actions certainly did not rise to the level of preventing Mr. Mayben from practicing his profession. It is undisputed that despite Mr. Mayben's inability to speak with Anthony at the police station on September 12, Mr. Mayben was paid $800 for his services that evening and that he continued to represent Anthony with respect to follow up interviews by DCF. *See* Defs.' 56(a)1 Statement ¶ 40; Pls.' 56(a)2 Statement ¶ 40. Furthermore, Mr. Mayben does not claim that he was forced to forgo a higher fee as a result of the Defendants' actions. Thus, in this case, Mr. Mayben was not even prevented from pursuing a particular assignment on behalf of a client, much less his chosen occupation. On the basis of these undisputed facts, the Court cannot agree that Mr. Mayben was prevented from practicing his profession. Therefore, the Court grants Defendants judgment on Mr. Mayben's claim that he was denied the right to practice his profession in violation of the Constitution.

**Equal Protection.** Mr. Mayben next claims that Defendants "intentionally, knowingly, and irrationally" treated him differently from other attorneys seeking to meet with clients at Canton Police Headquarters, thereby violating his Fourteenth Amendment right to equal protection of the laws, under the "class of one" theory approved in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). In order to succeed on a "class of one" equal protection claim, a plaintiff must allege "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564.[5]

---

[5] The Second Circuit has declined to decide whether a showing of malice or bad faith is necessary to state a valid "class of one" equal protection claim. *See, e.g., Giordano v. New York*, 274 F.2d 740, 751 (2d Cir. 2001); *Harlen Assoc. v. Village of Mineola*, 273 F.3d 494, 500 (2d Cir. 2001). This Court need not resolve that issue in this case because Mr. Mayben's equal protection claim fails even if no showing of animus is required.

-15-

Mr. Mayben points to Mr. Soulsby, an attorney representing Mrs. Pezzenti, as his sole example of a similarly situated person whom Defendants treated differently. However, Mr. Mayben's situation – as an attorney attempting to speak with a minor being held in protective custody – is not at all similar to that of Mr. Soulsby – who was representing an adult arriving to voluntarily surrender herself on an arrest warrant. "If no other similarly situated individuals exist, then plaintiffs have no claim for equal protection." *Tuchman v. Connecticut*, 185 F. Supp.2d 169, 173 (D. Conn. 2002).

In any event, even if the two attorneys were similarly situated – and they are not – the Court agrees with Defendants that on the basis of the undisputed facts there was a rational basis for treating Mr. Mayben differently from Mr. Soulsby. There are "profound differences between arrest and protective custody, and between the treatment of children taken into protective custody and adults arrested on suspicion of a crime." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 350 (4th Cir. 1994). Unlike an arrest, "[c]ustody is assumed not to be a preliminary step to punishment, but as a measure intended to avert impending and serious danger to the innocent child." *Id.* In light of the different purposes served by arrest and protective custody, it was entirely rational for Defendants to require Mr. Mayben to wait until Anthony had spoken to a DCF representative.

This was particularly true since Mr. Mayben had been hired by Mr. Pezzenti, who at the time was suspected of abusing Anthony. *See* Krupa Aff. ¶ 41 [doc. #25, Ex. B]. Furthermore, Mr. Mayben had also represented Mr. Pezzenti in the past, and therefore may well have owed his allegiance to Mr. Pezzenti. Defs.' 56(a)1 Statement ¶ 25; Pls.' 56(a)2 Statement ¶ 25. While Mr. Mayben correctly points out that the police department does not have the authority to determine when an attorney has a conflict of interest, he fails to appreciate that police are responsible for

protecting a possible victim of child abuse. In light of this responsibility, Defendants rightly wanted Anthony to speak to DCF before speaking with an attorney who had a prior affiliation with Mr. Pezzenti. Accordingly, the Court grants judgment to Defendants on Mr. Mayben's Equal Protection claim.

## VI. CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment [**doc. ##21, 23**] are GRANTED and judgment should enter in favor of Defendants and against Plaintiffs on all federal claims. The Court declines to exercise supplemental jurisdiction over Mr. Pezzenti's state law claims against Defendant asserted on behalf of his minor son, on the ground that the Court has dismissed all federal law claims. Accordingly, the Court dismisses the state claims as against both Defendants without prejudice to renewal in state court.

The Clerk is directed to close this file.

IT IS SO ORDERED.

_____
Mark R. Kravitz
United States District Judge

Dated at New Haven, Connecticut: September 23, 2004.